Amy P. Lally (SBN 198555)
alally@sidley.com
SIDLEY AUSTIN LLP
1999 Avenue of the Stars 17th Floor
Los Angeles, CA 90067
Telephone: (310) 595-9500
Facsimile: (310) 595-9501

Jonathan F. Cohn (*pro hac vice*)
jfcohn@sidley.com
Joshua J. Fougere (*pro hac vice*)
jfougere@sidley.com
SIDLEY AUSTIN LLP
1501 K Street, NW
Washington, DC 20005
Telephone: (202) 736-8000
Facsimile: (202) 736-8711

Morgan Branch (*pro hac vice*)
mbranch@sidley.com
SIDLEY AUSTIN LLP
One South Dearborn
Chicago, IL 60603
Telephone: (312) 853-7000
Facsimile: (312) 853-7036

*Attorneys for Defendants*
*Bayer HealthCare LLC and*
*Bayer Corporation*

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

CAMILLE CABRERA, individually and on behalf of all others similarly situated,

Plaintiff,

vs.

BAYER HEALTHCARE LLC and BAYER CORPORATION,

Defendants.

Case No. 2:17-cv-08525 JAK (JPRx)

**DECLARATION OF AMY P. LALLY IN SUPPORT OF DEFENDANTS' SUBMISSION FOR THE JOINT STIPULATION RE: DEFENDANTS' MOTION TO COMPEL AND OTHER RELIEF**

**DISCOVERY MATTER**

Hearing Date: January 2, 2020
Hearing Time: 10:00am
Hon. Jean P. Rosenbluth
Courtroom: 690, 6th Floor

Fact Discovery Cut Off: May 20, 2019
Pre-Trial Conference Date: N/A
Trial Date: N/A

I, Amy P. Lally, declare and state as follows:

1. I am an attorney at law duly licensed and entitled to practice in the State of California appearing in the above captioned matter. I am a partner at Sidley Austin LLP ("Sidley"), and acting counsel of record appearing on behalf of Defendants Bayer Corporation and Bayer HealthCare LLC (collectively, "Bayer"). The facts set forth in this declaration are within my personal knowledge, and, if called as a witness, I could and would competently testify as follows:

2. I am making this Declaration in support of the Joint Stipulation Re: Defendants' Motion to Compel pursuant to Local Rules 37-2, the Court's Standing Order for Civil Cases, and the rules and procedures of the Hon. Jean P. Rosenbluth.

3. I have reviewed the relevant documents, including the Court's most recent Scheduling Order. *See* Dkt. No. 75.

4. True and correct copies of the Court's orders establishing the case schedule are attached hereto as **Exhibits A-E**.

5. The Court has not yet ruled on the Parties' joint stipulation requesting an extension of the briefing schedule for class certification. *See* Dkt. 80.

6. On May 29, 2019, the first named plaintiff in this matter, Ms. Camille Cabrera ("Ms. Cabera"), sat for deposition. True and correct copies of relevant excerpts from Ms. Cabrera's deposition transcript that are referenced in the Joint Stipulation Re: Motion to Compel are attached hereto as **Exhibit F.**

7. Among other things, Ms. Cabrera elicited sworn testimony that was materially different than her verified discovery responses, including her responses to Defendants' second set of Interrogatories, which were served on Ms. Cabrera on December 13, 2018. A true and correct copy of Ms. Cabrera's Responses to Defendants' second set of Interrogatories is attached hereto as **Exhibit G**.

8. Ms. Cabrera's deposition raised serious concerns with Defendants about whether there was a good faith basis to proceed with this litigation, and Defendants notified Plaintiff's counsel of their concerns on June 4, 2019. A true and correct copy

of this correspondence is attached hereto as **Exhibit H**.

9. On June 12, 2019, Plaintiff's counsel informed Defendants that Ms. Cabrera would amend her discovery responses in response to Defendants' objections. A true and correct copy of this correspondence is attached hereto as **Exhibit I**.

10. Instead, Plaintiff's counsel chose to substitute Ms. Cabrera after representing that Ms. Cabrera no longer wished to serve as a class representative. *See* Decl. of B. Heikali (Dkt. 73-1).

11. Defendants agreed to Ms. Cabrera's replacement after assurances from Plaintiff's counsel that the new proposed plaintiff, Ms. Sonnetta Woods ("Ms. Woods"), was prepared to move forward with discovery and produce documents at any time.

12. On September 11, 2019, the Court GRANTED the Parties' Joint Stipulation For Substitution of Named Plaintiff and Revised Scheduling Order. *See* Dkt. No. 75.

13. Pursuant to the September 11, 2019 Order, Ms. Woods was named as the class representative. *See* Dkt. No. 75.

14. Pursuant to the September 11, 2019 Order, the Court also established amended deadlines for filing the First Amended Complaint, Serving Written Discovery on Ms. Woods, filing a Responsive Pleading to the First Amended Complaint, Responding to Defendants' Written Discovery, taking Plaintiff Woods's Deposition, and completing Expert Discovery. *Id.*

15. On September 16, 2019, Ms. Woods filed the First Amended Complaint. *See* Dkt. No. 76.

16. On September 16, 2019, Defendants served Written Discovery requests on Plaintiff Woods, including Interrogatories and Requests for Production.

17. On October 7, 2019, Defendants filed their Answer to the First Amended Complaint. *See* Dkt. No. 77.

18. On October 16, 2019, Ms. Woods served her responses to Defendants'

Interrogatories and Requests for Production.

19. The Parties met and conferred between October 18 and October 22, by phone and email, to discuss Defendants' various objections to Ms. Woods's initial responses to Defendants' Interrogatories and Requests for Production.

20. On October 21, 2019, Plaintiff's counsel informed Defendants that Ms. Woods's then-production of a single document was the only document responsive to Defendants' Requests for Production. A true and correct copy of this correspondence is attached hereto as **Exhibit P**.

21. On October 24, 2019, Ms. Woods served her Supplemental Responses to Defendants' Interrogatories. A true and correct copy of Ms. Woods's Supplemental Responses to Bayer's Interrogatories is attached hereto as **Exhibit J**.

22. Attached hereto as **Exhibit K** is a true and correct copy of Ms. Woods's responses to Defendants' Requests for Production.

23. On November 19, 2019, Defendants' took Ms. Woods's deposition at the Los Angeles Airport Marriott located at 5855 West Century Boulevard, Los Angeles, California, 90045. A true and correct copy of Ms. Woods's deposition transcript in condensed format is attached hereto as **Exhibit L**.

24. After Ms. Woods's deposition, the Parties met and conferred between November 20, 2019 and December 4, 2019, including by phone, email, and letter, to discuss Defendants' objections to Ms. Woods's conduct in discovery.

25. Specifically, Defendants alerted Plaintiff's counsel of their concerns following Ms. Woods's deposition, during which she revealed that her responses to Defendants' Interrogatories 4, 5, 6, 7, 8, and 9 were incomplete, and that documents had not been produced in response to Requests for Production 1, 4, 7, and 8.

26. Defendants also objected to Plaintiff counsel's objections throughout Ms. Woods's deposition hundreds of times.

27. On November 22, 2019, Defendants delivered a letter to Plaintiff's counsel requesting a pre-filing conference to discuss each of Defendants' discovery

requests in dispute, in accordance with Local Rule 37-1.

28. On November 25, 2019, Plaintiff's counsel delivered a response letter to Defendants.

29. Attached as **Exhibit M** is a true and correct copy of WOODS_0000029.

30. Attached as **Exhibit N** is a true and correct copy of WOODS_0000031.

31. Attached as **Exhibit O** is a true and correct copy of WOOOD_0000035.

32. Attached as **Exhibit P** is a true and correct copy of an email from Morgan Branch to Benjamin Heikali on October 23, 2019.

33. The Parties were able to resolve some, but not all, of Defendants' discovery objections, and Defendants' now respectfully seek this Court's intervention.

34. The Parties' Joint Stipulation for Motion to Compel will not alter the Court's trial schedule, which has not been set.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Dated: December 6, 2019

SIDLEY AUSTIN LLP

By: */s/ Amy P. Lally*

Amy P. Lally (SBN 198555)
alally@sidley.com
1999 Avenue of the Stars 17th Floor
Los Angeles, CA 90067
Telephone: 310.595.9500
Facsimile: 310.595.9501

*Attorneys for Defendants Bayer Corporation, and Bayer HealthCare LLC*

# Exhibit A

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

CAMILLE CABRERA, individual and on behalf of all others similarly situated

Plaintiff,

vs.

BAYER HEALTHCARE LLC and BAYER CORPORATION,

Defendants.

Case No. 2:17-c-08525 JAK (JPRx)

**ORDER GRANTING IN PART STIPULATION FOR SUBSTITUTION OF NAMED PLAINTIFF AND REVISED SCHEDULING ORDER (DKT. 73)**

Based on a review of the parties' joint stipulation, certain good cause has been shown for a continuance of certain scheduled dates in light of the plan to have a new named plaintiff appear. Therefore, the relief sought through the Stipulation is **GRANTED IN PART** as follows:

1. The named Plaintiff in the above-captioned matter is hereby substituted pursuant the following terms and conditions:

   a. Ms. Cabrera's individual claims in the above-referenced action are hereby dismissed with prejudice pursuant to Fed. R. Civ. P. 42(a)(1)(A)(ii).

   b. Bayer is deemed to be the prevailing party on Ms. Cabrera's individual claims. The Parties shall coordinate payment of costs to Bayer for Ms. Cabrera's deposition transcript, with all rights to additional costs reserved pending the outcome of the case.

   c. The certified deposition transcript for Ms. Cabrera is deemed admissible under Fed. R. Civ. P. 32(a)(1), subject to all timely and properly raised objections. The certified deposition transcript for Ms. Cabrera is also deemed admissible evidence for purposes of Summary Judgment under Fed. R. Civ. P. 56, and as evidence with respect to Class Certification under Rule 23, subject to all timely and properly raised objections. The Parties reserve the right to raise all objections not waived at the deposition, including but not limited to relevance.

   d. Plaintiff Sonnetta Woods is substituted as the new named Plaintiff. Plaintiff shall file an Amended Complaint that substitutes Plaintiff Woods and her claims for Ms. Cabrera and her claims.

2. The Scheduling Order (Dkt. 59, as modified by Dkts. 71, 74) is amended. Because this action has been pending since November 22, 2017, and there is very limited additional discovery to which the parties have stipulated, the briefing schedule

for the motion for class certification sets dates that are earlier than those proposed by the parties in their stipulation.

| Event | Current Date | Continued Date |
|---|---|---|
| Deadline to File Amended Complaint | Not applicable | September 16, 2019 |
| Deadline for Serving Written Discovery on Plaintiff Woods | Not applicable | September 16, 2019 |
| Deadline for Bayer's Response to Amended Complaint | Not applicable | October 7, 2019 |
| Deadline for Plaintiff Woods' Responses to Written Discovery | Not applicable | 30 days after service of written discovery |
| Production of Responsive Documents by Bayer as to Plaintiff Woods | Not applicable | October 16, 2019 |
| Deadline for Deposition of Plaintiff Woods | Not applicable | November 15, 2019 |
| Rebuttal Expert Disclosures | July 8, 2019 | December 6, 2019 |
| Post Mediation Status Conference | December 16, 2019, at 1:30 p.m. | December 16, 2019 at 11:30 am |
| Deadline to File Motion for Class Certification | September 27, 2019 | January 6, 2020 |
| Expert Discovery Cut-Off | August 19, 2019 | January 17, 2020 |
| Deadline to File Opposition to Motion | October 21, 2019 | January 27, 2020 |

| | | |
|---|---|---|
| for Class Certification | | |
| Last Day to File All Motions Other than Motion for Class Certification | September 27, 2019 | February 3, 2020 |
| Deadline to File Reply to Motion for Class Certification | November 4, 2019 | February 10, 2020 |
| Hearing on Motion for Class Certification | December 16, 2019 at 8:30 a.m. | February 24, 2020 at 8:30 a.m. |
| Deadline to File Opposition to Motion for Summary Judgment | October 21, 2019 | March 2, 2020 |
| Deadline to File Reply to Motion for Summary Judgment | November 4, 2019 | March 16, 2020 |
| Hearing on Motion for Summary Judgment | December 16, 2019 at 8:30 a.m. | March 30, 2020 at 8:30 a.m. |

IT IS SO ORDERED.

Dated: September 11, 2019

JOHN A. KRONSTADT
UNITED STATES DISTRICT JUDGE

# Exhibit B

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

CAMILLE CABRERA, individual and on behalf of all others similarly situated

Plaintiff,

vs.

BAYER HEALTHCARE LLC and BAYER CORPORATION,

Defendants.

Case No. 2:17-cv-08525 JAK (JPRx)

**ORDER RE STIPULATION FOR REVISED SCHEDULING ORDER (DKT. 57) / AMENDED SCHEDULING ORDER**

Upon consideration of Plaintiff Camille Cabrera's ("Plaintiff") and Defendants Bayer Healthcare LLC and Bayer Corporation's ("Defendants") (collectively, the "Parties") Joint Stipulation for Revised Scheduling Order ("Stipulation" (Dkt. 57)), and for good cause shown, the Stipulation is **APPROVED.** The case schedule is modified as follows:

| | |
|---|---|
| May 20, 2019: | Non-Expert Discovery Cut-Off |
| May 30, 2019: | Last day to participate in a settlement conference/mediation |
| June 10, 2019: | Initial Expert Disclosures |
| July 8, 2019: | Rebuttal Expert Disclosures |
| August 12, 2019: | Last day to file notice of settlement / joint report re settlement |
| August 19, 2019: | Expert Discovery Cut-Off |
| September 9, 2019, at 1:30 p.m.: | Post Mediation Status Conference |
| September 27, 2019: | Last day to file All Motions |
| October 21, 2019: | Deadline to File Oppositions to Motion for |

| | |
|---|---|
| | Summary Judgment and/or Motion for Class Certification |
| November 4, 2019: | Deadline to File Replies to Motion for Summary Judgment and/or Motion for Class Certification |
| December 2, 2019, at 8:30 a.m.: | Hearing on Motion for Summary Judgment and/or Motion for Class Certification |

IT IS SO ORDERED.

Dated: February 22, 2019

JOHN A. KRONSTADT
UNITED STATES DISTRICT JUDGE

# Exhibit C

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| CAMILLE CABRERA, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>BAYER HEALTHCARE LLC and BAYER CORPORATION,<br><br>Defendants. | Case No. 2:17-cv-08525 JAK (JPRx)<br><br>**ORDER RE JOINT STIPULATION FOR REVISED SCHEDULING ORDER (DKT. 52)** |

Having considered the Joint Stipulation for a Revised Scheduling Order ("Stipulation" (Dkt. 52)), filed by Plaintiff, Camille Cabrera, and Defendants, Bayer Healthcare LLC and Bayer Corporation, and good cause appearing, the Stipulation is **GRANTED.**

The Revised Scheduling Order (Dkt. 47) is amended as follows:

- Non-Expert Discovery Cut-Off – **March 19, 2019**
- Initial Expert Disclosures – **April 11, 2019**
- Rebuttal Expert Disclosures – **May 9, 2019**
- Last day to participate in a settlement conference/mediation – **May 30, 2019**
- Last day to file notice of settlement / joint report re settlement – **June 13, 2019**
- Expert Discovery Cut-Off – **June 20, 2019**
- Post Mediation Status Conference – **July 8, 2019, 8:30 AM**
- Last day to file All Motions – **July 29, 2019**
- Deadline to file response to motion for summary judgment and/or motion for class certification – **August 22, 2019**
- Deadline to file reply to motion for summary judgment and/or motion for class certification – **September 5, 2019**
- Hearing on motion for summary judgment and/or motion for class certification – **September 30, 2019 at 8:30 AM**

Absent extraordinary circumstances, no further extensions will be granted.

IT IS SO ORDERED

Date: November 5, 2018

JOHN A. KRONSTADT
UNITED STATES DISTRICT JUDGE

# Exhibit D

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

CAMILLE CABRERA, individually and on behalf of all others similarly situated,

Plaintiff,

vs.

BAYER HEALTHCARE LLC and BAYER CORPORATION,

Defendants.

Case No. 2:17-cv-08525 JAK (JPRx)

**ORDER RE JOINT STIPULATION FOR REVISED SCHEDULING ORDER**

Upon consideration of Defendant Bayer Healthcare LLC and Defendant Bayer Corporation's (collectively, "Defendants"), and Plaintiff Camille Cabrera ("Plaintiff"), jointly referred to as the parties ("Parties"), Joint Stipulation for A Revised Scheduling Order and for good cause shown, the Court hereby **GRANTS** the Stipulation and orders as follows:

The Scheduling Order in the above-captioned matter is revised as follows:

- Non-Expert Discovery cut-off – December 19, 2018
- Initial Expert disclosures – January 11, 2019
- Rebuttal expert disclosures – February 8, 2019
- Last day to participate in a settlement conference/mediation – March 1, 2019
- Last day to file notice of settlement / joint report re settlement – March 15, 2019
- Expert Discovery Cut-Off – March 22, 2019
- Post Mediation Status Conference – April 8, 2019 at 1:30 pm
- Last day to file All Motions – April 29, 2019
- Deadline to file response to motion for summary judgment and/or motion for class certification – May 24, 2019
- Deadline to file reply to motion for summary judgment and/or motion for class certification – June 7, 2019
- Hearing on motion for summary judgment and/or motion for class certification – July 1, 2019 at 8:30 am

**IT IS SO ORDERED.**

Dated: July 13, 2018

JOHN A. KRONSTADT
UNITED STATES DISTRICT JUDGE

# Exhibit E

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No. LA CV17-08525 JAK (JPRx) Date March 19, 2018

Title Camille Cabrera v. Bayer Healthcare, LLC, et al.

Present: The Honorable JOHN A. KRONSTADT, UNITED STATES DISTRICT JUDGE

| Andrea Keifer | Alex Joko |
|---|---|
| Deputy Clerk | Court Reporter / Recorder |
| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
| Benjamin Heikali<br>Joshua Nassir | Amy P. Lally<br>Joshua J. Fougere |

**Proceedings:** **SCHEDULING CONFERENCE**

The scheduling conference is held. The Court confers with counsel regarding the status of the case. The Court has reviewed the parties' March 12, 2018, Joint Report and sets the following deadlines:

| | |
|---|---|
| Closed: | Last day to amend or add parties |
| April 12, 2018: | Counsel shall agree on a private neutral by April 9, 2018. If an agreement is not reached, counsel shall file a joint report by April 12, 2018, with each party to include three proposed nominees with a resume and hourly rate for each. The Court will select one from the proposed nominees. |
| September 17, 2018: | Non-Expert Discovery Cut-Off |
| October 22, 2018: | Initial Expert Disclosures |
| November 30, 2018: | Rebuttal Expert Disclosures |
| December 21, 2018: | Last day to participate in a settlement conference/mediation |
| January 4, 2019: | Last day to file notice of settlement / joint report re settlement |
| January 7, 2019: | Expert Discovery Cut-Off |
| January 14, 2019 at 1:30 p.m.: | Post Mediation Status Conference |
| January 21, 2019: | Last day to file All Motions *(including discovery motions, motion for summary judgment and/or motion for class certification)* |
| February 18, 2019: | Deadline to file response to motion for summary judgment |

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| | | | |
|---|---|---|---|
| Case No. | LA CV17-08525 JAK (JPRx) | Date | March 19, 2018 |
| Title | Camille Cabrera v. Bayer Healthcare, LLC, et al. | | |

| | |
|---|---|
| | and/or motion for class certification |
| March 4, 2019: | Deadline to file reply to motion for summary judgment and/or motion for class certification |
| March 25, 2019 at 8:30 a.m.: | Hearing on motion for summary judgment and/or motion for class certification |

The parties will be invited to submit proposed dates for the final pretrial conference and trial, if necessary, upon the Court's final ruling on the motions. The trial estimate will be set at the final pretrial conference.

The Court grants the parties' request to participate in a settlement conference with a private neutral. The parties are ordered to have a representative with authority to make final decisions as to this matter present at the settlement conference. If a settlement is reached, the parties are ordered to file a notice of settlement, with a proposed date by which the matter will be dismissed. No appearance will be required on January 14, 2019, if such notice is filed on or before January 4, 2019. If a notice of settlement is not filed, counsel shall file a joint report by January 4, 2019, regarding the status of settlement and whether a second session would be productive. The joint report shall not disclose the substantive contents of any settlement communications between the parties.

**IT IS SO ORDERED.**

: 17

Initials of Preparer ak

# Exhibit F

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CAMILLE CABRERA, individually and on behalf of all others similarly situated,

Plaintiff,

vs.

BAYER HEALTHCARE, LLC and BAYER CORPORATION,

Defendants.

Case No. 2:17-cv-08525 JAK (JPRx)

VIDEOTAPED DEPOSITION OF CAMILLE CABRERA
Los Angeles, California
Wednesday, May 29, 2019
Volume I

(ATTORNEYS' EYES ONLY UNDER PROTECTIVE ORDER)

Stenographically Reported by:
AMANDA J. KALLAS
CSR No. 13901
Job No. 3403865
PAGES 1 - 308

A I bought both of them there.
Q Okay. But when you say you always buy them, do you mean you always buy Flintstones Gummies Complete at the Target versus elsewhere?
A Yes.
Q Okay.
A That's where I first bought them.
Q Okay. How many times have you bought Flintstones Gummies Complete?
A Just that one. One time.
Q Okay. So when you say I always buy them there --
A I always buy my -- all my vitamins there, like just regular.
Q Okay. You buy all of your vitamins at the Target?
A (No audible response.)
Q Other than the Flintstones Gummies, what other vitamins have you bought at Target?
A Just like a daily, for myself.
Q Okay. A daily multivitamin?
A Uh-huh.
Q Okay. Which daily multivitamin do you take?
A I don't take it anymore. I always forget to take them. But I'm -- let me see, Nature's

something. Nature's something. Best or Nature's... by Nature's Best or something.
Q Okay. And is -- what kind of vitamin is it?
A I used to take the vitamin D. I take the Melatonin. I take the fiber. I take -- just those. And I bought the Centrum.
Q So just to clarify, the Melatonin, the fiber, are these separate products?
A Uh-huh.
Q Okay. So you buy and take these separate vitamin products?
A (No audible response.)
Yes.
Q Okay. And what about a -- specifically a multivitamin? Do you take a multivitamin?
A The Centrum.
Q You take the Centrum.
Do you currently take the Centrum?
A Not right now.
Q Okay. How long have you taken the Centrum?
A Off and on, when I remember.
Q When did you first start taking it?
A A couple years ago.
Q And what prompted you to start taking the Centrum multivitamin?

said, "it has everything I need"?
A Yes.
Q Okay. Why would you think that it has all of the vitamins?
A I don't know what it said on there, but it was a multivitamin, I -- at that time, I was feeling tired a lot.
Q Okay.
A So I figured I'd start taking vitamins again.
Q Okay. So you mentioned that you don't know if it has B12, so it doesn't have all Bs; correct?
A Yes.
Q Okay. Correct, it doesn't have all Bs?
A It doesn't, yes.
Q All right. You also mentioned that you took OAD at one point.
(Reporter requested clarification.)
MS. BRANCH: One A Day, I'm sorry.
THE WITNESS: Yes.
BY MS. BRANCH:
Q Okay. And what does One A Day have in it?
A Iron -- I think I was taking One A Day because it had iron. And I remember my doctor was saying, do I take iron, because my blood -- I guess I was anemic at the time, so I guess he said I

needed more iron.
Q Okay. What else did it have in it?
A I don't know. At that time, all I cared about was the iron.
Q Okay. So -- okay. So you don't know what else it had in it, other than iron?
A No.
Q Okay. So back to the Centrum, other than -- are there any other vitamins that the Centrum product doesn't have?
A No.
Q Okay. Okay. So the fiber product that you mentioned, what's in that?
A I don't know what's in that. It's -- I just take the fiber. I have no idea what's in it.
Q Okay. Did -- have you ever read the label to see what's in it?
A No.
Q Okay.
A It's just --
Q And --
A It just works.
Q Okay. You take it, it works, so you keep buying it?
A Yes.

Q Okay. And what about the prenatal? What does it have in it?

A It -- it has higher dose -- higher amounts of, like -- it has all the vitamins I needed, while I was pregnant, to get -- if I wasn't eating right or anything like that. Because I was sick a lot, I didn't want to eat most of the time. And then when I didn't eat the vitamins, still made me sick. Because you need them with food, just with the --

Q So --

A I took them because I needed -- I took them because I needed iron, I needed the vitamins. I was really sick.

Q How did you know that the prenatal vitamin that you were taking had everything you needed for your pregnancy?

A Because the doctor gave me the prescription and told me that this is what I need.

Q Okay. So you did talk to your doctor about multivitamins?

A Just about my prenatal.

Q Okay. Any other conversations you've had with doctors about vitamins?

A No, just the prenatal.

Q Okay. But you said earlier you've never

talken -- spoken to a doctor?
A I just forgot about the prenatal.
Q Okay. All right. And what was in the prenatal?
A It was a full vitamin, complete vitamin. And it had iron.
Q Okay. But what was in the prenatal, other than iron?
A Just vitamins.
Q Do you know which ones?
A No, I just --
Q Okay.
A -- assumed it would be everything I would need while I was pregnant.
Q Okay. You assumed it would have everything you need because your doctor told you?
A Yes.
Q Okay. Okay. I'd like to just go ahead and mark as Exhibit 3, the second bottle that Ms. Cabrera brought with her today under the notice.
(Exhibit 3 was marked for identification.)
MS. BRANCH: It's the Flintstones Complete Chewable.
//

actual requests?
A No.
Q Okay. And did anybody ask you to search for documents relevant to the case?
A No.
Q Ben didn't ask you to search for documents?
A He asked me to search for receipts.
Q Did he ask you to search for anything else?
A No.
Q Okay. So he only asked you to search for receipts.
Do you have a Flintstones file at home?
A No.
Q Okay. Did Ben ask you whether you had any documents or communications about multivitamins?
MR. HEIKALI: I'm going to -- again, I'm going to object based on attorney/client privilege.
And to the extent you can answer that without divulging any privileged communications, you can try to answer.
THE WITNESS: What was the question?
BY MS. BRANCH:
Q I said, were you ever asked by anyone, Ben or otherwise, to search for documents or communications related to multivitamin?

A Yes.
Q You were?
A Just the receipts.
Q Just the receipts.
What about communications?
A No.
Q Okay. Were you asked by anyone to search your internet browsing history for anything related to multivitamins?
A No.
Q Were you asked by Ben or anyone else about your social media accounts?
A No.
Q Do you have any social media accounts?
A Yes.
Q Which ones?
A Instagram, Facebook.
Q Okay. So you have a Facebook?
A Yes.
Q And you have an Instagram?
A Yes.
Q Any other social media accounts?
A Snapchat.
Q So you have a Snapchat.
A Yes.

A Like ten years.
Q Okay. And do you have a laptop?
A No.
Q Okay. What about a tablet?
A Yes.
Q Okay. What kind of tablet?
A A Galaxy View.
Q Okay. Any other tablets?
A A Kindle.
Q Okay. What about a smartphone?
A Android, yes.
Q An Android?
A Yes.
Q How long have you had an Android?
A Since they came out. I don't know, I've always had an Android.
Q Okay. And has your -- has anyone ever asked you to preserve anything on your laptop or preserve anything on your phone --
A No.
Q -- related to this case?
A No.
Q Has anybody asked you to preserve any paper documents related to this case?
A No.

Q What about products related to the case? Did -- were you ever asked to preserve it?
A Did -- the vitamins?
Q Correct.
A No.
Q Okay. Any other documents you were asked to preserve by anybody?
A No.
Q Okay. So going back to your electronics, how long have you had an Android?
A Since Androids came out. Which is -- I don't know, I've always had an Android.
Q Okay.
A Since phones came out with Androids.
Q And do you have the ability to access the internet on your Android?
A Yes.
Q And your tablet?
A Yes.
Q And your computer?
A Yes.
Q Okay. And I think we discussed this earlier, but have you ever Googled anything about multivitamins? Other than the product that you found that was your boyfriend's?

(At 1:05 p.m., the deposition of Camille Cabrera was reconvened.)

THE VIDEOGRAPHER: We are back on the record. The time is 1:05 p.m.

BY MS. BRANCH:

Q Ready?

A Yes.

Q Ms. Cabrera, while we were at lunch, did you discuss the deposition with your attorney?

A Yes.

Q What did you guys talk about?

MR. HEIKALI: I'm going to object. That based on attorney/client --

Based on attorney/client privilege, I'm going to instruct you not to answer.

(Witness instructed not to answer.)

MS. BRANCH: For a break during a deposition --

MR. HEIKALI: Yeah.

MS. BRANCH: -- you're asserting privilege?

MR. HEIKALI: Yup.

I'm instructing you not to answer, but --

THE WITNESS: I'm sorry.

MR. HEIKALI: Did you want her to ask the question again?

THE WITNESS: Oh, go ahead. Ask me.
BY MS. BRANCH:
Q What did you and your lawyer talk about on a break during the deposition, about the deposition?
MR. HEIKALI: Again, I'm going to object based on attorney/client privilege.
And instruct you not to answer.
(Witness instructed not to answer.)
THE WITNESS: Okay. No.
BY MS. BRANCH:
Q Did he give you any instructions on how you're doing during the deposition?
MR. HEIKALI: Same -- same objection.
BY MS. BRANCH:
Q During the break, did Ben coach you at all about how you were doing during the deposition?
MR. HEIKALI: Same objection.
BY MS. BRANCH:
Q I'm not asking about the substance of your conversations. I'm asking if he coached you.
MR. HEIKALI: Objection. Vague as to what the word "coaching" means.
BY MS. BRANCH:
Q Did he provide feedback on how you're doing during the deposition?

MR. HEIKALI: Same objection.
To -- to the extent you can answer that question without disclosing what we actually said, you can go ahead and answer.
THE WITNESS: Some feedback.
BY MS. BRANCH:
Q Okay. Did he coach you?
MR. HEIKALI: Objection. Vague.
You could --
THE WITNESS: No.
BY MS. BRANCH:
Q Your testimony is no, he did not coach you over the break?
A (No audible response.)
Q Did he tell you how to answer certain questions?
MR. HEIKALI: Objection. Attorney/client privilege.
Instruct you not to answer.
(Witness instructed not to answer.)
BY MS. BRANCH:
Q I'm not asking you the substance of what he might have told you to say, but did he tell you how to answer certain questions?
MR. HEIKALI: One second.

the bottle around to look at the label when you purchased it, knowing now what the bottle says, you could have turned it around and seen that it did not contain vitamins B1, B2, B3, and vitamin K; correct?
A Correct.
Q You could have turned it around, like Pilar did, and read the label?
A Yes.
Q But you didn't?
A I didn't.
Q Okay. And why didn't -- why didn't you?
A Because it says "complete" and "complete" on the front.
Q Is there any other reason why?
A No, just says "complete vitamins," should say -- be all the same.
Q You think --
A I --
(Simultaneous speaking.)
THE REPORTER: Excuse me.
BY MS. BRANCH:
Q Sorry, were you saying that you think all vitamins should be the same?
A No. I just thought they were complete vitamins for kids. I didn't need to buy something

The time is 3:00 p.m.
BY MS. BRANCH:
Q Ready?
A Yes.
Q So Ms. Cabrera, I want to go back to some of your testimony. Earlier, we were discussing your knowledge of some of the B vitamins. You testified earlier that you knew of the existence of B1 before purchasing the product; correct?
A Correct.
Q And you knew the -- of the existence of B2 when you purchased the product?
A Correct.
Q You knew of the existence of B3 before purchasing the product?
A Correct.
Q And you knew of the existence of vitamin K; correct?
A Correct.
Q And you knew about all of these vitamins before you bought the Flintstones Gummies?
A Correct.
Q Okay. And you know -- and earlier, we've looked at the label a few times, and you know now that the supplemental facts section lists all of the

vitamins and minerals that are in the product; correct?

A Correct.

Q And you know, by looking at the product, that it does not have vitamins B1, B2, B3, and vitamin K?

MR. HEIKALI: Can you -- can you repeat the question? Sorry.

BY MS. BRANCH:

Q Sure.

I said, and in looking at the label now, we can see that the supplemental facts section does not list vitamins B1, B2, B3, and vitamin K; correct?

A Correct.

Q And you would have known that had you turned the bottle around, as you testified, and read the supplemental facts section?

A Correct.

Q Now, earlier, you said that one of the reasons why you didn't turn it around is because of the "complete," that -- that was your former testimony.

A Yes.

Q But that's not right, is it?

A Excuse me?

Q So earlier, you also testified that you've

bought multivitamins in the past; correct?
A Yes.
Q You've bought Centrum?
A Yes.
Q And you did not read the back of the label when you bought Centrum.
A No.
Q You bought fiber.
A Yes.
Q You did not read the back of the label when you bought fiber.
A Yes.
Q You've bought AOD or One A Day --
A (No audible response.)
Q -- correct?
A Yes.
Q And you did not read the back of the label before you bought One A Day.
A Yes.
Q And you've bought Melatonin products; correct?
A Yes.
Q And you did not read the back of the label when you purchased the Melatonin products?
A Just to see how many grams of Melatonin were

there.

Q Okay. But you did not read the ingredients?

A No.

Q And you said earlier that sometimes you'll look at the back of the label if it's a beauty product; correct?

A Yes.

Q And that's the only time you'll look at the back of the label?

A Yes.

Q So here, you didn't treat the Flintstones Gummies product any differently, you did not read the back of the label here either; correct?

A Correct.

Q Okay. So just like with other products that you've bought, it had nothing to do with the "complete" word that caused you not to turn the bottle around and look at the back of the label; correct?

A Correct.

Q Okay. Now, I want to go back to -- I want to go back to Exhibits 8 and 9, which are the L'il Critters complete multivitamin and the Disney complete multivitamin.

Did you see these in the store on the day you

# Exhibit G

DocuSign Envelope ID: D773ED5E-FDAC-41B4-8C48-1E99D449C39B

**FARUQI & FARUQI, LLP**
Benjamin Heikali (SBN 307466)
bheikali@faruqilaw.com
Joshua Nassir (SBN 318344)
jnassir@faruqilaw.com
10866 Wilshire Boulevard, Suite 1470
Los Angeles, California 90024
Telephone: 424.256.2884
Facsimile: 424.256.2885

*Attorneys for Plaintiff Camille Cabrera*

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| CAMILLE CABRERA, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>BAYER HEALTHCARE LLC and BAYER CORPORATION,<br>Defendants. | Case No. 2:17-cv-08525 JAK (JPRx)<br><br>**PLAINTIFF'S RESPONSES TO DEFENDANTS BAYER HEALTHCARE LLC AND BAYER CORPORATION'S SECOND SET OF INTERROGATORIES**<br><br>Hon. John A. Kronstadt<br>Courtroom 10B |

| | |
|---|---|
| PROPOUNDING PARTY: | DEFENDANTS BAYER HEALTHCARE LLC AND BAYER CORPORATION |
| RESPONDING PARTY: | PLAINTIFF CAMILLE CABRERA |
| SET NO. | TWO |

Plaintiff Camille Cabrera ("Plaintiff") hereby responds Defendants Bayer Healthcare LLC and Bayer Corporation's ("Defendants") Second Set of Interrogatories as follows:

**PRELIMINARY STATEMENT**

These responses reflect the results of Plaintiff's diligent and reasonable efforts to respond to Defendants' Second Set of Interrogatories, based on the investigation Plaintiff has thus far been able to conduct. Discovery and investigation of this case is ongoing, and the following responses are given without prejudice to Plaintiff's right to amend, modify or supplement these responses and/or assert additional objections as this litigation continues and as additional information becomes available to her.

Plaintiff does not waive: (1) any objections as to the admissibility of, competency of, relevancy of, materiality of, or privilege attaching to any information provided; or (2) the right to object to other discovery requests or undertakings involving or relating to the subject matter of the Interrogatories herein. An objection or answer in response to Defendants' Interrogatories in no way constitutes or should be construed as an admission with respect to the relevance or admissibility of any response.

**GENERAL OBJECTIONS**

1. Plaintiff objects to each Interrogatory to the extent that it calls for information that is equally available to Defendant through public documents or other documents in its possession, custody, or control.

2. Plaintiff objects to each Interrogatory to the extent that it calls for any

DocuSign Envelope ID: D773ED5E-FDAC-41B4-8C48-1E99D449C39B

information that is protected by the attorney-client privilege, the attorney work product doctrine, or any other lawfully recognized privilege or immunity from disclosure, and to the extent it purports to impose requirements beyond those of the Federal Rules of Civil Procedure.

3. Plaintiff objects to each Interrogatory to the extent that it seeks information protected by Plaintiff's constitutional, statutory, and common law rights of privacy.

4. Plaintiff objects to each Interrogatory to the extent that it is not relevant to any party's claims or defenses, and seeks information which is not reasonably calculated to lead to the discovery of admissible evidence.

5. Plaintiff objects to Defendants' definitions and instructions to the Interrogatories to the extent that they are inconsistent with, or enlarge upon, obligations imposed upon Plaintiff by the Federal Rules of Civil Procedure, applicable Court orders, and/or agreements between the Parties. In the event that any portion of the Instructions conflicts with the applicable rules of civil procedure or attempts to impose requirements beyond those imposed by the applicable rules, the applicable rules and their requirements shall prevail.

6. Plaintiff objects to the definitions of the terms "you" or "your", and Interrogatories relying on those terms, as overly broad and unduly burdensome, and to the extent such definitions purport to impose any burden or obligation in excess of the requirements of the Federal Rules of Civil Procedure, or applicable court orders, including by purporting to seek responses from non-parties or based upon documents outside of Plaintiff's possession, custody or control. Plaintiff further objects to the extent the definition of these terms purports to include counsel representing Plaintiff, as such definition is overbroad and implicates information protected by the attorney work-product doctrine and the attorney-client privilege. All objections and responses herein are propounded on behalf of Camille Cabrera, and the term "you" is understood in Plaintiff's responses to refer to Camille Cabrera.

DocuSign Envelope ID: D773ED5E-FDAC-41B4-8C48-1E99D449C39B

7. Plaintiff objects to the Interrogatories to the extent that they require Plaintiff to draw a legal conclusion. Plaintiff's responses shall not be construed as providing a legal conclusion regarding the meaning of any terms or phrases.

8. Plaintiff objects to the Interrogatories to the extent that that they constitute improper early contention interrogatories.

9. Plaintiff objects to the all Instructions and Requests to the extent they are inconsistent with Rule 26 of the Federal Rules of Civil Procedure.

10. Plaintiff does not waive: (1) any objections as to the admissibility of, competency of, relevancy of, materiality of, or privilege attaching to any information provided; or (2) the right to object to other discovery requests or undertakings involving or relating to the subject matter of the requests herein. An objection or answer in response to Defendants' Interrogatory in no way constitutes or should be construed as an admission with respect to the relevance or admissibility of any response.

Without waiving any of the foregoing General Objections, which apply to each and every one of Plaintiff's responses set forth below and are incorporated by reference therein, Plaintiff responds as follows:

## RESPONSES TO INTERROGATORIES

**INTERROGATORY NO. 1:**

Define "the scientific and nutritional community," as referenced in your Responses to Bayer's First Set of Interrogatories, and provide the source(s) and/or authority on which you rely for this definition.

**RESPONSE TO INTERROGATORY NO. 1:**

Plaintiff incorporates herein by specific reference each of the aforementioned General Objections. Plaintiff further objects to this Interrogatory to the extent it calls for a legal conclusion and/or an expert opinion.

Subject to and without waiving the foregoing General Objections, Plaintiff responds as follows: The "scientific and nutritional community" are those who have

DocuSign Envelope ID: D773ED5E-FDAC-41B4-8C48-1E99D449C39B

expertise on vitamins. The precise parameters of who or what is an expert on vitamins calls for expert testimony. Therefore, requesting Plaintiff to define "the scientific and nutritional community", and provide sources and/or authority in this regard, is premature.

**INTERROGATORY NO. 2:**

Identify all "vitamins which the scientific and nutritional community generally accepts as vitamins," as referenced in your Responses to Bayer's First Set of Interrogatories, and provide the source(s) and/or authority on which you rely for this definition, and state when you first learned of this definition.

**RESPONSE TO INTERROGATORY NO. 2:**

Plaintiff incorporates herein by specific reference each of the aforementioned General Objections. Plaintiff further objects to this Interrogatory to the extent it calls for a legal conclusion and/or an expert opinion. Plaintiff further objects to this Interrogatory as the term "definition" is vague in its context. Plaintiff further objects to this Interrogatory to the extent it seeks information that is protected by the attorney-client privilege.

Subject to and without waiving the foregoing General Objections, Plaintiff responds as follows: The "vitamins which the scientific and nutritional community generally accepts as vitamins" are as follows: Vitamin A, Vitamin B1 (Thiamine), Vitamin B2 (Riboflavin), Vitamin B3 (Niacin), Vitamin B5 (Pantothenic Acid), Vitamin B6 (Pyridoxine), Vitamin B9 (Folate or Folic Acid), Vitamin B12 (Cobalamin), Vitamin C, Vitamin D, Vitamin E, Vitamin K, and Biotin. Because Plaintiff relied on Bayer at the time of purchase to provide all the vitamins which the scientific and nutritional community accepts as vitamins, Plaintiff only became aware of the specific list of vitamins after purchasing the Product.

**INTERROGATORY NO. 3:**

State which specific vitamins (if any) that the "scientific and nutritional

DocuSign Envelope ID: D773ED5E-FDAC-41B4-8C48-1E99D449C39B

community," as defined by you, does not "accept[] as vitamins," as defined by you, and why.

**RESPONSE TO INTERROGATORY NO. 3:**

Plaintiff incorporates herein by specific reference each of the aforementioned General Objections. Plaintiff further objects to this Interrogatory to the extent it calls for a legal conclusion and/or an expert opinion. Plaintiff further objects to this Interrogatory on the grounds that it is vague, ambiguous, and unintelligible.

Subject to and without waiving the foregoing General Objections, Plaintiff will not respond to this Interrogatory at this time, but is willing to meet and confer to clarify the information Bayer seeks in regard to this Interrogatory.

**INTERROGATORY NO. 4:**

Identify which multivitamin products on sale in the U.S. market contain "all of the vitamins which the scientific and nutritional community generally accept as vitamins," as defined by you.

**RESPONSE TO INTERROGATORY NO. 4:**

Plaintiff incorporates herein by specific reference each of the aforementioned General Objections. Plaintiff further objects to this Interrogatory to the extent it calls for a legal conclusion and/or an expert opinion. Plaintiff further objects to this Interrogatory on the grounds that this information is equally or more readily available to Defendants. Plaintiff further objects to this Interrogatory on the grounds that overly burdensome.

Subject to and without waiving the foregoing General Objections, Plaintiff responds as follows: At this time, Plaintiff is aware of the following products which are responsive to this Interrogatory - Bayer's Flintstones™ Complete Chewables Multivitamins tablets.

**INTERROGATORY NO. 5:**

Identify all multivitamins you or your family members have purchased and/or

DocuSign Envelope ID: D773ED5E-FDAC-41B4-8C48-1E99D449C39B

used, including but not limited to the Flintstones Gummies at issue, along with the dates on which the multivitamins were purchased, and the prices of the products purchased.

**RESPONSE TO INTERROGATORY NO. 5:**

Plaintiff incorporates herein by specific reference each of the aforementioned General Objections. Plaintiff further objects to this Interrogatory on the ground that, to the extent it seeks information regarding products not related to this underlying Action, the Interrogatory is not reasonably calculated to lead to the discovery of admissible evidence. Plaintiff further object to this Interrogatory to the extent it seeks information regarding purchases Plaintiff did not make. Plaintiff further objects to this Interrogatory on the grounds that it is overbroad as to scope of time.

Subject to and without waiving the foregoing General Objections, Plaintiff responds as follows: In or around March 2017, Plaintiff purchased the Flintstones™ Gummies Complete Children's Multivitamin Supplement. In or around June 2017, Plaintiff purchased the Bayer's Flintstones™ Complete Chewables Multivitamins tablets. Plaintiff does not recall the precise price she paid for these products.

**INTERROGATORY NO. 6:**

Have you visited any websites concerning *any* multivitamins, including but not limited to the Flintstones Gummies at issue? If yes, provide the name of the website, the website URL, and the date(s) you visited.

**RESPONSE TO INTERROGATORY NO. 6:**

Plaintiff incorporates herein by specific reference each of the aforementioned General Objections. Plaintiff further objects to this Interrogatory on the ground that, to the extent it seeks information regarding websites for products not related to this underlying Action, the Interrogatory is not reasonably calculated to lead to the discovery of admissible evidence. Plaintiff further objects to this Interrogatory on the grounds that it is overbroad as to scope of time.

DocuSign Envelope ID: D773ED5E-FDAC-41B4-8C48-1E99D449C39B

Subject to and without waiving the foregoing General Objections, Plaintiff responds as follows: Plaintiff has not visited any websites concerning any multivitamins.

**INTERROGATORY NO. 7:**

Identify any and all email addresses, social media handles or profiles, names, screen names, or other identifiers you have used to communicate with anyone other than your lawyer regarding multivitamins and/or dietary supplements, this lawsuit, or anything related to your allegations against Bayer.

**RESPONSE TO INTERROGATORY NO. 7:**

Plaintiff incorporates herein by specific reference each of the aforementioned General Objections. Plaintiff further objects to this Interrogatory on the grounds that it is overbroad as to scope of time. Plaintiff further objects to this Interrogatory on the ground that, to the extent it seeks information regarding multivitamins and dietary outside the scope of this Action, the Interrogatory is not reasonably calculated to lead to the discovery of admissible evidence.

Subject to and without waiving the foregoing General Objections, Plaintiff responds as follows: There are none.

**INTERROGATORY NO. 8:**

Have you ever spoken with a doctor, pharmacist, or any healthcare provider regarding the use and/or purchase of multivitamins? If yes, identify with whom you spoke, his or her address and phone number, when the conversation occurred, and the content of such conversations.

**RESPONSE TO INTERROGATORY NO. 8:**

Plaintiff incorporates herein by specific reference each of the aforementioned General Objections. Plaintiff further objects to this Interrogatory on the grounds that it is overbroad as to scope of time. Plaintiff further objects to this Interrogatory as it seeks privileged information.

DocuSign Envelope ID: D773ED5E-FDAC-41B4-8C48-1E99D449C39B

**INTERROGATORY NO. 9:**

Have you ever spoken with anyone regarding your lawsuit, other than your lawyer, either orally, in writing or by any other means? If yes, identify with whom you spoke, when the conversation(s) occurred, and the content and nature of such conversation(s). If the conversation is in writing, produce those conversations.

**RESPONSE TO INTERROGATORY NO. 9:**

Plaintiff incorporates herein by specific reference each of the aforementioned General Objections. Plaintiff further objects to this Interrogatory to the extent it seeks information protected by third-parties' right to privacy under Article One, Section One of the California Constitution. Plaintiff further objects to this Interrogatory to the extent it seeks information that is protected by the attorney-client privilege.

Subject to and without waiving the foregoing General Objections, Plaintiff responds as follows: Except for communications between Plaintiff, her attorneys, and her attorney's agents, Plaintiff has not spoken to anyone regarding this lawsuit.

**INTERROGATORY NO. 10:**

Have you been convicted of or pled guilty to any felony or any crime that involved an alleged act of dishonesty or providing a false statement? If yes, identify the charge to which you pled guilty to or were convicted, as well as the court where the action was pending, and the date of the plea or conviction.

**RESPONSE TO INTERROGATORY NO. 10:**

Plaintiff incorporates herein by specific reference each of the aforementioned General Objections.

Subject to and without waiving the foregoing General Objections, Plaintiff responds as follows: No.

**INTERROGATORY NO. 11:**

Have you ever filed a lawsuit or issued a demand letter, other than with regard

DocuSign Envelope ID: D773ED5E-FDAC-41B4-8C48-1E99D449C39B

to the present suit? If yes, identify the nature of the case, the parties, case number, where it was filed, and identify your lawyer.

**RESPONSE TO INTERROGATORY NO. 11:**

Plaintiff incorporates herein by specific reference each of the aforementioned General Objections. Plaintiff further objects to this Interrogatory on the ground that, to the extent it seeks information regarding other lawsuits not related to this underlying Action, the Interrogatory is not reasonably calculated to lead to the discovery of admissible evidence.

Subject to and without waiving the foregoing General Objections, Plaintiff responds as follows: No.

DATED: December 13, 2018

**FARUQI & FARUQI, LLP**
By: */s/ Benjamin Heikali*
Benjamin Heikali (SBN 307466)
10866 Wilshire Boulevard, Suite 1470
Los Angeles, CA 90024
Telephone: (424) 256-2884
Facsimile: (424) 256-2885
E-mail: bheikali@faruqilaw.com

*Counsel for Camille Cabrera and the Proposed Class*

DocuSign Envelope ID: D773ED5E-FDAC-41B4-8C48-1E99D449C39B

# VERIFICATION

United States District Court
Central District of California

*Cabrera, et al. v. Bayer Healthcare LLC, et al.*
Case No. 2:17-cv-08525 JAK (JPRx)

I, Camille Cabrera, declare that I have read and reviewed the following discovery responses and know the contents thereof:

**PLAINTIFF'S RESPONSES TO DEFENDANTS BAYER HEALTHCARE LLC AND BAYER CORPORATION'S SECOND SET OF INTERROGATORIES**

The factual contentions contained in this discovery are based on my own knowledge, except as to those matters which are therein stated upon my information or belief, and as to those matters, I believe them to be true.

I declare under penalty of perjury under the laws of the United States of America and the State of California that the foregoing is true and correct and that this Verification was executed on 12/13/2018 | 10:29 AM PST in Los Angeles, California.

DocuSigned by:
[signature]
FC0871937EA84FF

Camille Cabrera

**PROOF OF SERVICE**

STATE OF CALIFORNIA )
) *ss.:*
COUNTY OF LOS ANGELES )

I am employed in the county of Los Angeles, State of California. I am over the age of 18 and not a party to the within action. My business address is 10866 Wilshire Boulevard, Suite 1470, Los Angeles, California 90024.

On December 13, 2018, I caused the following document to be served which is described as:

**PLAINTIFF'S RESPONSES TO DEFENDANTS BAYER HEALTHCARE LLC AND BAYER CORPORATION'S FIRST SET OF REQUEST FOR PRODUCTION OF DOCUMENTS AND THINGS**

**PLAINTIFF'S RESPONSES TO DEFENDANTS BAYER HEALTHCARE LLC AND BAYER CORPORATION'S SECOND SET OF INTERROGATORIES**

by delivering true copies addressed as follows:

**SEE ATTACHED SERVICE LIST**

☐ BY FACSIMILE TRANSMISSION. I caused a facsimile machine transmission from facsimile machine telephone number (424) 256-2885 to the facsimile machine telephone number(s) listed on the attached Service List. Upon completion of said facsimile machine transmission(s), the transmitting machine issued a transmission report(s) showing the transmission(s) was/were complete and without error.

☒ BY ELECTRONIC SERVICE. I emailed the above document(s) from e-mail address smarton@faruqilaw.com to the respective e-mail addresses listed in the attached service list, from Los Angeles, California.

☒ BY U.S. MAIL. I caused such envelope(s) to be mailed with postage thereon fully prepaid. I am familiar with the firm's practice of collection and processing correspondence for mailing. Under that practice it would be

deposited with the U.S. postal service on that same day with postage thereon fully prepaid in the ordinary course of business.

Executed on December 13, 2018, at Los Angeles, California.

Susanna Marton

**SERVICE LIST**

Via U.S. mail and Electronic Service (e-mail)

Amy P. Lally
alally@sidley.com
SIDLEY AUSTIN LLP
1999 Avenue of the Stars 17th Floor
Los Angeles, CA 90067
Telephone: (310) 595-9500
Facsimile: (310) 595-9501

Jonathan F. Cohn (*pro hac vice*)
jfcohn@sidley.com
Joshua J. Fougere (*pro hac vice*)
jfougere@sidley.com
SIDLEY AUSTIN LLP
1501 K Street, NW
Washington, DC 20005
Telephone: (202) 736-8000
Facsimile: (202) 736-8711

*Attorneys for Defendants*
*Bayer HealthCare LLC and Bayer Corporation*

RECEIVED
DEC 17 2018
SIDLEY AUSTIN LLP

# Exhibit H

**From:** Branch, Morgan
**To:** Benjamin Heikali; Lally, Amy P.
**Cc:** Timothy J. Peter; Joshua Nassir; Aubry Wand; Cohn, Jonathan
**Subject:** RE: Flintstones
**Date:** Tuesday, June 4, 2019 12:41:00 PM
**Attachments:** image003.png
image001.png

---

Ben:

As an initial matter, we feel it is important to meet and confer about the discovery issues that were raised during the deposition of Ms. Cabrera and whether there is even a good faith basis for her to proceed with the litigation at this time. Not only were her responses inconsistent with the interrogatory responses we received, but her admissions undercut her theory of the case and call into question why she brought this lawsuit in the first place. We are happy to discuss these issues at your convenience this week.

Notwithstanding Ms. Cabrera's discovery deficiencies, Bayer agrees on the revised expert schedule you outline below, but notes that if there is no good faith basis to proceed with the litigation, Bayer should not have to incur additional expenses.

For the 30(b)(6), we have a tentative date of June 21st, but we still need to confirm with the witness. In the meantime, please let us know if that day works on Plaintiff's end.

Finally, let us know if there is a time to meet and confer regarding the mediation briefs, assuming you have a good faith basis to proceed with the litigation.

Regards,

Morgan

**MORGAN BRANCH**
Associate

**SIDLEY AUSTIN LLP**
One South Dearborn
Chicago, IL 60603
+1 312 853 0824
mbranch@sidley.com
www.sidley.com
**SIDLEY**

**From:** Benjamin Heikali <bheikali@faruqilaw.com>
**Sent:** Monday, June 3, 2019 1:59 PM
**To:** Branch, Morgan <mbranch@sidley.com>; Lally, Amy P. <alally@sidley.com>
**Cc:** Timothy J. Peter <tpeter@faruqilaw.com>; Joshua Nassir <jnassir@faruqilaw.com>; Aubry Wand <awand@wandlawfirm.com>

**Subject:** Flintstones

Morgan,

Hope you had a nice weekend. Just to confirm, the parties have agreed to internally push the expert schedule to the following dates, correct?

Initial Expert Report Due: July 16
Rebuttal Expert Report Due: August 6
Close of Expert Discovery: September 10
Last Day to File Class Cert Motion: September 27.

Also, have you had a chance to lock down a date for the 30b6 deposition? I think we were targeting the week of the 17th.

Lastly, I think we need to meet and confer about the scope/confidentiality of the mediation briefs we will submit before the mediation, according to the notice we received from Brooke. Do you have any thoughts on what your client would like to submit and the scope? If not, we can propose something.

-Ben

Ben Heikali ¦ Partner ¦ Faruqi & Faruqi, LLP ¦ 10866 Wilshire Boulevard, Suite 1470 ¦ Los Angeles, CA 90024 ¦ (D) 424 365 3220 ¦ (T) 424 256 2884 ¦ (F) 424 256 2885 ¦ www.faruqilaw.com

This message originates from the law firm of Faruqi & Faruqi, LLP. This email message and all attachments may contain legally privileged and confidential information intended solely for the use of the addressee. If you are not the intended recipient, you should immediately stop reading this message and delete it from your system. Any unauthorized reading, distribution, copying or other use of this message or its attachments is strictly prohibited. All personal messages express solely the sender's view and not those of Faruqi & Faruqi, LLP. This message may not be copied or distributed without this disclaimer. If you received this message in error, please reply to the sender above immediately and permanently delete this message from your inbox.

# Exhibit I

**From:** Branch, Morgan
**To:** Benjamin Heikali; Joshua Nassir; Timothy J. Peter
**Cc:** Cohn, Jonathan; Lally, Amy P.; Fougere, Josh
**Subject:** Flintstones - Discovery Follow Up
**Date:** Wednesday, July 10, 2019 2:16:00 PM
**Attachments:** image001.png

Ben:

I'm writing to follow-up on Plaintiff's discovery deficiencies discussed almost a month ago during our meet and confer on June 12. As Defendants pointed out then and again now: Plaintiff both omitted and misrepresented key information in her discovery responses, which became apparent during Plaintiff's deposition on May 29.

For instance, Plaintiff failed to disclose until her deposition key discussions about multivitamins and her lawsuit with "Pillar" – information squarely responsive to Defendants' Interrogatories, Set 2, among other requests. Plaintiff also indicated in her interrogatory responses that she had not purchased any other multivitamins aside from Flintstones, which was directly contradicted by her sworn testimony. In fact, Ms. Cabrera had purchased many other multivitamins, including Centrum and One A Day, among others.

Further, Plaintiff indicated that she was never instructed to preserve information, nor did she search for any responsive documents other than receipts, which was only one of many document requests Defendants served. Plaintiff admitted, in fact, that she was not made aware of *any* of Defendants' requests other than the request for receipts. Defendants are not familiar with a rule allowing counsel to cherry-pick the requests it chooses to share with parties it represents, but if there is one please let us know. As Defendants made clear during mediation, these omissions and misrepresentations impacted Defendants' preparation for Plaintiff's deposition as well as further discovery Bayer would have sought within the now-expired discovery period.

On June 12 you indicated that Plaintiff would amend and supplement her discovery responses. Nearly a month has passed, and that has not happened. Please let us know when we can expect amended responses. You also indicated that you would investigate additional information related to Pillar, including her contact information. Have you? If so, please provide. And if counsel knows Pillar was not the conduit, Plaintiff is obligated to tell us who was; counsel may not hide behind false testimony. You also said that you would verify that Ms. Cabrera does not have additional responsive documents. Have you? If so, please certify that all responsive documents have been produced.

If Ms. Cabrera does not fix her discovery deficiencies by July 20, Bayer will seek court intervention.

Please let us know if you would like to schedule a meet and confer.

Regards,

Morgan

**MORGAN BRANCH**
Associate

**SIDLEY AUSTIN LLP**
One South Dearborn
Chicago, IL 60603
+1 312 853 0824
mbranch@sidley.com
www.sidley.com
**SIDLEY**

# Exhibit J

**FARUQI & FARUQI, LLP**
Benjamin Heikali (SBN 307466)
bheikali@faruqilaw.com
Joshua Nassir (SBN 318344)
jnassir@faruqilaw.com
10866 Wilshire Boulevard, Suite 1470
Los Angeles, California 90024
Telephone: 424.256.2884
Facsimile: 424.256.2885

*Attorneys for Plaintiff Sonnetta Woods*

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| SONNETTA WOODS, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>BAYER HEALTHCARE LLC and BAYER CORPORATION,<br><br>Defendants. | Case No. 2:17-cv-08525 JAK (JPRx)<br><br>**PLAINTIFF'S SUPPLEMENTAL RESPONSES TO DEFENDANTS BAYER HEALTHCARE LLC AND BAYER CORPORATION'S FIRST SET OF INTERROGATORIES ON SUBSTITUTED PLAINTIFF**<br><br>Hon. John A. Kronstadt<br>Courtroom 10B |

PROPOUNDING PARTY: DEFENDANTS BAYER HEALTHCARE LLC AND BAYER CORPORATION

RESPONDING PARTY: PLAINTIFF SONNETTA WOODS

SET NO. ONE

Plaintiff Sonnetta Woods ("Plaintiff") hereby supplements her prior responses to Defendants Bayer Healthcare LLC and Bayer Corporation's ("Defendants") First Set of Interrogatories on Substituted Plaintiff as follows:

**PRELIMINARY STATEMENT**

These responses reflect the results of Plaintiff's diligent and reasonable efforts to respond to Defendants' First Set of Interrogatories on Substituted Plaintiff, based on the investigation Plaintiff has thus far been able to conduct. Discovery and investigation of this case is ongoing, and the following responses are given without prejudice to Plaintiff's right to amend, modify or supplement these responses and/or assert additional objections as this litigation continues and as additional information becomes available to her.

Plaintiff does not waive: (1) any objections as to the admissibility of, competency of, relevancy of, materiality of, or privilege attaching to any information provided; or (2) the right to object to other discovery requests or undertakings involving or relating to the subject matter of the Interrogatories herein. An objection or answer in response to Defendants' Interrogatories in no way constitutes or should be construed as an admission with respect to the relevance or admissibility of any response.

**GENERAL OBJECTIONS**

1. Plaintiff objects to Defendants' definitions and instructions to the Interrogatories to the extent that they are inconsistent with, or enlarge upon, obligations imposed upon Plaintiff by the Federal Rules of Civil Procedure, applicable Court orders, and/or agreements between the Parties. In the event that

any portion of the Instructions conflicts with the applicable rules of civil procedure or attempts to impose requirements beyond those imposed by the applicable rules, the applicable rules and their requirements shall prevail.

2. Plaintiff objects to the definitions of the terms "you" or "your", and Interrogatories relying on those terms, as overly broad and unduly burdensome, and to the extent such definitions purport to impose any burden or obligation in excess of the requirements of the Federal Rules of Civil Procedure, or applicable court orders, including by purporting to seek responses from non-parties or based upon documents outside of Plaintiff's possession, custody or control. Plaintiff further objects to the extent the definition of these terms purports to include counsel representing Plaintiff, as such definition is overbroad and implicates information protected by the attorney work-product doctrine and the attorney-client privilege. All objections and responses herein are propounded on behalf of Sonnetta Woods, and the term "you" is understood in Plaintiff's responses to refer to Sonnetta Woods.

3. Plaintiff does not waive: (1) any objections as to the admissibility of, competency of, relevancy of, materiality of, or privilege attaching to any information provided; or (2) the right to object to other discovery requests or undertakings involving or relating to the subject matter of the requests herein. An objection or answer in response to Defendants' Interrogatory in no way constitutes or should be construed as an admission with respect to the relevance or admissibility of any response.

Without waiving any of the foregoing General Objections, which apply to each and every one of Plaintiff's responses set forth below and are incorporated by reference therein, Plaintiff responds as follows:

## RESPONSES TO INTERROGATORIES

**INTERROGATORY NO. 1:**

State your definition of the word "Complete" as it appears on the label of Flintstones Gummies.

**RESPONSE TO INTERROGATORY NO. 1:**

Plaintiff incorporates herein by specific reference each of the aforementioned General Objections. Plaintiff further objects to this Interrogatory to the extent it calls for a legal conclusion and/or an expert opinion.

Subject to and without waiving the foregoing General Objections, Plaintiff responds as follows: In the context of the Flintstones Gummies' labeling, Plaintiff defines the word "Complete" to mean that the Flintstones Gummies would include every vitamin that experts in the field of vitamins would consider a "vitamin".

**INTERROGATORY NO. 2:**

State specifically what you understood the word "Complete" on the label of Flintstones Gummies to mean when you purchased the product.

**RESPONSE TO INTERROGATORY NO. 2:**

Plaintiff incorporates herein by specific reference each of the aforementioned General Objections. Plaintiff further objects to this Interrogatory to the extent it calls for a legal conclusion and/or an expert opinion.

Subject to and without waiving the foregoing General Objections, Plaintiff responds as follows: Plaintiff understands Interrogatory No. 2 to seek the same information as Interrogatory No. 1. For this reason, Plaintiff refers Defendants to Plaintiff's answer in Interrogatory No. 1. To the extent Interrogatories Nos. 1 and 2 seek different information, Plaintiff is willing to meet and confer with Defendants to specify the information Defendants seek in Interrogatory No. 2.

**INTERROGATORY NO. 3:**

State specifically what vitamins and minerals that you understood to be included or excluded from Flintstones Gummies based on the fact that the word "Complete" was included on the label, when you purchased the product.

**RESPONSE TO INTERROGATORY NO. 3:**

Plaintiff incorporates herein by specific reference each of the aforementioned General Objections. Plaintiff further objects to this Interrogatory to the extent it calls for a legal conclusion and/or an expert opinion. Plaintiff further objects to this Interrogatory on the grounds that "minerals" in the Flintstones Gummies is irrelevant, as Plaintiff's allegations in the Complaint are not related to the presence or absence of minerals in the product.

Subject to and without waiving the foregoing General Objections, Plaintiff responds as follows: Plaintiff expected that the Flintstones Gummies would contain all the vitamins, as referenced in her response to Defendants' Interrogatory No. 1. Plaintiff did not have an expectation on whether specific vitamins would be included or excluded in the Product when making her purchasing decision.

**INTERROGATORY NO. 4:**

Please state all facts underlying, warranting, justifying, or evidencing your allegation that you and all "other consumers" "believ[ed] that [Flintstones Gummies] contain all the vitamins" due to "Defendants' 'Complete' multivitamin supplement representation" on the label. First Am. Compl. ¶ 25.

**SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 4:**

Plaintiff incorporates herein by specific reference each of the aforementioned General Objections. Plaintiff further objects to this Interrogatory as overbroad and unduly burdensome. Plaintiff further objects to the extent this Interrogatory seeks identification of what specific evidence Plaintiff intends to rely on in this matter, as

Plaintiff will disclose such evidence as required by the Court's rules and orders, including orders regarding disclosure of exhibit lists and expert testimony. Plaintiff further objects to this Interrogatory on the grounds that it seeks information equally available to Defendants. Plaintiff further objects to this Interrogatory to the extent it calls for a legal conclusion and/or an expert opinion. Plaintiff further objects to this Interrogatory on the grounds that Defendants assumes facts not found in Plaintiff's First Amended Complaint, in particular that Plaintiff pleads this allegation in regard to "all" consumers. Plaintiff further objects to this Interrogatory to the extent it requires responding party to state "all facts" supporting a contention and is thereby impermissibly overbroad.

Subject to and without waiving the foregoing General Objections, Plaintiff responds as follows: Plaintiff refers Defendants to the other allegations and pictures attached in the Complaint, the documents and discovery responses produced by Defendants thus far in this litigation (e.g., responses to all sets of Plaintiff's Requests for Production of Documents, Plaintiff's Interrogatories, and Plaintiff's Requests for Admission), and declarations, reports, and/or deposition testimony provided by expert and corporate witnesses thus far in this litigation. Specifically, Plaintiff refers Defendant to the Expert Report of J. Michael Dennis, submitted on July 16, 2019. Plaintiff also refers Defendants to Bay-Flint-0003688. The discovery period remains open and Plaintiff reserves the right to supplement or amend her answers.

**INTERROGATORY NO. 5:**

Please state all facts underlying, warranting, justifying, or evidencing your allegation that you and all "other consumers purchased the [Flintstones Gummies]" "[i]n reasonable reliance on Defendants' 'Complete' multivitamin supplement representation" on the Flintstones Gummies. *Id.*

**SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 5:**

Plaintiff incorporates herein by specific reference each of the aforementioned General Objections. Plaintiff further objects to this Interrogatory as overbroad and unduly burdensome. Plaintiff further objects to the extent this Interrogatory seeks identification of what specific evidence Plaintiff intends to rely on in this matter, as Plaintiff will disclose such evidence as required by the Court's rules and orders, including orders regarding disclosure of exhibit lists and expert testimony. Plaintiff further objects to this Interrogatory on the grounds that it seeks information equally available to Defendants. Plaintiff further objects to this Interrogatory to the extent it calls for a legal conclusion and/or an expert opinion. Plaintiff further objects to this Interrogatory on the grounds that Defendants assumes facts not found in Plaintiff's First Amended Complaint, in particular that Plaintiff plead this allegation in regard to "all" consumers. Plaintiff further objects to this Interrogatory to the extent it requires responding party to state "all facts" supporting a contention and is thereby impermissibly overbroad.

Subject to and without waiving the foregoing General Objections, Plaintiff responds as follows: Plaintiff refers Defendants to the other allegations and pictures attached in the Complaint, the documents and discovery responses produced by Defendants thus far in this litigation (e.g., responses to all sets of Plaintiff's Requests for Production of Documents, Plaintiff's Interrogatories, and Plaintiff's Requests for Admission), and declarations, reports, and/or deposition testimony provided by expert and corporate witnesses thus far in this litigation. Specifically, Plaintiff refers Defendants to the Declaration and Expert Report of J. Michael Dennis, submitted on July 16, 2019. Plaintiff also refers Defendants to Bay-Flint-0003688. The discovery period remains open and Plaintiff reserves the right to supplement or amend her answers.

**INTERROGATORY NO. 6:**

Please state all facts underlying, warranting, justifying, or evidencing your allegation that you and all "other consumers did not know, and had no reason to know, that [Flintstones Gummies] do not contain the Missing Vitamins." *Id.* ¶ 26.

**SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 6:**

Plaintiff incorporates herein by specific reference each of the aforementioned General Objections. Plaintiff further objects to this Interrogatory as overbroad and unduly burdensome. Plaintiff further objects to the extent this Interrogatory seeks identification of what specific evidence Plaintiff intends to rely on in this matter, as Plaintiff will disclose such evidence as required by the Court's rules and orders, including orders regarding disclosure of exhibit lists and expert testimony. Plaintiff further objects to this Interrogatory on the grounds that it seeks information equally available to Defendants. Plaintiff further objects to this Interrogatory to the extent it calls for a legal conclusion and/or an expert opinion. Plaintiff further objects to this Interrogatory on the grounds that Defendants assumes facts not found in Plaintiff's First Amended Complaint, in particular that Plaintiff plead this allegation in regard to "all" consumers. Plaintiff further objects to this Interrogatory to the extent it requires responding party to state "all facts" supporting a contention and is thereby impermissibly overbroad.

Subject to and without waiving the foregoing General Objections, Plaintiff responds as follows: Plaintiff refers Defendants to the other allegations and pictures attached in the Complaint, the documents and discovery responses produced by Defendants thus far in this litigation (e.g., responses to all sets of Plaintiff's Requests for Production of Documents, Plaintiff's Interrogatories, and Plaintiff's Requests for Admission), and declarations, reports, and/or deposition testimony provided' by expert and corporate witnesses thus far in this litigation. Specifically, Plaintiff refers

Defendants to the Declaration and Expert Report of J. Michael Dennis, submitted on July 16, 2019. Furthermore, because the Flintstones Gummies do not disclose that they lack the Missing Vitamins, consumers do not know, and have no reason to know, that these vitamins are missing. The discovery period remains open and Plaintiff reserves the right to supplement or amend her answers.

**INTERROGATORY NO. 7:**

Please state all facts underlying, warranting, justifying, or evidencing your allegation that you and all "other consumers . . . paid an unlawful premium for the [Flintstones Gummies]." *Id.* ¶ 29.

**SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 7:**

Plaintiff incorporates herein by specific reference each of the aforementioned General Objections. Plaintiff further objects to this Interrogatory as overbroad and unduly burdensome. Plaintiff further objects to the extent this Interrogatory seeks identification of what specific evidence Plaintiff intends to rely on in this matter, as Plaintiff will disclose such evidence as required by the Court's rules and orders, including orders regarding disclosure of exhibit lists and expert testimony. Plaintiff further objects to this Interrogatory on the grounds that it seeks information equally available to Defendants. Plaintiff further objects to this Interrogatory to the extent it calls for a legal conclusion and/or an expert opinion. Plaintiff further objects to this Interrogatory on the grounds that Defendants assumes facts not found in Plaintiff's First Amended Complaint, in particular that Plaintiff plead this allegation in regard to "all" consumers. Plaintiff further objects to this Interrogatory to the extent it requires responding party to state "all facts" supporting a contention and is thereby impermissibly overbroad.

Subject to and without waiving the foregoing General Objections, Plaintiff responds as follows: Plaintiff refers Defendants to the other allegations and pictures

attached in the Complaint, the documents and discovery responses produced by Defendants thus far in this litigation (e.g., responses to all sets of Plaintiff's Requests for Production of Documents, Plaintiff's Interrogatories, and Plaintiff's Requests for Admission), and declarations, reports, and/or deposition testimony provided by expert and corporate witnesses thus far in this litigation. Specifically, Plaintiff refers Defendants to the Declaration and Expert Report of J. Michael Dennis, submitted on July 16, 2019, and the Declaration and Expert Report of Kevin W. Caves, Ph.D., submitted on July 16, 2019. Plaintiff also refers Defendants to Bay-Flint-0001938. The discovery period remains open and Plaintiff reserves the right to supplement or amend her answers.

**INTERROGATORY NO. 8:**

Please state all facts underlying, warranting, justifying, or evidencing your allegation that you and all "other consumers would have paid significantly less for . . . [or] would not have purchased [Flintstones Gummies] at all had they known that the [Flintstones Gummies] do not contain the Missing Vitamins." *Id.*

**SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 8:**

Plaintiff incorporates herein by specific reference each of the aforementioned General Objections. Plaintiff further objects to this Interrogatory as overbroad and unduly burdensome. Plaintiff further objects to the extent this Interrogatory seeks identification of what specific evidence Plaintiff intends to rely on in this matter, as Plaintiff will disclose such evidence as required by the Court's rules and orders, including orders regarding disclosure of exhibit lists and expert testimony. Plaintiff further objects to this Interrogatory on the grounds that it seeks information equally available to Defendants. Plaintiff further objects to this Interrogatory to the extent it calls for a legal conclusion and/or an expert opinion. Plaintiff further objects to this Interrogatory on the grounds that Defendants assumes facts not found in

Plaintiff's First Amended Complaint, in particular that Plaintiff plead this allegation in regard to "all" consumers. Plaintiff further objects to this Interrogatory to the extent it requires responding party to state "all facts" supporting a contention and is thereby impermissibly overbroad.

Subject to and without waiving the foregoing General Objections, Plaintiff responds as follows: Plaintiff refers Defendants to the other allegations and pictures attached in the Complaint, the documents and discovery responses produced by Defendants thus far in this litigation (e.g., responses to all sets of Plaintiff's Requests for Production of Documents, Plaintiff's Interrogatories, and Plaintiff's Requests for Admission), and declarations, reports, and/or deposition testimony provided by expert and corporate witnesses thus far in this litigation. Specifically, Plaintiff refers Defendants to the Declaration and Expert Report of J. Michael Dennis, submitted on July 16, 2019, and the Declaration and Expert Report of Kevin W. Caves, Ph.D., submitted on July 16, 2019. The discovery period remains open and Plaintiff reserves the right to supplement or amend her answers.

**INTERROGATORY NO. 9:**

Identify all multivitamins you or your family members have purchased and/or used, including but not limited to the Flintstones Gummies at issue, along with the dates on which the multivitamins were purchased, and the prices of the products purchased.

**RESPONSE TO INTERROGATORY NO. 9:**

Plaintiff incorporates herein by specific reference each of the aforementioned General Objections. Plaintiff further objects to this Interrogatory and will not respond to this Interrogatory to the extent it seeks information regarding products not related to this underlying Action, as the Interrogatory is not relevant to any party's claim or defense and is not proportional to the needs of this case. Plaintiff

further objects to this Interrogatory to the extent it seeks information regarding purchases Plaintiff did not personally make. Plaintiff further objects to this Interrogatory on the ground that, to the extent it seeks information regarding products purchased by non-parties, the Interrogatory is not relevant to any party's claim or defense and is not proportional to the needs of this case. Plaintiff further objects to this Interrogatory on the grounds that it is overbroad as to scope of time. Plaintiff further objects to the extent the phrase "family members" is undefined, vague and ambiguous.

Subject to and without waiving the foregoing General Objections, Plaintiff responds as follows:

1. Flintstones™ Gummies Complete Children's Multivitamin Supplement:
    a. Purchased on or around January 2019. Plaintiff does not recall the price she paid for this product.
    b. Purchased approximately three to four times throughout 2018. Plaintiff does not recall the prices she paid for this product.
    c. Purchased approximately three to four times throughout 2017. Plaintiff does not recall the prices she paid for this product.
    d. Purchased approximately three to four times throughout 2016. Plaintiff does not recall the prices she paid for this product.
2. Flintstones™ Sour Gummies Complete Children's Multivitamin Supplement:
    a. Purchased on or around early 2016. Plaintiff does not recall the price she paid for this product.
3. Flintstones™ Complete Chewables Multivitamins tablets:
    a. Purchased on or around February to March 2019. Plaintiff does not recall the price she paid for this product.

**INTERROGATORY NO. 10:**

Have you visited any websites concerning *any* multivitamins, including but not limited to the Flintstones Gummies at issue? If yes, provide the name of the website, the website URL, and the date(s) you visited.

**SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 10:**

Plaintiff incorporates herein by specific reference each of the aforementioned General Objections. Plaintiff further objects to this Interrogatory on the ground that, to the extent it seeks information regarding websites for products not related to this underlying Action, the Interrogatory is not relevant to any party's claim or defense and is not proportional to the needs of this case. Plaintiff further objects to this Interrogatory on the grounds that it is overbroad as to scope of time.

Subject to and without waiving the foregoing General Objections, Plaintiff responds as follows: No. By way of further response, Plaintiff saw a social media post regarding Flintstones multivitamins. Plaintiff has conducted a diligent search, including a review of her website and social media records, and is unable to provide further information about the post.

**INTERROGATORY NO. 11:**

Identify any and all email addresses, social media handles or profiles, names, screen names, or other identifiers you have used to communicate with anyone other than your lawyer regarding multivitamins and/or dietary supplements, this lawsuit, or anything related to your allegations against Bayer.

**RESPONSE TO INTERROGATORY NO. 11:**

Plaintiff incorporates herein by specific reference each of the aforementioned General Objections. Plaintiff further objects to this Interrogatory on the grounds that it is overbroad as to scope of time. Plaintiff further objects to this Interrogatory on the ground that, to the extent it seeks information regarding multivitamins and

dietary supplements outside the scope of this Action, the Interrogatory is not relevant to any party's claim or defense and is not proportional to the needs of this case.

Subject to and without waiving the foregoing General Objections, Plaintiff responds as follows: None.

**INTERROGATORY NO. 12:**

Have you ever spoken with a doctor, pharmacist, or any healthcare provider regarding the use and/or purchase of multivitamins? If yes, identify with whom you spoke, his or her address and phone number, when the conversation occurred, and the content of such conversation(s).

**SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 12:**

Plaintiff incorporates herein by specific reference each of the aforementioned General Objections. Plaintiff further objects to this Interrogatory on the grounds that it is overbroad as to scope of time. Plaintiff further objects to this Interrogatory as it seeks privileged information. Plaintiff further objects to this Interrogatory to the extent it seeks information protected by third-parties' right to privacy under Article One, Section One of the California Constitution.

Subject to and without waiving the foregoing General Objections, Plaintiff responds as follows: No.

**INTERROGATORY NO. 13:**

Have you spoken with anyone regarding your lawsuit, other than your lawyer, either orally, in writing, or by any other means? If yes, identify with whom you spoke, when the conversation(s) occurred, and the content and nature of such conversation(s). If the conversation is in writing, produce those conversations.

**RESPONSE TO INTERROGATORY NO. 13:**

Plaintiff incorporates herein by specific reference each of the aforementioned General Objections. Plaintiff further objects to this Interrogatory to the extent it

seeks information protected by third-parties' right to privacy under Article One, Section One of the California Constitution. Plaintiff further objects to this Interrogatory to the extent it seeks information that is protected by the attorney-client privilege.

Subject to and without waiving the foregoing General Objections, Plaintiff responds as follows: No.

**INTERROGATORY NO. 14:**

Have you been convicted of or pled guilty to any felony or any crime that involved an alleged act of dishonesty or providing a false statement? If yes, identify the change to which you pled guilty to or were convicted, as well as the court where the action was pending, and the date of the plea or conviction.

**RESPONSE TO INTERROGATORY NO. 14:**

Plaintiff incorporates herein by specific reference each of the aforementioned General Objections.

Subject to and without waiving the foregoing General Objections, Plaintiff responds as follows: No.

**INTERROGATORY NO. 15:**

Have you ever filed a lawsuit or issued a demand letter, other than with regard to the present suit? If yes, identify the nature of the case, the parties, case number, where it was filed, and identify your lawyer.

**RESPONSE TO INTERROGATORY NO. 15:**

Plaintiff incorporates herein by specific reference each of the aforementioned General Objections. Plaintiff further objects to this Interrogatory on the ground that, to the extent it seeks information regarding other lawsuits not related to this underlying Action, the Interrogatory is not relevant to any party's claim or defense and is not proportional to the needs of this case. Plaintiff further objects to this

Interrogatory on the grounds that it is overbroad as to scope of time.

Subject to and without waiving the foregoing General Objections, Plaintiff responds as follows: No.

DATED: October 24, 2019

**FARUQI & FARUQI, LLP**
By: /s/ Benjamin Heikali
Benjamin Heikali (SBN 307466)
10866 Wilshire Boulevard, Suite 1470
Los Angeles, CA 90024
Telephone: (424) 256-2884
Facsimile: (424) 256-2885
E-mail: bheikali@faruqilaw.com

*Counsel for Sonnetta Woods and the Proposed Class*

DocuSign Envelope ID: F2CE05A9-F6E3-4683-AC7C-87752C2A1601

# VERIFICATION

United States District Court
Central District of California

*Cabrera, et al. v. Bayer Healthcare LLC, et al.*
Case No. 2:17-cv-08525 JAK (JPRx)

I, Sonnetta Woods, declare that I have read and reviewed the following discovery responses and know the contents thereof:

**PLAINTIFF'S SUPPLEMENTAL RESPONSES TO DEFENDANTS BAYER HEALTHCARE LLC AND BAYER CORPORATION'S FIRST SET OF INTERROGATORIES ON SUBSTITUTED PLAINTIFF**

The factual contentions contained in this discovery are based on my own knowledge, except as to those matters which are therein stated upon my information or belief, and as to those matters, I believe them to be true.

I declare under penalty of perjury under the laws of the United States of America and the State of California that the foregoing is true and correct, and that this Verification was executed on 10/24/2019 | 8:19 PM PDT in Gardena, California.

DocuSigned by:
[signature]
1924919FEE9F49C

Sonnetta Woods

# Exhibit K

**FARUQI & FARUQI, LLP**
Benjamin Heikali (SBN 307466)
bheikali@faruqilaw.com
Joshua Nassir (SBN 318344)
jnassir@faruqilaw.com
10866 Wilshire Boulevard, Suite 1470
Los Angeles, California 90024
Telephone: 424.256.2884
Facsimile: 424.256.2885

*Attorneys for Plaintiff Sonnetta Woods*

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| SONNETTA WOODS, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>BAYER HEALTHCARE LLC and BAYER CORPORATION,<br><br>Defendants. | Case No. 2:17-cv-08525 JAK (JPRx)<br><br>**PLAINTIFF'S RESPONSES TO DEFENDANTS BAYER HEALTHCARE LLC AND BAYER CORPORATION'S FIRST SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS AND THINGS ON SUBSTITUTED PLAINTIFF**<br><br>Hon. John A. Kronstadt<br>Courtroom 10B |

PROPOUNDING PARTY: DEFENDANTS BAYER HEALTHCARE LLC AND BAYER CORPORATION

RESPONDING PARTY: PLAINTIFF SONNETTA WOODS

SET NO. ONE

Plaintiff Sonnetta Woods ("Plaintiff") hereby responds to Defendants Bayer Healthcare LLC and Bayer Corporation's ("Defendants") First Set of Request for Production of Documents and Things on Substituted Plaintiff as follows:

**PRELIMINARY STATEMENT**

These responses reflect the results of Plaintiff's diligent and reasonable efforts to respond to Defendants' Request for Production of Documents and Things, based on the investigation Plaintiff has thus far been able to conduct. Investigation of this case is ongoing, and Plaintiff reserves the right to amend, modify, or supplement these responses and productions and/or assert additional objections as this litigation continues. There may also exist documents responsive to Defendants' Requests for Production of Documents that Plaintiff has not located, identified, or viewed despite his efforts to do so.

Additionally, Plaintiff's responses are made without waiver of: (a) any objections as to competency, relevancy, materiality, privilege and admissibility of the response or of any documents produced, in this litigation or any other proceeding; (b) the right to object to the use of any response or document produced, in this litigation or any other proceeding; or (c) the right to object on any ground at any time for a demand for further response to these or any other discovery requests or other discovery procedures involving or relating to the subject matter of the discovery being answered.

These responses also do not constitute an admission by Plaintiff of the authenticity, relevancy, or admissibility of any of the documents produced in response to these Requests. Plaintiff reserves any and all objections he may have to

the admission of any or all of these documents into evidence in this action.

## GENERAL AND CONTINUING OBJECTIONS

Plaintiff objects to each and every request for production ("Request") on the basis of the following General Objections, which are incorporated into Plaintiff's responses to each Request below as if fully reproduced therein. To the extent particular objections are restated in a specific response, they are provided because they are particularly applicable to the specific Request and such inclusion is not to be considered a waiver of any other objection.

1. Plaintiff objects to Defendants' definitions and instructions to the Requests and to each and every Request to the extent that they are inconsistent with, or enlarge upon, obligations imposed upon Plaintiff by the Federal Rules of Civil Procedure, applicable Court orders, and/or agreements between the Parties. In the event that any portion of the Instructions conflicts with the applicable rules of civil procedure or attempts to impose requirements beyond those imposed by the applicable rules, the applicable rules and their requirements shall prevail.

2. Plaintiff objects to Defendants' definitions of the terms "you" or "your", and Requests relying on those terms, as overly broad and unduly burdensome, and to the extent such definitions purport to impose any burden or obligation in excess of the requirements of the Federal Rules of Civil Procedure, or applicable court orders, including to the extent they purport to seek responses from non-parties or documents outside of Plaintiff's possession, custody, or control. Plaintiff further objects to the extent the definitions of these terms purport to include counsel in this matter, as such definition is overbroad and implicates documents protected by the attorney work-product doctrine and the attorney-client privilege. All objections and responses herein are propounded on behalf of Sonnetta Woods, and the term "you" is understood in Plaintiff's responses to refer to Sonnetta Woods.

## RESPONSES TO REQUSTS FOR PRODUCTION (SET ONE)

**REQUEST FOR PRODUCTION NO. 1:**

Produce any and all Documents and other things that you collected, reviewed, consulted, or otherwise saw, read, or relied upon to answer Defendants' First Set of Interrogatories.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 1:**

Plaintiff incorporates herein by specific reference each of the aforementioned General Objections. Plaintiff further objects to this Request to the extent it seeks documents protected from disclosure under the attorney-client privilege and/or the attorney work product doctrine.

Subject to and without waiving the foregoing Objections, Plaintiff responds as follows: To the extent they are not already in Defendants' possession, Plaintiff will produce all relevant, non-privileged, responsive documents in Plaintiff's possession, custody, or control in response to this Request.

**REQUEST FOR PRODUCTION NO. 2:**

Produce receipts or other proof of payment for all multivitamins and/or dietary supplements you or your household family members have purchased and/or used, including the Flintstones Gummies at issue.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 2:**

Plaintiff incorporates herein by specific reference each of the aforementioned General Objections. Plaintiff further objects to this Request on the grounds that, to the extent it seeks Documents regarding products not related to this underlying Action, the Request is not relevant to any party's claim or defense and is not proportional to the needs of this case. Plaintiff further object to this Request to the extent it seeks documents regarding purchases Plaintiff did not make. Plaintiff further objects to this Request on the ground that, to the extent it seeks documents regarding products purchased by non-parties, the Request is not relevant to any party's claim or defense and is not proportional to the needs of this case. Plaintiff

further objects to this Request as it is overbroad as to the scope of time and documents requested. Plaintiff further objects to the extent the phrase "family members" is undefined, vague and ambiguous. Plaintiff is withholding documents based on these objections.

Subject to and without waiving the foregoing Objections, Plaintiff responds as follows: To the extent they are not already Defendants' possession, Plaintiff will produce all relevant, non-privileged, responsive documents in Plaintiff's possession, custody, or control in response to this Request.

**REQUEST FOR PRODUCTION NO. 3:**

Produce your internet browsing history from all devices reflecting all websites you have visited pertaining to any multivitamin and/or other nutritional supplement, including but not limited to the Flintstones Gummies and any other multivitamins. The production should include the URL, date of website visit, and other relevant information and metadata.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 3:**

Plaintiff incorporates herein by specific reference each of the aforementioned General Objections. Plaintiff further objects to this Request on the grounds that, to the extent it seeks Documents regarding products not related to this underlying Action, the Request is not relevant to any party's claim or defense and is not proportional to the needs of this case. Plaintiff further objects to this Request as it is overbroad as to the scope of time.

Subject to and without waiving the foregoing Objections, Plaintiff responds as follows: After a diligent search and reasonable inquiry, Plaintiff is not in possession, custody, or control of documents responsive to this Request.

**REQUEST FOR PRODUCTION NO. 4:**

Produce all Documents relating to multivitamins—including but not limited to the Flintstones Gummies at issue—that you have read and/or have in your

possession, custody or control, including but not limited to pamphlets, books, web printouts, scholarly articles, and academic journals.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 4:**

Plaintiff incorporates herein by specific reference each of the aforementioned General Objections. Plaintiff further objects to this Request as it is overbroad as to the scope of time and documents requested. Plaintiff further objects to this Request on the grounds that, to the extent it seeks Documents regarding products not related to this underlying Action, the Request is not relevant to any party's claim or defense and is not proportional to the needs of this case. Plaintiff further objects to this Request on the grounds that it seeks documents not in Plaintiff's possession or control. Plaintiff is withholding documents based on these objections.

Subject to and without waiving the foregoing Objections, Plaintiff responds as follows: To the extent they are not already Defendants' possession, Plaintiff will produce all relevant, non-privileged, responsive documents in Plaintiff's possession, custody, or control in response to this Request.

**REQUEST FOR PRODUCTION NO. 5:**

Produce all Communications you have had with a doctor, pharmacist, or any other Healthcare Provider regarding your use and/or purchase of multivitamins, whether by or for you or any of your household family members.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 5:**

Plaintiff incorporates herein by specific reference each of the aforementioned General Objections. Plaintiff further objects that this Request is overbroad as to scope of time. Plaintiff further objects to this Request on the grounds that it seeks documents not relevant to any party's claim or defense and is not proportional to the needs of this case. Specifically, the Request seeks documents regarding products not at issue in the underlying Action. Plaintiff further objects to

this Request on the grounds that it seeks documents protected by Plaintiff's doctor-patient privilege.

**REQUEST FOR PRODUCTION NO. 6:**

Produce all Communications you have had with anyone regarding your lawsuit, other than your lawyer, either orally, in writing, or by any other means. This includes, but is not limited to, letters, emails, social media posts and communications, etc.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 6:**

Plaintiff incorporates herein by specific reference each of the aforementioned General Objections. Plaintiff further objects to this Request to the extent it seeks documents protected by third-parties' right to privacy under Article One, Section One of the California Constitution.

Subject to and without waiving the foregoing Objections, Plaintiff responds as follows: After a diligent search and reasonable inquiry, Plaintiff is not in possession, custody, or control of documents responsive to this Request.

**REQUEST FOR PRODUCTION NO. 7:**

Produce all Documents and Communications that you have or will collect, consult, review, or otherwise rely upon to support any and all of the allegations in the First Amended Complaint. This includes, but it not limited to, articles, journals, research, reports, photographs, transcripts, financial information, marketing materials, and any other Documents or things.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 7:**

Plaintiff incorporates herein by specific reference each of the aforementioned General Objections. Plaintiff further objects that this Request seeks documents protected from disclosure under the attorney-client privilege and the attorney work product doctrine. Plaintiff further objects to this Request on the grounds that it is vague and ambiguous as to the type of documents requested. Plaintiff further objects

to this Interrogatory to the extent it calls for a legal conclusion and/or an expert opinion.

Subject to and without waiving the foregoing Objections, Plaintiff responds as follows: To the extent they are not already Defendants' possession, Plaintiff will produce all relevant, non-privileged, responsive documents in Plaintiff's possession, custody, or control in response to this Request.

**REQUEST FOR PRODUCTION NO. 8:**

Produce any and all Document and other things you reviewed or intend to review to prepare for your deposition.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 8:**

Plaintiff incorporates herein by specific reference each of the aforementioned General Objections. Plaintiff further objects that this Request seeks documents protected from disclosure under the attorney-client privilege and the attorney work product doctrine. Plaintiff further objects to this Interrogatory on the grounds that it seeks information equally available to Defendants. Plaintiff further objects that this Request is vague and ambiguous as to the type of Documents requested.

Subject to and without waiving the foregoing Objections, Plaintiff responds as follows: To the extent they are not already Defendants' possession, Plaintiff will produce all relevant, non-privileged, responsive documents in Plaintiff's possession, custody, or control in response to this Request.

DATED: October 16, 2019

**FARUQI & FARUQI, LLP**
By: */s/ Benjamin Heikali*
Benjamin Heikali (SBN 307466)
10866 Wilshire Boulevard, Suite 1470
Los Angeles, CA 90024
Telephone: (424) 256-2884
Facsimile: (424) 256-2885
E-mail: bheikali@faruqilaw.com

*Counsel for Sonnetta Woods and the Proposed Class*

**PROOF OF SERVICE**

STATE OF CALIFORNIA )
) *ss.:*
COUNTY OF LOS ANGELES )

I am employed in the county of Los Angeles, State of California. I am over the age of 18 and not a party to the within action. My business address is 10866 Wilshire Boulevard, Suite 1470, Los Angeles, California 90024.

On October 16, 2019, I caused the following document to be served which is described as:

**PLAINTIFF'S RESPONSES TO DEFENDANTS BAYER HEALTHCARE LLC AND BAYER CORPORATION'S FIRST SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS AND THINGS ON SUBSTITUTED PLAINTIFF**

by delivering true copies addressed as follows:

**SEE ATTACHED SERVICE LIST**

☐ BY FACSIMILE TRANSMISSION. I caused a facsimile machine transmission from facsimile machine telephone number (424) 256-2885 to the facsimile machine telephone number(s) listed on the attached Service List. Upon completion of said facsimile machine transmission(s), the transmitting machine issued a transmission report(s) showing the transmission(s) was/were complete and without error.

☒ BY ELECTRONIC SERVICE. I emailed the above document(s) from e-mail address smarton@faruqilaw.com to the respective e-mail addresses listed in the attached service list. from Los Angeles. California.

☒ BY U.S. MAIL. I caused such envelope(s) to be mailed with postage thereon fully prepaid. I am familiar with the firm's practice of collection and processing correspondence for mailing. Under that practice it would be deposited with the U.S. postal service on that same day with postage thereon fully prepaid in the ordinary course of business.

Executed on October 16, 2019, at Los Angeles, California.

[signature]

Susanna Marton

**SERVICE LIST**

Via U.S. mail and Electronic Service (e-mail)

Amy P. Lally
alally@sidley.com
SIDLEY AUSTIN LLP
1999 Avenue of the Stars 17th Floor
Los Angeles, CA 90067
Telephone: (310) 595-9500
Facsimile: (310) 595-9501

Jonathan F. Cohn (*pro hac vice*)
jfcohn@sidley.com
Joshua J. Fougere (*pro hac vice*)
jfougere@sidley.com
SIDLEY AUSTIN LLP
1501 K Street, NW
Washington, DC 20005
Telephone: (202) 736-8000
Facsimile: (202) 736-8711

*Attorneys for Defendants*
*Bayer HealthCare LLC and Bayer Corporation*

# Exhibit L

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SONNETTA WOODS, individually and on behalf of all others similarly situated ) | |
| Plaintiff ) | Case No. 2:17-cv-08525 JAK (JPRx) |
| vs. ) | |
| BAYER HEALTHCARE LLC and BAYER CORPORATION ) | |
| Defendants ) | |

VIDEOTAPED DEPOSITION OF SONNETTA WOODS
Los Angeles, California
Tuesday, November 19, 2019

Reported by:
Lynda L. Fenn, CSR, RPR
CSR No. 12566
JOB No. 3662786

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

SONNETTA WOODS, individually )
and on behalf of all others )
similarly situated )
)
Plaintiffs ) Case No.
) 2:17-cv-08525 JAK
vs. ) (JPRx)
)
BAYER HEALTHCARE LLC and )
BAYER CORPORATION )
)
Defendants )

VIDEOTAPED DEPOSITION of SONNETTA WOODS, taken on behalf of Defendants, at 5855 West Century Boulevard, Los Angeles, California, at 7:29 a.m. and ending at 12:38 p.m., Tuesday, November 19, 2019, reported by Lynda L. Fenn, CSR No. 12566, Certified Shorthand Reporter within and for the State of California, pursuant to notice.



APPEARANCES:
For the Plaintiff:
FARUQI & FARUQI, LLP
BY: REZA REZVANI, ESQ.
685 Third Avenue, 26th Floor
New York, New York 10017
(212) 983-6804
rrezvani@faruqilaw.com

FARUQI & FARUQI, LLP
BY: BEN HEIKALI, ESQ.
10866 Wilshire Boulevard
Los Angeles, California 90024
(424) 256-2884
bheikali@faruqilaw.com

For the Defendants:
For Bayer HealthCare LLC and Bayer Corporation:
SIDLEY AUSTIN LLP
BY: MORGAN BRANCH, ESQ.
One South Dearborn
Chicago, Illinois 60603
(312) 853-7000
mbranch@sidley.com

SIDLEY AUSTIN LLP
BY: JONATHAN F. COHN, ESQ.
1501 K Street, NW
Washington, DC 20005
(202) 736-8000
jfcohn@sidley.com

ALSO PRESENT: Fritz Sperberg, Videographer



INDEX


| EXAMINATION BY: | PAGE |
|---|---|
| MS. BRANCH | 9 |


EXHIBITS


| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 1 | A four-page document entitled Defendants' Notice of Oral Deposition of Plaintiff Sonnetta Woods | 74 |
| Exhibit 2 | An 11-page document entitled Plaintiff's Responses to Defendants Bayer Healthcare LLC and Bayer Corporation's First Set of Requests for Production of Documents and Things on Substituted Plaintiff | 79 |
| Exhibit 3 | A two-page document beginning with an email from Susanna Marton to Amy Lally, October 21, 2019, attaching a photograph of Flintstones Complete; WOODS_0000001 | 85 |
| Exhibit 4 | A two-page email string beginning with an email from Benjamin Heikali to Morgan Branch, October 21, 2019 | 88 |
| Exhibit 5 | A two-page document beginning with an email Susanna Marton to Amy Lally, October 23, 2019, attaching a document entitled Schools First Federal Credit Union; WOODS_0000002 | 92 |




EXHIBITS (Continued)


| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 6 | A two-page document beginning with an email Susanna Marton to Amy Lally, October 23, 2019, attaching a document entitled Schools First Federal Credit Union; WOODS_0000003 | 97 |
| Exhibit 7 | A 17-page document entitled Plaintiff's Supplemental Responses to Defendants Bayer Healthcare LLC and Bayer Corporation's First Set of Interrogatories on Substituted Plaintiff | 114 |
| Exhibit 8 | A two-page document entitled National Institutes of Health Dictionary of Dietary Supplement Terms | 159 |
| Exhibit 9 | Flintstones Gummies Complete bottle depicted in two color photographs taken by the court reporter | 187 |
| Exhibit 10 | L'il Critters Gummy Vites Complete Multivitamin bottle depicted in two color photographs taken by the court reporter | 211 |
| Exhibit 11 | Disney Complete Multivitamins Gummies bottle depicted in two color photographs taken by the court reporter | 213 |

I N D E X (Continued)

INFORMATION REQUESTED

(None)

INSTRUCTION NOT TO ANSWER

| PAGE | LINE |
| --- | --- |
| 28 | 4 |
| 28 | 21 |
| 32 | 7 |
| 52 | 7 |
| 53 | 15 |
| 56 | 5 |
| 56 | 10 |
| 56 | 24 |
| 57 | 4 |
| 57 | 8 |
| 61 | 5 |
| 61 | 10 |
| 61 | 18 |
| 79 | 2 |
| 83 | 6 |
| 85 | 2 |
| 87 | 11 |
| 91 | 17 |
| 108 | 21 |
| 109 | 1 |
| 109 | 6 |
| 109 | 11 |
| 158 | 17 |
| 226 | 14 |
| 226 | 20 |
| 227 | 2 |
| 227 | 6 |
| 227 | 12 |



Los Angeles, California
Tuesday, November 19, 2019
7:29 a.m. - 12:38 p.m.

THE VIDEOGRAPHER: Good morning. We're going on the record at 7:29 a.m. on November 19th, 2019.

Please note our microphones are sensitive and may pick up whispering, private conversations, also cellular interference, so if you could turn off all cell phones or place them away from the microphones. They can interfere with the deposition audio.

Audio and video recording will continue to take place unless all parties agree to go off the record.

This is media unit number one in the video recorded deposition of Sonnetta Woods taken by counsel for defendant in the matter of Woods versus Bayer HealthCare LLC, et al., filed in the United States District Court for the Central District of California, Case No. 2:17-cv-08525 JAK (JPRx).

This deposition is being held at the



Los Angeles Airport Marriott Hotel located at 5855 West Century Boulevard in Los Angeles, California.

My name is Fritz Sperberg from the firm of Veritext Legal Solutions, I'm the videographer and the court reporter is Lynda Fenn, also of Veritext. We're not related to any party in this action nor are we financially interested in the outcome.

Counsel, please identify yourselves and your affiliation for the record and if there are any objections to the proceedings state them at the time of your appearance, beginning with our noticing attorney.

MS. BRANCH: Sure. Morgan Branch of Sidley Austin.

MR. REZVANI: Reza Rezvani from Faruqi & Faruqi for the plaintiff.

MR. HEIKALI: Ben Heikali for plaintiffs from Faruqi & Faruqi as well.

MR. COHN: John Cohn from Sidley for Bayer.

THE VIDEOGRAPHER: Would the reporter please swear in the witness.

SONNETTA WOODS,

produced as a witness on behalf of the Defendants, and having been first duly sworn, was examined and



testified as follows:

THE VIDEOGRAPHER: You may begin.

EXAMINATION

BY MS. BRANCH:

Q Hi, Ms. Woods.

A Hi.

Q My name is Morgan Branch here on behalf of the Bayer entities that are the defendants in this case.

Before we get started I just want to go over a couple of ground rules for depositions.

You understand that you are under oath just the same as if you were in court testifying; correct?

A Yes.

Q So the court reporter is here so we need to make sure that you and I speak one at a time that way she doesn't have trouble with the transcript. So let's be sure not to talk over one another.

The court reporter cannot record head shakes and head nods and stuff like that and so -- and she also can't record things like "uh-huh" or "huh-uh" and so just be sure to use words and be sure to answer the questions verbally rather than using

Page 10

some sort of nonverbal act.

If you don't understand a question, just tell me and I can try to clarify. If you answer the questions, then I'm assume that you understood what I was asking.

Does that work?

A Yes.

Q Okay. Are you suffering from any medical issues today?

A No.

Q Okay. Are you taking any medications that would impact your memory?

A No.

Q Okay. Are you -- do you have any impairments that affect your memory?

A No.

Q Okay. Anything that would impact your ability to testify truthfully today?

A No.

Q And if you need a break just let us know. Hopefully, we can keep this going so that we can get you out of here in time --

A Okay.

Q -- to pick up your kids. But to do that, you know, we will take short breaks.

Page 11

A Okay.

Q Any questions before we get started?

A No.

Q Okay. So, for the record can you state your full name and spell it?

A Sonnetta Woods, S-o-n-n-e-t-t-a, Woods, W-o-o-d-s.

Q Okay. And have are you ever gone by any other name other than Sonnetta Woods?

A No.

Q Okay. When were you born?

A June fourth, 1975.

Q Okay. And how old are you?

A 44.

Q Okay. And what's your current address?

A 1647 West 147th Street, Apartment 206, Gardena, California 90247.

Q Gardenia, is that what you --

A Gardena.

Q Gardena?

A Yes.

Q Okay. How far away is that from here?

A Maybe around 20 minutes.

Q And how long have you lived in Gardena?

A A year.

Page 12

Q Where did you live before that?

A Inglewood.

Q Inglewood.

How far is Inglewood away from here?

A Maybe ten minutes.

Q Okay. And before Inglewood where did you live?

A Hawthorne.

Q Is that also close by?

A Yes.

Q And before Hawthorne?

A Carson. No, before L.A.

Q Okay. Is that all in California?

A Yes.

Q Have you always lived in California?

A Yes.

Q Okay. Were you born in California?

A Yes.

Q And you've never lived in any other state?

A No.

Q Have you always lived in and around the L.A. area?

A Yes.

Q And who do you live with currently?

A My daughter.

Page 13

Q Anyone else?

A No.

Q No spouse or any other kids?

A No.

Q And how old is your daughter?

A Nine.

Q And when you mentioned the previous places you've lived in and around L.A., were you also just living with you and your daughter or have you lived with anybody else in the past?

A In Inglewood, yes, she was in Inglewood.

Q Okay.

A In Hawthorne, yes, I had a boyfriend.

Q So you lived with your boyfriend in Hawthorne?

A Uh-huh.

Q Did you live with anybody else before that?

A No. Well, yes, my mom.

Q Right. Just before, I guess, postdating when you left your household with your parents?

A Yes, I lived with my auntie.

Q Okay.

A And my friend.

Q And when did you live with your friend?

A In -- around '97.

Page 14

Q Okay. So not within the last ten years?
A No.
Q Within the last ten years was it with -- was it within the last ten years that you lived with your boyfriend?
A No.
Q Okay. So within the last ten years you've only lived with your daughter?
A Yes.
Q Okay. And how old is your daughter now?
A Nine.
Q Okay. Do you own any property in California?
A No.
Q Have you ever owned any property in California?
A No.
Q Have you ever been married?
A No.
Q Okay. And the only child you have is your daughter who's nine?
A Yes.
Q Okay. And is she in school?
A Yes.
Q What grade is she in?

Page 15

A Fourth.
Q Okay. What school does she go to?
A Peary Elementary.
Q Is that also close by?
A Yes.
Q How far away is it from here?
A About twenty minutes.
Q And how many days a week is she in school?
A Five.
Q And was she also born in California?
A No.
Q Where was she born?
A I believe Modesto.
Q Modesto?
A Yes.
Q Where is Modesto?
A Maybe up north.
Q Okay. Up north in California?
A Yes.
Q Okay. So she was born in the state of California?
A Yes.
Q Okay. And who's her father?
A Her father's name is Kenneth.
Q You can't remember?

Page 16

A Kenneth.
Q Oh, Kenneth. Okay. Kenneth what?
A James.
Q Okay. And have you ever lived with Kenneth James?
A No.
Q Has your daughter ever lived with Kenneth James?
A I'm not sure.
Q Okay. Why are you not sure?
A Because she's adopted.
Q Okay. All right. So your daughter, who is nine, is adopted?
A Yes.
Q Have you ever met her father before?
A Yes.
Q Okay. Did you ever have a relationship with Kenneth James?
A No.
Q Okay. And when did you decide to adopt -- or, I guess, how old was your daughter when you adopted her?
A She was four. She was four.
Q Okay.
A Oh, when I adopted her, she was five.

Page 17

Q Five when you adopted her?
A Yes.
Q Okay. Okay. And how did you go about identifying her as the one to adopt ? Did you go through an adoption agency? Did you know Kenneth James? How did that happen?
A My mom asked me if I wanted to adopt her. She's related.
Q Okay. She's related to your mom?
A She's related to us.
Q Okay. In what way is she related?
A Her father is my mom's cousin.
Q So Kenneth James is your mom's cousin?
A Yes.
Q And ever since you adopted her when she was five, has she always lived with you since then?
A Yes.
Q And have you been her primary caregiver since then?
A Yes.
Q Does anybody else help out with the caregiving?
A No.
Q Okay. Do you have family members who watch her sometimes?

Page 18

A Sometimes.
Q Okay. And who watches her sometimes?
A My sister.
Q Anybody else?
A No.
Q Okay. So I -- we'll come back to your daughter. I wanted to talk a little bit about your background.
Where did you go to high school?
A Carson High School.
Q And where is Carson High School?
A In Carson.
Q And how far away is that?
A I'm not sure.
Q Okay. It's close by in the L.A. area?
A Yes.
Q Okay. Did you go to college after high school?
A Yes.
Q Where did you go to college?
A Phillips Junior College.
Q Is that also in California?
A Yes.
Q And when did you go to Phillips Junior College?

Page 19

A In '93.
Q And what was your degree?
A It was an associates.
Q Okay. Do you remember in what topic -- in what subject area?
A Computer information system.
Q Okay. And did you graduate with that degree?
A I finished.
Q Okay. And then after you finished your degree at Phillips Junior College, did you go to any other graduate school after that?
A No.
Q Any vocational school?
A That's what that was.
Q Okay. Any other continued education other than --
A No.
Q Okay. Do you have any licenses associated with your education?
A No.
Q Okay. And if you could just describe generally what computer information systems, what it -- what did they teach you?
A I don't remember.

Page 20

Q Okay. And have you used anything you learned during your education at Phillips Junior College for work?
A No.
Q Okay. So turning to your employment, what is your current occupation?
A I'm a school bus driver.
Q Okay. And how long have you been a school bus driver?
A Maybe around 21 years.
Q Okay. And what did you do before that?
A I was in college.
Q So you went straight from college and your first job was a school bus driver?
A No, I didn't go straight but that was not -- it was a space, I didn't do anything.
Q Okay. Have you had any other jobs after high school other than driving a school bus?
A No.
Q Okay. And what -- for what school system do you drive a school bus?
A Lynwood Unified School District.
Q And where is that?
A In Lynwood.
Q And where is Lynwood, as compared to where

Page 21

we are now? How many minutes?
A Maybe about -- on a good day fifteen minutes.
Q Okay. Do you enjoy your job as a school driver?
A Yes.
Q Okay. And how many days a week do you drive the school bus?
A Five to six.
Q Okay. And so that includes some weekends?
A Yes.
Q Okay. How many hours a day do you drive a school bus?
A Eight.
Q Okay. Have you ever worked in any -- I assume no based on what we've been talking about.
But have you ever worked in any sort of science-based field?
A No.
Q Do you have any background in nutrition or dietary supplements?
A No.
Q Do you understand what a vitamin is?
A No.
Q Do you understand what a mineral is?

Page 22

A No.
Q Do you understand what nutrients are?
A No.
Q Okay. Do you know the differences between vitamins, minerals or nutrients?
A No.
Q Do you know how one gets vitamins, minerals and nutrients?
MR. REZVANI: Objection to form.
THE WITNESS: No.
BY MS. BRANCH:
Q Do you know that people get vitamins, minerals and nutrients from food?
MR. REZVANI: Objection.
THE WITNESS: No.
MS. BRANCH: Okay.
BY MS. BRANCH:
Q Do you understand that your body makes certain vitamins, minerals and nutrients?
MR. REZVANI: Objection.
THE WITNESS: Yes.
MS. BRANCH: Okay.
BY MS. BRANCH:
Q So you do understand that your body makes some vitamins, minerals and nutrients?

Page 23

MR. REZVANI: Objection.
THE WITNESS: Yes.
BY MS. BRANCH:
Q Have you ever given a deposition before under oath?
A No.
Q Have you ever been a party to a lawsuit prior to this case?
A Define "party."
Q Have you ever sued someone or been sued?
A No.
Q Okay. Have you ever been associated with a party in a lawsuit in any way?
MR. REZVANI: Objection.
THE WITNESS: I'm not clear.
BY MS. BRANCH:
Q Well, what's your experience in the past related to lawsuits --
MR. REZVANI: Objection.
BY MS. BRANCH:
Q -- before this one?
A I don't have any experience.
Q You don't have any?
A No.
Q Okay. So you've never been involved in any

Page 24

court proceedings prior to this?
A No.
Q Are you -- in this lawsuit, this is the first lawsuit you've been involved in; right?
A Yes.
Q Are you represented by counsel today in this lawsuit?
A Yes.
Q Okay. Who do you consider to be your lawyer?
MR. REZVANI: Objection.
THE WITNESS: These two.
MS. BRANCH: Okay.
BY MS. BRANCH:
Q You consider the two men who are here on your behalf to be your lawyers?
A Yes.
Q Anybody else?
A Yes.
Q Who else?
A I -- I don't recall his name.
Q Okay. And have you formally retained lawyers to represent you?
A No.
Q You have not formally retained lawyers to

Page 25

represent you?
A No.
MR. REZVANI: Objection.
BY MS. BRANCH:
Q Have you signed a contract with any lawyers in this case?
MR. REZVANI: Objection.
THE WITNESS: No.
BY MS. BRANCH:
Q So you don't have any agreement with any lawyers in this case?
MR. REZVANI: Objection.
THE WITNESS: No.
MS. BRANCH: Okay.
BY MS. BRANCH:
Q Did you meet with any lawyers to prepare for this deposition?
MR. REZVANI: Objection.
THE WITNESS: Yes.
BY MS. BRANCH:
Q But those weren't lawyers that you formally retained?
MR. REZVANI: Objection; asked and answered. Argumentative.
THE WITNESS: I'm confused right now.

Page 26

BY MS. BRANCH:
Q Well, you said earlier that you had not formally retained any lawyers to represent you?
A No.
Q So when you met with lawyers to prepare for the deposition, if you did, those were not lawyers that you had retained?
MR. REZVANI: Same objection.
THE WITNESS: I still don't understand.
MS. BRANCH: Okay.
BY MS. BRANCH:
Q Well, just going back to my original question --
A Uh-huh.
Q -- you said you did not retain any lawyers in this case?
MR. REZVANI: That is not what she said. Objection.
BY MS. BRANCH:
Q I think I asked the question earlier did you formally retain any lawyers?
MR. REZVANI: She stated that she is represented by counsel here. That's all you need to know for purposes of privilege so -- feel free to ask your questions.

Page 27

BY MS. BRANCH:
Q Did you meet with lawyers in preparation for this deposition?
A Yes.
Q Okay. And those are lawyers that you did not have a signed agreement with; correct?
MR. REZVANI: Objection.
THE WITNESS: No.
MS. BRANCH: Okay.
BY MS. BRANCH:
Q Who did you meet with?
A I met with Ben and Josh.
Q Okay. You met with Ben and Josh. Do you know their last names?
A No.
Q Is it Ben Heikali who's also here?
A Yes.
Q And is it Josh Nassir? Did I say that right?
MR. HEIKALI: "Nassir."
BY MS. BRANCH:
Q Nassir, is that who you met with?
A Yes.
Q Okay. When did you meet with Ben and Josh?
A Maybe a month ago. That was the first one.

Page 28

Q And was the purpose of that meeting to prepare for your deposition?
MR. REZVANI: Objection; privileged. Don't answer.
BY MS. BRANCH:
Q How many times did you meet with Ben and Josh?
A Twice.
Q Okay. So once was a month ago; is that right?
A Yes.
Q And when was the second time you met with Ben and Josh?
A About a week ago.
Q Okay. Do you remember when a week ago? Was it roughly seven days ago or do you remember which day?
A It was on a Sunday.
Q Okay. Where did you guys meet?
MR. REZVANI: Objection; privileged. Don't answer.
MS. BRANCH: The location where you met is privileged?
MR. REZVANI: I'm asserting a privilege. You have the date of the meeting, the approximate

Page 29

date, so I'm asserting privilege to the content.
MS. BRANCH: I didn't ask about the content.
MR. REZVANI: I think location is cutting it close, but that's my objection.
MS. BRANCH: Okay.
BY MS. BRANCH:
Q So you met with Josh and Ben two times over the last month; is that right?
A Yes.
Q Did you meet with them any other times other than those two times?
A No.
Q Did you meet with anybody else other than Ben and Josh to prepare for your deposition?
MR. REZVANI: Objection to form.
THE WITNESS: Yes.
BY MS. BRANCH:
Q Who else did you meet with?
A This gentleman right here.
MR. REZVANI: Indicating me.
THE WITNESS: Yes.
MS. BRANCH: Okay.
BY MS. BRANCH:
Q And how many times did you meet with this

gentleman right here?
A Once.
Q And when was that?
A Yesterday.
Q Okay. So you met with Ben and Josh twice and then you met again yesterday with one of your lawyers; is that right?
A Yes.
Q So three times total?
A Yes.
Q Did you have any other meetings to prepare for your deposition?
A No.
Q What about phone calls? Did you speak with your lawyers on the phone to prepare for your deposition?
A Yes.
MR. REZVANI: Objection to form.
BY MS. BRANCH:
Q When did you speak with your lawyers on the phone?
A Several times.
Q How many?
A Not sure.
Q Do you have a ballpark? Three? Five?



Ten?
A Maybe five or more.
Q And when did those phone calls take place, just the general span of time?
A Yes.
Q Do you -- yes, you do know the span of time?
A You said -- oh, no.
Q Okay. Was it over the course of the last month?
A Yes.
Q Did you have any phone calls to prepare for this deposition prior to your first meeting with Ben and Josh a month ago?
MR. REZVANI: Objection to form.
THE WITNESS: Repeat.
BY MS. BRANCH:
Q Did you have any telephone calls to prepare for your deposition prior to your first meeting with Josh and Ben a month ago?
MR. REZVANI: Objection to form.
THE WITNESS: No.
BY MS. BRANCH:
Q So it would have been within the last month that you had these five or more phone calls with your



lawyers?
A Yes.
Q Okay. How long did you speak with them on the phone?
MR. REZVANI: Objection; form. Don't -- sorry, objection; privilege.
Don't answer.
MS. BRANCH: For the length of time?
MR. REZVANI: Yes.
BY MS. BRANCH:
Q Generally, how many hours would you guess you spent preparing for your deposition?
MR. REZVANI: Same objection.
With your attorneys or you are asking her generally?
MS. BRANCH: Generally.
MR. REZVANI: Well, I'm just going to be -- if you be clear that it's not with your attorneys, you can ask the question and answer it.
MS. BRANCH: You are saying that the time spent preparing with attorneys is privileged?
MR. REZVANI: I am.
MR. COHN: We are wondering what your authority is with these novel privilege assertions?
MR. REZVANI: Well, I -- are you on the



record? Would you like to go off the record?
MR. COHN: If you have authority just tell us.
MR. REZVANI: Okay. Do you have authority to say you are allowed to ask how long the meetings are?
MR. COHN: Are you kidding me? You're asking -- you're asserting a novel privilege assertion and you are asking us to disprove the negative.
MR. REZVANI: You are saying that it's novel. I would disagree with you.
MR. COHN: Well, then just give us authority.
MR. REZVANI: Okay. We can mark this and I can find the authority during a break. And if not -- if I can't find the authority, we can discuss it and then you can come back and ask these questions.
MS. BRANCH: Okay.
MR. COHN: There might be a second deposition, but go on. That's ridiculous.
BY MS. BRANCH:
Q Ms. Woods, did you review documents to prepare for your deposition?
A I'm not sure.

Page 34

Q Did you look at any pieces of paper in preparation for your deposition?
A Yes.
Q And which documents did you review?
A Legal documents.
Q Okay. What type of legal documents?
A I don't remember what they were named.
Q Were any of them not legal documents?
A No.
Q Okay. About how many documents do you recall reviewing in preparation for your deposition?
A Three.
Q Okay.
THE VIDEOGRAPHER: Excuse me a moment. Reza, can you raise your microphone. When you lean your sleeve like that you are rubbing up against it. Nice and high, right up near the boutonniere hole. That would be great.
MR. REZVANI: Thank you.
THE VIDEOGRAPHER: Thank you. Go ahead.
BY MS. BRANCH:
Q So you reviewed three legal documents in preparation for today; is that right?
A Yes.
Q Anything else?

Page 35

A No.
Q Now, other than your lawyers -- I'm not asking you about conversations you had with your lawyers, but did you speak with anybody else, other than your lawyers, in preparation for your deposition?
A No.
Q Did you do any Internet research in preparation from your deposition?
A No.
Q Okay. I assume it's no since you've already stated that you only reviewed three court documents, but did you review any other deposition testimony, like a transcript before your deposition?
A No.
Q Did you review discovery responses?
A Yes.
Q Okay. And would that be one of the court documents you referenced?
A Yes.
Q Okay. What about any expert reports? Did you review any expert reports?
A No.
Q Okay. And have you ever reviewed any expert reports related to this case?

Page 36

A No.
Q Have you ever reviewed any other documents -- aside from preparing for your deposition, have you ever reviewed any other documents in this case, other than the three court documents we discussed?
A No.
Q Okay. Do you know anyone by the name of Camille Cabrera?
A No.
Q Have you ever heard that name before?
A No.
Q Are you aware that she was the lead plaintiff in this case before you?
A No.
Q Okay. I assume the answer to this is no, because you said you've never been involved in a lawsuit before, but have you ever been a class representative before in litigation?
A No.
Q Do you know what that means?
A No.
Q What does it mean to you?
A You said a class litigation?
Q A class representative for litigation.

Page 37

A Probably what I'm doing now.
Q And just in your own words, what do you think you are doing now as the lead plaintiff in this case?
A I'm -- I'm the voice.
Q You are the voice. Okay.
The voice for?
A Everyone in the class-action.
Q Okay. And you've never been a class member before either?
A I have.
Q You have been a class member?
A I have been a class member.
Q Okay. And what lawsuit were you a class member or within which lawsuit were you a class member?
A First Student. It was with the bus driving.
Q Okay. So when you said earlier that you've never been associated with a lawsuit, that wasn't one hundred percent accurate?
MR. REZVANI: Objection.
THE WITNESS: Well, yes, it was.
BY MS. BRANCH:
Q But you would agree that you have been a

Page 38

class member in a lawsuit?
A Yes.
Q Okay. And so you've been associated with a lawsuit before?
MR. REZVANI: Objection.
THE WITNESS: Well, yes, I have been associated.
MS. BRANCH: Okay.
BY MS. BRANCH:
Q And for First Student, what was -- just tell me about that lawsuit?
A Well, I worked for Laidlaw. First Student bought Laidlaw and they did a background check on us without our permission.
Q Okay. And where was this case pending?
A What do you mean, "where"?
Q Do you recall what court the class-action was brought?
A No, I don't.
Q Was it somewhere in California?
A Yes.
Q And what was the outcome of the class-action?
A I'm not sure.
Q Did it settle?

Page 39

A I believe so.
Q You believe it settled.
And did you receive money as a result of that settlement?
A No.
Q Okay. Was that disappointing?
MR. REZVANI: Objection.
THE WITNESS: Yeah.
BY MS. BRANCH:
Q How much had you been promised that you would receive?
MR. REZVANI: Objection.
THE WITNESS: I wasn't promised anything.
BY MS. BRANCH:
Q Did anybody tell you, Hey, you might get "X" amount of money if you join this class?
A No.
Q How much were you hoping to get?
A No amount.
Q Okay. Just any amount?
A Yes.
Q And is that the only time you've been a class member?
A Yes.
Q Have you ever filed for Workers'

Page 40

Compensation in the past?
A Yes.
Q And when was that?
A I'm not sure of the date. Maybe last year.
Q And why did you file for Workers' Comp.
A I was stressed out.
Q Because of work? Because of family?
A Because of work.
Q Why were you stressed out because of work?
A Because of my boss.
Q And what was your boss doing that was stressing you out?
A He wasn't doing his job right.
Q And in what way was he not doing his job, in your opinion?
A Let me see. Okay. The way we work is we have times that we supposed to be at places.
Q Uh-huh.
A And he didn't -- he didn't -- I'll say go by those times. He likes to run everything late and it kept trickling down on the drivers.
Q Uh-huh.
A So it was stressing me out because I wasn't making my times. I like to be on time.
Q Uh-huh.

Page 41

A So that's what he was doing, sending us places where he knew we was going to run late.
Q Okay. So you like to be on time, but the way he ran things you were late?
A Yes.
Q And that stressed you out?
A Yes.
Q And because of that stress you filed for Workers' Comp.?
A Yes.
Q Okay. And did you receive Workers' Comp. as a result of filing for it?
A No.
Q Do you know why?
A I missed my deadline.
Q Missed your deadline to file?
A No, to go to their doctor.
Q Okay. Okay. So you were told you needed to go to a doctor.
You missed the deadline to do so?
A Yes.
Q Okay. Did you ever go to a doctor as a result of the stress that you were --
A I seen their doctor, but it wasn't in time.
Q Okay. So you did see a doctor, it just

Page 42

wasn't within the deadline?
A Yes.
Q Okay. And what did the doctor say about your stress?
A He said I was stressed out.
Q Did he prescribe you any medication as a result?
A No.
Q Okay. And what was the final outcome of your Workers' Compensation filing?
A I just went back to work.
Q Okay. So they denied your application and then you went back to work?
A Yes.
Q Is that the only time you filed for Workers' Compensation?
A No.
Q Okay. So once within the last year.
When else have you filed for Workers' Compensation?
A I don't recall the date. Somewhere in maybe '98, '99.
Q Okay. So in the late nineties?
A Yes.
Q Okay. And it was for the same bus driving

Page 43

job?
A Yeah -- no, no, it wasn't for the -- it was bus driving but not the same job.
Q Okay. Tell me -- and maybe let's go back to that.
You said you've been a bus driver for 21 years?
A Yes.
Q Is it that you've been a bus driver for different school systems?
A Different school districts, yes.
Q Any other difference in your job in those 21 years, other than the school you were driving for?
A No.
Q So in the late nineties you were working for a different school system?
A Yes.
Q And what school system was that?
A Laidlaw.
Q And is that in California as well?
A Yes.
Q And why did you file for Workers' Compensation in the late nineties?
A I twisted my ankle.
Q Okay. How did you do that?

Page 44

A Stepping off the bus.
Q Okay. Did you have a cast?
A No.
Q Okay. How long were you out of work as a result of the twisted ankle?
A Maybe two months.
Q Okay. And did you receive Workers' Comp. when you applied in the late nineties?
A Yes.
Q Okay. And did you receive it for those two months?
A Yes.
Q How much did you receive?
A I'm not sure.
Q Okay. Okay. So once in the last year. Once in the late nineties.
Any other time you've applied for Workers' Comp.?
A No.
Q Have you ever made a claim for Social Security for disability?
A Oh, yes.
Q When was that?
A I'm not sure.
Q Okay. In the last five years? In the last

Page 45

ten years?
A Maybe within ten.
Q Okay. And what were the circumstances of your making a claim for Social Security?
A I didn't receive it.
Q Okay. But what were the circumstances leading to your making a claim?
A I had surgery.
Q What kind of surgery?
A Foot surgery.
Q And why did you have to have foot surgery?
A I have plantar fasciitis.
Q Okay. Okay. So you had plantar fasciitis, you had surgery and then you filed for Social Security?
A Not Social Security.
Q Or disability?
A Yes.
Q And you said did you not receive that disability?
A No.
Q Why was your application denied?
A Because I was getting my sick time.
Q Okay. So your employer was giving you --
A Yes.

Page 46

Q -- money for your medical leave?
A Yes.
Q So although you were getting -- you were still getting paid by your employer, you still filed for disability?
A Yes.
Q Have you ever filed any type of complaint with a government agency?
A No.
Q Have you ever filed any sort of complaint, other than the Workers' Compensation we've already discussed, at work?
A No.
Q Have you ever filed for bankruptcy?
A No.
Q Have you ever been convicted of a crime?
A No.
Q Have you ever been arrested in the past?
A No.
Q Okay. So turning now to the lawsuit that you filed in this case, you understand that you are the lead plaintiff in this lawsuit --
A Yes.
Q -- and that you have sued Bayer?
A Yes.

Page 47

Q Okay. When did you first consider suing Bayer?
A When I saw the ad.
Q When you saw the ad?
A Yes.
Q When did you roughly see the ad?
A Maybe February, March.
Q And when you say, "the ad," what ad are you referring to? Was it a --
A I mean like -- like a posting or something.
Q Was it a posting on the Internet?
A Yes, yes.
Q Was it a posting on social media?
A Yes.
Q Okay. And what did the ad say?
A It said that the Flintstones wasn't -- that they didn't have all the vitamins. Something like that about -- it wasn't complete and if you had purchased them to sign up.
Q And so was this an ad posted on behalf of your lawyers or by your lawyers?
A I'm not sure.
Q Okay. Did it have a phone number on the ad to call?
A I'm not sure.

Page 48

Q Did it have an email address?
A I'm not sure.
Q Okay. So after you saw that ad, what did you do? Did you call someone?
A I entered my information.
Q So you entered your information straight into the ad?
A Where it said for me to do it.
Q Okay. And what happened after you entered that information? Did someone call you?
A Yes.
Q And was it your lawyers that are here today who called you?
A I believe so.
Q Okay. Okay. So it was the ad that prompted you to sue Bayer?
MR. REZVANI: Objection to form.
THE WITNESS: Yes.
MS. BRANCH: Okay.
BY MS. BRANCH:
Q And how did you find your lawyers ? Is it that they called you after you entered your information? Is that how you got in touch with them in the first place?
A Yes.

Page 49

Q Before you filed this suit, did you have a relationship with any of your lawyers?
A No.
Q Had you met them before?
A No.
Q Did you know them in any other way before they called you?
A No.
Q Okay. Have you previously heard of Faruqi & Faruqi?
MR. REZVANI: Faruqi & Faruqi.
BY MS. BRANCH:
Q Faruqi & Faruqi law firm?
MS. BRANCH: I think I did that last time.
MR. HEIKALI: You did the same thing last time.
BY MS. BRANCH:
Q You had never heard of them before?
A No.
Q So, I know we've mentioned Ben and Josh -- sorry, what's your first name again?
MR. REZVANI: Reza.
MS. BRANCH: Reza.
BY MS. BRANCH:
Q Is there anybody else who you've met at

Page 50

Faruqi & Faruqi other than the three lawyers we talked about?
A No.
Q Have you ever met anybody Timothy -- named Timothy Peter?
A No.
Q And what about Aubry Wand? Have you ever heard the name Aubry Wand?
A No.
Q Okay. So you don't consider Mr. Wand your lawyer?
MR. REZVANI: Objection.
THE WITNESS: He could be.
BY MS. BRANCH:
Q But you're not familiar with that name?
A No.
Q And you've never met Mr. Wand?
A No.
Q So, after you entered your information into the ad, someone called you.
Do you remember who called you?
A No.
Q Was it one of the lawyers we've discussed today?
A Yes.

Page 51

Q So it was either Ben, Reza or Josh who called you?
A Yes.
Q Do you remember which one?
A No.
Q Okay. And after they called you, what did you do then?
MR. REZVANI: Objection to form.
BY MS. BRANCH:
Q Did you meet with them? What was the next thing that happened after they called you about the lawsuit?
A I don't recall.
Q When's the next time you talked to your lawyers after that initial call?
A The next time? Maybe a week or so.
Q Okay. So you talked to your lawyers a week later after that initial call?
A Yes, maybe.
Q And was that another phone call or did you have a meeting?
A A phone call.
Q Okay. And who was that phone call with?
A Josh.
Q Okay. So Josh called you a week later

Page 52

after the initial call?
A Yes.
Q Okay. When they first called you after you had entered your information into the ad, what did they say?
MR. REZVANI: Objection; privilege. Don't answer.
MS. BRANCH: Well, take a step back.
BY MS. BRANCH:
Q When they initially called you, did you retain them as your lawyers on that first call?
MR. REZVANI: Objection; privilege. Don't answer.
That one she can answer, I apologize. She can answer. I withdraw that objection.
THE WITNESS: What do you mean?
BY MS. BRANCH:
Q On that first call when Josh called you or, I'm sorry, Ben, Reza or Josh called you that first time after you had entered your information into the ad on the website, did you on that call retain them as your lawyers?
MR. REZVANI: Objection to form.
THE WITNESS: I don't recall.
//

Page 53

BY MS. BRANCH:
Q Was it more of a preliminary discussion?
MR. REZVANI: Objection.
THE WITNESS: Yes.
MS. BRANCH: Okay.
BY MS. BRANCH:
Q And so on that call you didn't say, I want you to be my lawyers?
MR. REZVANI: Objection.
THE WITNESS: I don't recall that.
MS. BRANCH: Okay.
BY MS. BRANCH:
Q So what did you discuss on that call?
MR. REZVANI: Objection; privileged. Don't answer.
MS. BRANCH: You're saying it's privileged even though she hadn't retained her lawyers yet?
MR. REZVANI: That's correct.
MR. COHN: Just to be clear, you are shutting down the deposition on all questions regarding substance to those communications with you on that call?
MR. REZVANI: I'm asserted privilege on the substance of the call, and I told you that I would do some research on the issue of the phone calls -- on

Page 54

the amount of time for the meetings and the phone calls. And I'm happy to take a break now, I think we have an answer on that, so you can come back to those questions so we don't interrupt the flow because I feel like we're on the same topics.

MS. BRANCH: Okay. And does that apply as well to the discussions on the initial call prior?

MR. REZVANI: No, the discussions I don't have to research. The discussions on that call I'm asserting privilege and I'm directing her not to answer.

MR. COHN: I mean can -- if she doesn't recall, because we're going to have to lay this out for the judge, do you recall when you guys became her lawyers? Because under California law it depends on when you were her lawyers and when she viewed you as her lawyers.

So we're trying to create a record, which we're happy to do.

MR. REZVANI: I understand that. I think the questions have been asked to create that record. To the extent that you want to establish that the privilege does exist or does not exist, I believe the questions have established the foundation that you need for that.

Page 55

I'm still asserting the privilege at this time. So I think you've made your record. You are allowed to ask any more questions you want. I'm just not going to allow you to ask the substance on that conversation.

MR. COHN: You're not -- you can't disallow us from asking the questions. You are just going to instruct the witness not to answer any questions about the substance --

MR. REZVANI: That's correct.

MR. COHN: -- on the call in which you recruited her to become plaintiff.

MR. REZVANI: Well, I'll going to object to your characterization of that.

Yeah, I think I've asserted my objection pretty clearly. I'm allowing you to ask any questions you want which I have already on -- on this -- on the subjects that you did already.

I'm not allowing the substance of the call, that's it.

MS. BRANCH: Okay. Well, before we take a break, we should -- if we could just go through a few more questions so we can create our record.

MR. REZVANI: Sure.

MS. BRANCH: Okay.

Page 56

BY MS. BRANCH:

Q So on that initial call what is it that you discussed with Josh, Ben or Reza?

MR. REZVANI: Objection; privileged. Don't answer.

BY MS. BRANCH:

Q Did they discuss any documents with you on that call?

MR. REZVANI: Objection; privilege. Don't answer.

BY MS. BRANCH:

Q Did you -- was there anybody else on the call, other than the one lawyer?

MR. REZVANI: Object -- okay.

THE WITNESS: On the first call?

MS. BRANCH: Yeah.

THE WITNESS: No.

BY MS. BRANCH:

Q It was just one lawyer on the first call?

A Yes.

Q Okay. And did they tell you about the lawsuit on that call?

MR. REZVANI: Objection; privileged. Don't answer.

//

Page 57

BY MS. BRANCH:

Q What did they tell you about the lawsuit?

MR. REZVANI: Objection; privileged. Don't answer.

BY MS. BRANCH:

Q What did you discuss on the call?

MR. REZVANI: Objection; privileged. Don't answer.

MS. BRANCH: I think we can take a break.

MR. COHN: Yeah.

MR. REZVANI: Okay.

THE VIDEOGRAPHER: Off the record. The time is 8:16 a.m.

(Brief interruption in proceedings.)

THE VIDEOGRAPHER: We're back on the record at 8:30 a.m.

MR. REZVANI: During previous questioning as the record reflects I objected to certain conversation -- certain questions regarding the length of time that the witness spoke to attorneys.

I asserted privilege and I directed the witness not to answer. I withdraw that objection and counsel is free to ask those types of questions. I apologize for objecting before.

//

Page 58

BY MS. BRANCH:
Q So going back real quick to our discussion earlier about your preparation for the deposition.
About how many hours did you spend preparing for the deposition, including time with your lawyers?
A Maybe an hour.
Q An hour total?
A Oh, total? On -- on all the days, you talked about.
Q Just all together, how long did you spend preparing for your deposition?
MR. REZVANI: The phone calls. The meetings. All together.
THE WITNESS: I'm not sure.
BY MS. BRANCH:
Q Do you have a ballpark?
A No.
Q Three hours?
A I'm not sure.
Q Well, let's start with the first meeting.
You said you had an initial meeting with Ben and Josh, about how long was that meeting?
A About an hour.
Q Okay. So one hour on the first meeting.

Page 59

And then you said you had a subsequent meeting within, I guess, a week later with Ben and Josh.
About how long was that second meeting?
A Maybe two hours.
Q Okay. So one hour on your first meeting, two hours on your second meeting and then you had a third meeting with Reza and about how long was that third meeting, which I believe was yesterday?
A About an hour.
Q Okay. So roughly four hours of meeting with your lawyers in preparation for your deposition.
Does that sound right?
A Yes.
Q And you also said that you had phone calls leading up to your deposition.
About how many phone calls did you have?
A Over five.
Q Okay. Over five.
So I think you testified earlier five or more.
About how long was each of those five phone calls?
A I'm not sure.
Q Thirty minutes to an hour? Any ballpark?

Page 60

MR. REZVANI: Each call you are talking about?
MS. BRANCH: Each individual call.
THE WITNESS: Maybe thirty minutes.
BY MS. BRANCH:
Q Were any of them over an hour?
A I'll not sure.
Q Were any of them over two hours?
A No.
Q Okay. So somewhere between thirty minutes and an hour?
A Yes.
Q Okay. So five of those.
So roughly six or seven hours spent preparing for deposition?
MR. REZVANI: Objection.
THE WITNESS: Yes.
MS. BRANCH: Okay.
BY MS. BRANCH:
Q Okay. So just a few minutes ago you took a break with your lawyers; correct?
A Yes.
Q Okay. And during that break did you speak with your lawyers?
A Yes.

Page 61

Q And did they discuss anything about the deposition or the substance of the deposition during that break?
MR. REZVANI: Objection; privilege.
Don't answer.
BY MS. BRANCH:
Q Did they coach you on how you are doing during the deposition?
MR. REZVANI: Objection; privileged.
Don't answer.
BY MS. BRANCH:
Q Did you discuss anything aside from privilege during the break --
MR. REZVANI: Objection.
BY MS. BRANCH:
Q -- with your lawyers?
MR. REZVANI: Objection; privileged.
Don't answer.
MS. BRANCH: We have authority that coaching, discussions of the substance of the deposition in California that we're allowed to explore the substance of those discussions, as long as it's not about asserting privilege.
MR. REZVANI: Okay. So, do you have the authority.

Page 62

THE WITNESS: I do.
MR. REZVANI: Okay. So can we go off the record?
THE VIDEOGRAPHER: Off the record. The time is 8:35 a.m.
(Brief interruption in proceedings.)
THE VIDEOGRAPHER: Back on the record at 8:37 a.m.
Go ahead.
BY MS. BRANCH:
Q Ms. Woods, I want to go back to the advertisement that you mentioned earlier which you entered your information into.
Do you recall that?
A Yes.
Q Now, when did you first see the ad?
A Probably around February.
Q February of this year?
A Yes.
Q And where did you see it on the Internet?
A I believe like I was on Facebook.
Q So it was a Facebook ad?
A Yes.
Q Was it one of those banner ads? Was it on your news feed? Where was the advertisement when you

Page 63

first saw it on Facebook?
A I believe it was like on the side.
Q On sort of a panel?
A Yes, I believe so.
Q And how did you find the ad? Did you see it or did you search for it?
A I did not search for it.
Q Okay. So you didn't search for the ad. You just saw it when you were on Facebook?
A Yes.
Q And what did you do after you saw it?
A I clicked on it.
Q And what did you do after you click on it?
A I was able to see it.
Q And what did it say?
A It said something about the Flintstones not being complete.
Q Which Flintstones product?
A Gummies, the sours.
Q Anything else you can recall of what the ad actually said?
A Yeah, and it said to enter my information and that's what I did.
Q And did it say -- well, what else did it say in terms of who should enter the information?

Page 64

A I believe it said if you purchased the Flintstones so enter your information.
Q And at that point had you purchased the Flintstones?
A Yes.
Q Okay. So you purchased the Flintstones Gummies, you decided to enter your information?
A Yes.
Q Any other information you remember in the ad?
A No.
Q You don't remember a phone number?
A No.
Q And before you entered your information into the ad, did you speak with anybody about entering your information?
A No.
Q Did you talk to a friend about whether you should?
A No.
Q Did you do any research into the Flintstones Gummies before you entered your information?
A No.
Q Did you do any searches in Google about

Page 65

Flintstones Gummies before you entered your information?
A No.
Q Did you do anything before entering your information after you saw the ad?
MR. REZVANI: Objection; form.
THE WITNESS: No.
BY MS. BRANCH:
Q So you saw it, you clicked on it and you entered your information?
A Yes.
Q What about after you entered your information? Aside from your lawyers, did you speak with anybody about the ad?
A No.
Q You didn't speak with any friends about the ad?
A No.
Q Okay. Did you speak with your daughter about the ad?
A No.
Q Okay. Did you do any research about Flintstones Gummies after you entered your information?
A No.

Page 66

Q Did you do any research on vitamins after you entered your information?
A No.
Q Did you do any research on other types of children's multivitamin products after you entered your information?
A No.
Q Okay. And did you speak with anybody about the Flintstones ad that you saw after you entered your information?
MR. REZVANI: Other than your attorneys.
THE WITNESS: No.
BY MS. BRANCH:
Q So you never spoke with anybody about the lawsuit after you entered your information?
MR. REZVANI: Other than your attorneys.
THE WITNESS: No.
BY MS. BRANCH:
Q You didn't speak with your mother about it?
MR. REZVANI: Are we talking about -- where are we now? Lawsuit? Ad? What are we talking about?
MS. BRANCH: Both. Let's start with the ad.
//

Page 67

BY MS. BRANCH:
Q Did you talk to your mother about the ad that you saw?
MR. REZVANI: Objection; asked and answered.
THE WITNESS: Can we take a break?
MS. BRANCH: Uh-huh.
THE VIDEOGRAPHER: Off the record. The time is 8:41 a.m.
(Brief interruption in proceedings.)
THE VIDEOGRAPHER: Back on the record at 8:45 a.m.
BY MS. BRANCH:
Q Ms. Woods, for the next series of questions I'm not asking you about any discussions you've had with your lawyers. Just anyone other than your lawyers.
Do you understand that?
A Yes.
Q Okay. Did you ever speak with anyone, other than your lawyers, about the advertisement?
A No.
Q Did you ever speak with anyone, other than your lawyers, about the Flintstones Gummies product?
A No.

Page 68

Q Did you ever speak with anyone, other than your lawyers, about vitamins?
A No.
Q Did you ever speak with anybody about minerals?
A No.
Q Did you ever speak with anybody about the science related to vitamins and minerals?
A No.
Q Did you ever speak with anyone about the content of the advertisement?
A No.
Q Did you speak with anybody about the -- the complete allegations in the ad, other than your lawyers?
A No.
Q Okay. So you took the advertisement at face value?
MR. REZVANI: Objection.
THE WITNESS: Yes.
MS. BRANCH: Okay.
BY MS. BRANCH:
Q Did you talk to anybody to verify the information that was on the advertisement?
A No.

Page 69

Q Did you speak with anyone to verify the information that was in the complaint that you filed against Bayer, other than your lawyers?
A No.
Q Did you do any research on your own, aside from speaking with others, about the advertisement?
A No.
MR. REZVANI: Objection.
BY MS. BRANCH:
Q Did you do any research on your own about the allegations in your complaint?
A No.
Q Did you do any research on your own about the Flintstones Gummies?
MR. REZVANI: Objection.
THE WITNESS: No.
BY MS. BRANCH:
Q Did you do any research on your own about vitamins?
MR. REZVANI: Objection.
THE WITNESS: No.
BY MS. BRANCH:
Q Did you do research on your own about minerals?
MR. REZVANI: Objection.

THE WITNESS: No.
BY MS. BRANCH:
Q Did you do research about the amount of vitamins and minerals in a product?
A No.
MR. REZVANI: Objection.
BY MS. BRANCH:
Q Did you do any research about the FDA?
MR. REZVANI: Objection.
THE WITNESS: No.
BY MS. BRANCH:
Q Did you speak with anybody about the FDA?
MR. REZVANI: Objection.
THE WITNESS: No.
BY MS. BRANCH:
Q Did you do any research about the essential vitamins?
MR. REZVANI: Objection.
THE WITNESS: No.
BY MS. BRANCH:
Q Do you speak with anybody about essential vitamins?
MR. REZVANI: Objection.
THE WITNESS: No.
MS. BRANCH: Okay.



BY MS. BRANCH:
Q Do you know how many -- do you know how many vitamins there are?
MR. REZVANI: Objection.
THE WITNESS: No.
BY MS. BRANCH:
Q Do you know how many minerals there are?
MR. REZVANI: Objection to form. In the whole world?
MS. BRANCH: Yes.
MR. REZVANI: Okay. Objection to form.
THE WITNESS: No.
BY MS. BRANCH:
Q Do you know how many vitamins are in the Flintstones products?
A No.
Q Do you know how many vitamins are in other products other than the Flintstones?
A No.
Q Okay. Have you spoken with anyone, other than your lawyers, about this lawsuit?
A No.
Q Have you told anybody that you've entered into this lawsuit?
A No.



Q Does your daughter know that you're involved in the lawsuit?
A No.
Q So nobody knows?
A No one.
Q Okay. When you decided to sue Bayer, did anyone tell you that you might make money?
MR. REZVANI: Objection.
THE WITNESS: No.
BY MS. BRANCH:
Q So then why did you decide to file the lawsuit?
MR. REZVANI: Objection.
THE WITNESS: Because it wasn't truthful.
BY MS. BRANCH:
Q So you didn't think that you would make any money off of it?
MR. REZVANI: Objection; asked and answered. Argumentative.
THE WITNESS: Not sure.
BY MS. BRANCH:
Q When you said you didn't think it was truthful, why -- what does that mean? What do you think is not truthful?
A Complete -- the word "complete."



Q And what's your basis for that?
A Complete? "Complete," meaning that it has all the multivitamins that it should have.
Q Okay. But as you stated earlier, you don't know what vitamins are; right?
MR. REZVANI: Objection; asked and answered. Argumentative.
BY MS. BRANCH:
Q Wasn't your testimony earlier that you don't know what vitamins are?
MR. REZVANI: Objection; asked and answered.
You can answer.
THE WITNESS: Oh.
MR. REZVANI: Sorry.
THE WITNESS: Yes.
BY MS. BRANCH:
Q That was your testimony?
A That was.
Q Okay. And so -- and you standby that testimony that you don't know what vitamins are?
MR. REZVANI: Objection.
THE WITNESS: Yes.
BY MS. BRANCH:
Q And that you don't know how many vitamins

there are?

MR. REZVANI: Objection; asked and answered.

THE WITNESS: Yes.

BY MS. BRANCH:

Q Now, I am handing you what the court reporter will mark as Exhibit No. 1.

(Defendant's Exhibit 1 was marked for identification by the Certified Shorthand Reporter and is attached hereto.)

MR. REZVANI: Thanks.

BY MS. BRANCH:

Q If you could just look at the exhibit the court reporter has marked as Exhibit No. 1?

MR. REZVANI: Take that one. Yeah.

BY MS. BRANCH:

Q Just take a quick look.

MS. BRANCH: And for the record I'm handing the deposition notice calling Ms. Woods to testify today.

BY MS. BRANCH:

Q Have you seen this document before?

A Yes.

Q Okay. And when did -- did your lawyer give it to you?



A Yes.

Q When -- when did you review this document?

A Wait a minute.

I'm not sure.

Q You are not sure if you've seen it before?

A I'm not sure when -- when it was given to me -- shown to me.

Q But you do you recall receiving this?

A Yes.

Q Okay. Now, if you could just turn to the second page?

A (Witness complies.)

Q I would like to direct your attention to the last paragraph. And essentially it says we've asked you to bring actual bottles of Flintstones with you to the deposition, the Flintstones Gummies product.

You didn't bring those today; right?

A No.

Q And that's because you didn't have any left; is that true?

A Right.

Q Did you throw them away? Did you use them?

A Yes.

Q You used them or you threw them away?



A Both.

Q Okay. Okay. So you used Flintstones Gummies; correct?

A Yes.

Q What about the last bottle you purchased, did you use the whole bottle?

A Yes.

Q Okay. When you said you threw them away, when did you throw Flintstones Gummies away?

A After every use.

Q Okay. So let me just clarify for the record.

You threw away the empty bottle of Flintstones?

A Yes.

Q Okay. Got it. So you used up all of the Flintstones Gummies that you had; is that right?

A Yes.

Q And then you threw away the empty bottles?

A Yes.

Q And that's why you didn't bring bottles with you today?

A Yes.

Q Got it. When's the last time you threw away an empty bottle of the Flintstones Gummies?



A Maybe in the beginning of this year.

Q Okay. Roughly January? February?

A Yes.

Q Okay. When did you last purchase the Flintstones Gummies product?

A The gummies?

Q Yes.

A Maybe January. That's roughly around there.

Q Okay. January of this year?

A Yes.

Q 2019?

A Yes.

Q Okay. And those are the ones that you finished and then threw away the empty bottle?

A Yes.

Q Okay. And did you finish the gummy -- the last gummy bottle that you purchased before you hired lawyers in this case?

A Yes.

Q Okay. Did you buy any Flintstones Gummies after --

A No.

Q -- you hired lawyers in this case?

A No.

Page 78

Q Have you purchased any Flintstones -- Flintstones Gummies since January 2019?
A No.
Q Okay.
MR. REZVANI: Can I move this aside?
MS. BRANCH: Sure. And actually this is not the right complaint I wanted to show her.
BY MS. BRANCH:
Q Do you remember reviewing the complaint that you filed in this case?
A Yes.
Q And when did you review that complaint?
A Maybe two, three weeks ago.
Q Two, three weeks ago.
And was it in preparation for this deposition that you reviewed the complaint?
A Yes.
Q Okay. And you don't recall reviewing the complaint before two or three weeks ago?
MR. REZVANI: Objection to form.
THE WITNESS: I don't.
MS. BRANCH: Okay.
BY MS. BRANCH:
Q Did you provide information to your lawyers for purposes of including in the complaint?

Page 79

MR. REZVANI: Objection; privileged.
Don't answer.
BY MS. BRANCH:
Q So, in that complaint it says that you purchased Flintstones Gummies in January 2019 and that's consistent with your testimony; is that right?
A Yes.
Q Okay. When in January did you purchase the Flintstones Gummies?
A What do you mean when in January?
MR. REZVANI: Like what day?
BY MS. BRANCH:
Q When in January, yeah, about what day in January?
A Maybe around the tenth or something.
Q Okay. And where did you purchase them?
A Wal-Mart.
Q Ms. Woods, I'm handing you what the court reporter will mark as Exhibit No. 2.
(Defendant's Exhibit 2 was marked for identification by the Certified Shorthand Reporter and is attached hereto.)
MR. REZVANI: Thank you.
BY MS. BRANCH:
Q Just take a quick look and let me know if

Page 80

you recognize this document?
MR. REZVANI: Go ahead.
THE WITNESS: Yes.
BY MS. BRANCH:
Q And what is this?
A My responses.
Q Your responses to what?
A To the questions.
Q Okay. And these are questions that Bayer asked you?
A Yes.
Q Okay. And when did you -- when do you recall first reviewing these requests?
A About two, three weeks ago.
Q Okay. Two or three weeks ago?
A Uh-huh.
Q Was it before October 16th?
MR. REZVANI: Sorry, I don't mean to interrupt. I just want to back up.
The last question you asked, when did you review these requests, but then you are referring to plaintiff's two which is the response, so I just wanted to clarify that.
BY MS. BRANCH:
Q When's the first time you saw the request

Page 81

from Bayer?
MR. REZVANI: Well, this is not the request.
MS. BRANCH: Right. They're the responses to the requests.
MR. REZVANI: Right. I just wanted to make sure the question is clear.
MS. BRANCH: Oh, sure.
BY MS. BRANCH:
Q When is the first time that you saw the requests that Bayer had provided to you?
A I'm not sure of the question.
Q Is the first time you saw the requests for documents from Bayer about two or three weeks ago?
MR. REZVANI: Objection.
THE WITNESS: And are you speaking of this one?
MS. BRANCH: I'm speaking of any requests from Bayer.
THE WITNESS: I believe so.
MS. BRANCH: Okay.
BY MS. BRANCH:
Q So two or three weeks ago you received the requests.
And did you provide any information in

Page 82

response to those requests?
A Yes.
Q Okay. And when did you provide information in response to those requests?
A Two or three weeks ago.
Q And did you provide information in response to that request before or after you reviewed this document?
MR. REZVANI: Referring to plaintiff's -- the defendant's two.
THE WITNESS: After. After I've seen this.
BY MS. BRANCH:
Q After you saw this you provided information?
A No, no, no, no. Wait.
Yes, after I seen this, yes, I did.
Q Okay. And what information did you provide?
A My answers.
Q And do you recall giving those answers?
A Wait a minute. Okay. Actually -- no, actually, I gave my -- they asked me these before.
Q And about how long ago did they ask you?
A Over a month.
Q Over a month ago?

Page 83

A Yes.
Q Okay. And how did they -- did they email them to you? Did they read them over the phone? How did you receive the requests?
MR. REZVANI: Objection; privileged.
Don't answer.
BY MS. BRANCH:
Q Did you receive these requests in paper?
A No.
Q Did you receive them over email?
A Yes.
Q Okay. And when did you receive them over email?
A Two, three weeks ago.
Q Okay. So after you received them over email, did you write the responses yourself?
A Did I write them?
Q So in this document you've provided responses to our requests?
A Yes.
Q So if you turn to the fourth page, you'll see there's request one and in response to request one did you write those answers?
A When it was in the -- in the email?
Q Just at all. Did you type up the answers

Page 84

to these requests?
A No.
Q Okay. So these aren't your words that are in the responses?
MR. REZVANI: Objection.
THE WITNESS: They're my words. I didn't type them.
BY MS. BRANCH:
Q So did you provide answers over the phone and then someone else typed them? How did they get into this document?
MR. REZVANI: Objection.
THE WITNESS: Yes, they asked me.
MS. BRANCH: Okay.
BY MS. BRANCH:
Q They asked you over the phone?
A I believe it was in person.
Q Okay. And who -- who you were meeting with in person when you went over the request?
A Ben and Josh.
Q Okay. And was this that first meeting that -- when you guys met or the second meeting?
A The first.
Q Okay. Did your -- did anybody ask you to search for documents in response to these requests?

Page 85

MR. REZVANI: Objection; privileged.
Don't answer.
BY MS. BRANCH:
Q Did you provide documents in response to these requests?
A What type of documents?
Q Any documents.
A Yes.
Q Okay. What did you provide?
A My bank statements.
Q Okay.
A And pictures of the -- the Flintstones chewable.
Q Anything else?
A And the Equate.
Q The Equate.
Okay. And did your -- do you know whether those documents were shared with Bayer?
MR. REZVANI: Objection.
THE WITNESS: I believe so.
MS. BRANCH: Okay. I'm handing you and the court reporter a copy of what will be marked as Exhibit No. 3.
(Defendant's Exhibit 3 was marked for identification by the Certified Shorthand Reporter

Page 86

and is attached hereto.)
BY MS. BRANCH:
Q Do you recognize this?
A Yes.
Q And what is it?
A The Flintstones.
Q The Flintstones -- what kind of Flintstones product?
A This is the chewables.
Q Okay. Your lawsuit is not about the chewable product; right?
A No.
Q It's just about the gummies?
A Yes.
Q But you don't have pictures of the gummy bottle; right?
A No.
Q Because you finished them before you could take pictures?
MR. REZVANI: Objection.
THE WITNESS: Yes.
BY MS. BRANCH:
Q Do you know how many vitamins are in the chewable?
A No.

Page 87

Q Okay. Now, if you could please look at the cover email that's on the top of this document.
Can you tell me what the date is of this email?
A October 21st, 2019.
Q Okay. So this document was provided to Bayer on October 21st, 2019?
A Yes.
Q Okay. And when did you provide the picture? Was it on October 21st?
MR. REZVANI: Objection. Don't answer. Privileged.
MS. BRANCH: As to the date she gave documents?
MR. REZVANI: As in you are asking questions about documents she gave to attorneys, that is one hundred percent privileged.
So you've gotten the dates or the approximate dates of the meetings, you've gotten the approximate dates of phone calls, emails. That's -- that's as far as I think you can go.
So asking what documents she sent to her attorneys is a hundred percent privileged so that is the basis for my objection.
MS. BRANCH: We disagree with it.

Page 88

MR. REZVANI: You can disagree, but I'm just letting you know my ground.
BY MS. BRANCH:
Q Ms. Woods, when did you take this picture?
A I don't remember.
Q Was it in the last -- was it around October 21st or was it earlier?
A Probably earlier.
Q Okay. How much earlier?
A Around -- around that time.
Q Okay. And you also said that you turned over other documents; right?
A Yes.
Q Okay. Now, I'm going to hand you what the court reporter will mark as Exhibit No. 4.
(Defendant's Exhibit 4 was marked for identification by the Certified Shorthand Reporter and is attached hereto.)
BY MS. BRANCH:
Q Have you ever seen this email correspondence before?
A No.
Q And just looking at the top email, who is this email from.
A From Benjamin.

Page 89

Q And is Benjamin, Ben Heikali, your lawyer here with you today?
A Yes.
Q And who is it to?
A To Branch, Morgan.
Q Okay. And that's me?
A Yes.
Q Okay. And when was this email sent?
A October 21st, 2019.
Q Okay. And that's the same day that the picture we received was sent; right?
A Yes.
Q And if you could just read the first sentence after, "Morgan," into the record?
A "You should have received a production served from the paralegal just a few moments ago. This is the only document responsive to defendants RFPs."
Q Okay. So Ben says it's the only document in response to the requests; right --
A Yes.
Q -- on October 21st?
A Yes.
Q Okay. And was that true when your lawyer said that that was the only responsive document?

Page 90

MR. REZVANI: Objection.
THE WITNESS: That he sent to you?
MS. BRANCH: Uh-huh.
THE WITNESS: I'm assuming.
MS. BRANCH: Okay.
BY MS. BRANCH:
Q Are you aware that Bayer requests -- requested proof of payment for dietary supplements in the request for production that we looked at earlier?
A Repeat that.
Q I said are you aware that Bayer asked you for proof of payment of the Flintstones Gummies?
A If Bayer, I'm not sure.
Q Well, why don't we go back to Exhibit No. -- actually -- so if you'll, please, look at Exhibit No. 2 that you had in front of you earlier?
A (Witness complies.)
Q Can you turn to Request No. 2?
A (Witness complies.)
Q And can you read Request No. 2 to yourself?
A (Witness complies.)
Q Does this refresh your recollection that Bayer asked for proof of payment for dietary supplements that you'd purchased?
A Yes.

Page 91

Q And that included the Flintstones Gummies?
A Yes.
Q Did you search for receipts related to your purchases?
A Yes.
Q Where -- where did you search?
A I searched in the cabinets. Car. Purses.
Q Do you remember when you searched for receipts or other proof of payment?
A Maybe -- I don't remember. Maybe a month or so ago.
Q Okay. Do you generally keep receipts?
A No.
Q And did you provide any other proof of purchase to your lawyers?
MR. REZVANI: Objection; privileged. Don't answer.
BY MS. BRANCH:
Q Did you find any proof of purchase when you were searching?
MR. REZVANI: Objection to form.
THE WITNESS: No.
MS. BRANCH: Okay.
BY MS. BRANCH:
Q Well, you mentioned earlier that you

Page 92

provided credit card statements.
Was that a proof of purchase of the Flintstones Gummies?
A No.
Q Okay. Well, let's talk through that then.
A Uh-huh.
Q I'm handing you and the court reporter what will be marked as Exhibit No. 5.
(Defendant's Exhibit 5 was marked for identification by the Certified Shorthand Reporter and is attached hereto.)
MS. BRANCH: Actually, let me switch with you.
Can you make a new one?
BY MS. BRANCH:
Q And what is the date on this email?
A October 23rd, 2019.
Q And that's after October 21st, the email that we saw earlier; right?
A Yes.
Q Okay. And what is this document?
MR. REZVANI: The attachment?
BY MS. BRANCH:
Q The attachment?
A My bank statements.

Page 93

Q Your bank statements?
A Yes.
Q Okay. And did you consider the bank statement a proof of purchase of the Flintstones product?
MR. REZVANI: Objection.
THE WITNESS: It was proof that I went to Wal-Mart because there's no way that you could tell.
BY MS. BRANCH:
Q Well, in response to which request that Bayer served on you, were you providing this bank statement?
MR. REZVANI: Objection.
THE WITNESS: You said -- are you saying why did I provide it?
BY MS. BRANCH:
Q Well, we received this document in response to our request that we've been talking about; right?
A Right.
Q And so it would have been in response to one of the requests that are in here; right?
MR. REZVANI: Objection.
THE WITNESS: Right.
BY MS. BRANCH:
Q So which request did you give this to us in

Page 94

response to?
MR. REZVANI: Objection.
THE WITNESS: That I went to -- where I purchased the -- that I went to Wal-Mart and that's where I purchased the gummies from.
MS. BRANCH: Okay.
BY MS. BRANCH:
Q So it's not to prove how much you paid for the product?
MR. REZVANI: Objection.
THE WITNESS: No.
MS. BRANCH: Okay.
BY MS. BRANCH:
Q And again, the date of this cover email when we received the document is October 23rd; right?
A Right.
Q And that's two days after the email that we looked at earlier from Ben; right?
A Yes.
Q And that email on October 21st your lawyer said that the picture of the Flintstones was the only responsive document.
Do you remember that?
MR. REZVANI: Objection; asked and answered.

Page 95

THE WITNESS: Yes.
BY MS. BRANCH:
Q But then after on October 23rd you provided bank statements; right?
MR. REZVANI: Objection; asked and answered. Argumentative and a host of others, but go ahead.
THE WITNESS: Yes.
MS. BRANCH: Okay.
BY MS. BRANCH:
Q And so Ben's statement that the picture was the only responsive document, that wasn't entirely true; right?
MR. REZVANI: Objection. Asked and answered. Argumentative.
But it's your deposition so go ahead.
THE WITNESS: Repeat it.
BY MS. BRANCH:
Q I said Ben's statement that the picture of the Flintstones bottle was the only responsive document, that wasn't entirely true; right?
MR. REZVANI: Same objection.
THE WITNESS: I'm not sure.
MS. BRANCH: Okay.
//

Page 96

BY MS. BRANCH:
Q But you agree that we received a document -- two documents two days later after that?
MR. REZVANI: Objection.
THE WITNESS: Yes.
MS. BRANCH: Okay.
BY MS. BRANCH:
Q So turning back to the bank statement itself, and just for the record it's Bates labeled WOODS, underscore, 0000002, that's your credit card statement; right?
A Yes.
Q And where on here does it tell me where you purchased Flintstones Gummies?
MR. REZVANI: Objection.
THE WITNESS: Nowhere.
BY MS. BRANCH:
Q So why did you produce this then?
MR. REZVANI: Objection.
THE WITNESS: You said why did I produce this?
BY MS. BRANCH:
Q Why did you give it to us if this has nothing to do with purchasing Flintstones Gummies?
MR. REZVANI: Objection.

Page 97

THE WITNESS: It's where I purchased it at.
MS. BRANCH: Okay.
BY MS. BRANCH:
Q And where on here does it tell me where you purchased it?
MR. REZVANI: Objection.
THE WITNESS: Nowhere.
MS. BRANCH: All right.
BY MS. BRANCH:
Q I'm handing you the next exhibit in order which I believe is Exhibit No. 6.
(Defendant's Exhibit 6 was marked for identification by the Certified Shorthand Reporter and is attached hereto.)
MR. REZVANI: Thanks.
BY MS. BRANCH:
Q And what's the date of this correspondence?
A October 23rd, 2019.
Q And that's the same day as the email we were discussing at Exhibit No. 5?
A Yes.
Q And this is another bank statement; right?
A Yes.
Q Where on here does it tell me how much you paid for Flintstones Gummies?

Page 98

MR. REZVANI: Objection.
THE WITNESS: Nowhere.
BY MS. BRANCH:
Q Where on here does it tell me where you purchased Flintstones Gummies?
MR. REZVANI: Objection.
THE WITNESS: Nowhere.
MS. BRANCH: Okay.
BY MS. BRANCH:
Q So we -- we don't know how much you paid for Flintstones Gummies; right?
MR. REZVANI: Objection.
THE WITNESS: Who don't know?
BY MS. BRANCH:
Q You don't know; right?
A No.
MR. REZVANI: Objection.
BY MS. BRANCH:
Q And you haven't provided that information to us; right?
MR. REZVANI: Objection.
THE WITNESS: No.
BY MS. BRANCH:
Q And you don't know the price you paid for Flintstones Gummies at any given time; right?

Page 99

MR. REZVANI: Objection.
THE WITNESS: No.
BY MS. BRANCH:
Q And, in fact, you provided sworn interrogatory responses that say that you don't know how much you paid --
MR. REZVANI: Objection.
BY MS. BRANCH:
Q -- for Flintstones gummy?
MR. REZVANI: Objection.
THE WITNESS: Right.
BY MS. BRANCH:
Q Do you ever use the Internet?
A Yes.
Q How often?
A Everyday.
Q Do you have a smartphone?
A Yes.
Q Do you have a computer?
A A computer? I have a laptop.
Q Do you have a tablet?
A Yes.
Q And do you use your laptop daily?
A No.
Q About how often do you use your laptop?

Page 100

A A couple of times a month.
Q And how often do you use your tablet?
A A couple of times a month.
Q And what about your smartphone?
A Everyday.
Q Okay. And have you looked on the Internet using your smartphone, tablet or laptop for any information about multivitamins?
MR. REZVANI: Objection.
THE WITNESS: Have I looked for it?
BY MS. BRANCH:
Q For instance, have you ever Googled Flintstones?
MR. REZVANI: Objection.
THE WITNESS: No.
BY MS. BRANCH:
Q Have you ever Googled vitamins?
MR. REZVANI: Objection.
THE WITNESS: No.
BY MS. BRANCH:
Q Do you use any other browsing service other than Google?
A No.
Q In other words, have you ever searched the Internet for Flintstones?

Page 101

MR. REZVANI: Objection.
THE WITNESS: No.
BY MS. BRANCH:
Q And have you ever searched the Internet for information about vitamins?
MR. REZVANI: Objection.
THE WITNESS: No.
BY MS. BRANCH:
Q What about information on nutrition?
MR. REZVANI: Objection.
THE WITNESS: No.
BY MS. BRANCH:
Q Have you ever looked up recipes on the Internet?
A Yes.
Q How often do you look up recipes on the Internet?
A Maybe a couple times out of the year.
Q Okay. So not often?
A No.
Q Have you ever looked on the Internet for information about what vitamins you can get through food?
MR. REZVANI: Objection.
THE WITNESS: No.

Page 102

MS. BRANCH: Okay.
BY MS. BRANCH:
Q Are you aware that Bayer asked for information about your Internet searches within its request for documents?
MR. REZVANI: Objection.
THE WITNESS: Yes.
BY MS. BRANCH:
Q And did you search your browsing history for responsive information?
A Yes.
Q When did you search?
A Around -- around October.
Q And how did you search your browsing history?
A On my phone, I went to the history and I typed it in to see if something would come up.
Q What did you type in?
A Flintstones multivitamins.
Q You typed "Flintstones multivitamins" in your browsing history?
A I believe so.
Q Did you search anything else?
A Yes, I -- well, I spelled it wrong one time. So I searched it. I don't recall what else.

Page 103

Q Any other key terms you used to search?
A Just "Flintstones" and "Flintstones multivitamins" and I believe that might have been it.
Q Did you search for "multivitamins" independent from "Flintstones"?
A No, not that I recall. No.
Q Did you search for, quote "vitamins" in your browsing history?
A I don't recall.
Q Did you search for just "Flintstones" by itself?
A Yes.
Q Okay. Anything else?
A No.
Q Okay. Did you run similar searches on your laptop?
A No.
Q What about on your tablet?
A No.
Q Okay. Now, the ad we talked about earlier on Facebook, where -- which -- was it your tablet, your laptop or your phone where you saw the ad on Facebook?
A My phone.
Q Did you search Facebook for your browsing history to see if there was anything responsive there?

Page 104

A Yes.
Q And did you -- and did you find the ad that you mentioned earlier?
A No.
Q Did you look for the ad that you mentioned earlier?
A Yes.
Q And how did you look for the ad specifically?
A I don't recall.
Q Did you type anything into your browsing history or did you just go on your Facebook page and look and see if it was still there?
A It's the way -- I don't recall -- I can't explain it to you how I did it on Facebook.
Q Okay.
A So that's what I'm saying I don't recall. But it was through the Facebook, yeah.
Q But you looked for it and you couldn't find it?
A Right.
MS. BRANCH: Well, we're on the record officially requesting for that ad to the extent you all have access to it. If she can't provide it, hopefully you guys can.

Page 105

MR. REZVANI: Yeah, I mean you'll follow-up in writing.
MS. BRANCH: Okay.
BY MS. BRANCH:
Q So you mentioned in response to one of the other requests for social media information, you mentioned the one ad that you saw.
Do you recall seeing any other information about Flintstones on Facebook --
MR. REZVANI: Objection.
BY MS. BRANCH:
Q -- aside from the ad?
MR. REZVANI: Objection.
THE WITNESS: No.
BY MS. BRANCH:
Q Have you ever searched for Bayer or Flintstones on Facebook?
A No.
Q Have you ever gone to any multivitamin-related pages on Facebook?
A No.
Q What about on any other social media?
A No.

Page 106

Q Do you have any other social media aside from Facebook?
A Yes.
Q What do you have?
A Instagram.
Q And have you ever searched for "Flintstones" on Instagram?
A No.
Q Have you ever searched for "Bayer" on Instagram?
A No.
Q Have you ever searched for anything related to vitamins on Instagram?
A No.
Q What other social media do you have?
A I believe that's it.
Q Okay.
A Yeah, that's it.
Q Do you have Twitter?
A No.
Q Okay. Did you know that Bayer asked for any other information that you've read about multivitamins?
MR. REZVANI: Objection.
THE WITNESS: I'm not sure if they asked.

Page 107

MS. BRANCH: Okay.
BY MS. BRANCH:
Q Well, let's look at Request No. 4 in Exhibit No. 2.
Can you read Request No. 4 to yourself?
A (Witness complies.)
Q And does that refresh your recollection that Bayer asked you for materials you might have read about multivitamins?
A Yes.
Q Okay. Do you read magazines?
A No.
Q Do you read the newspaper?
A No.
Q Do you read any articles or journals?
A No.
Q Do you read books?
A Sometimes.
Q Okay. And have you ever read anything about multivitamins?
A No.
Q Have you ever read anything about Flintstones Gummies?
A No.
Q Have you ever read anything about Bayer?

Page 108

MR. REZVANI: Objection.
THE WITNESS: No.
MR. REZVANI: Are you changing topics? That's okay. No, I just wanted to know if now is a good time to take a five-minute break.
MS. BRANCH: Yeah, we do. Yeah, that's fine. Yeah.
THE VIDEOGRAPHER: This will mark the end of media unit number one. Going off the record at 9:30 a.m.
(Brief interruption in proceedings.)
THE VIDEOGRAPHER: We're back on the record and this marks the beginning of media unit number two. The time is 9:42 a.m.
Go ahead.
BY MS. BRANCH:
Q And just to make a record, Ms. Woods, just now on the break did your lawyers speak with you about the deposition?
MR. REZVANI: Objection; privileged.
Don't answer.
BY MS. BRANCH:
Q Did they speak with you about how you are doing in the deposition?
MR. REZVANI: Objection; privileged.

Page 109

Don't answer.
BY MS. BRANCH:
Q Did they coach you about anything you've said during the deposition?
MR. REZVANI: Objection; privileged.
Don't answer.
BY MS. BRANCH:
Q Did they ask you about -- or did they talk to you about anything other than privilege?
MR. REZVANI: Objection; privileged.
Don't answer.
MS. BRANCH: Okay.
BY MS. BRANCH:
Q Now, Ms. Woods, have you ever had any communications with a physician or other healthcare provider about vitamins?
A No.
Q Have you ever spoken with your doctor about nutrition?
A No.
Q Have you ever spoken with your daughter's doctor about nutrition?
A No.
Q Have you ever spoken with your daughter's doctor about whether she's getting enough nutrients

Page 110

through food?
A No.
Q Have you ever spoken with your daughter's doctor about her health in general?
MR. REZVANI: Objection to form.
THE WITNESS: No.
BY MS. BRANCH:
Q Do you take your daughter to the doctor periodically?
A Yes.
Q How often?
A How often? Well, let me see, a physical and as needed.
Q A physical?
A She gets her physical and as needed.
Q And how often does she get a physical?
A Yearly.
Q So every year she gets a physical?
A Yes.
Q Okay. And so since she was five and now she's nine, for the last four years she's gotten an annual physical with a doctor?
A No.
Q Okay. How many times over the course of the four years has she gotten a physical?

Page 111

A About three.
Q So three out of the four years she had an annual physical with a doctor?
A Yes.
Q And what did you discuss with the doctor during those annual appointments?
A Nothing.
Q Nothing?
A There was no problems.
Q Okay. Did the doctor ever ask you whether she's eating enough vegetables?
A No.
Q Okay. So you also said that your daughter sees a doctor as needed; right?
A Yes.
Q And what does that mean?
A If she hurts herself or if she's not feeling well.
Q And does she often visit a doctor as needed for those issues?
MR. REZVANI: Objection to form.
THE WITNESS: No.
MS. BRANCH: Okay.
BY MS. BRANCH:
Q About how often does she go to the doctor

Page 112

as needed per year?
A Maybe about three or four.
Q Three or four?
A Per year, maybe.
Q And what are some of the reasons why she's visited a doctor this year?
A Her foot.
Q What happened to her foot?
A She has flat feet.
Q Okay. And did she see just a general practitioner for her flat feet?
MR. REZVANI: Objection.
THE WITNESS: She's seen -- yes.
BY MS. BRANCH:
Q Are there any other reasons why she's seen a doctor this year?
A Eczema.
Q Okay. What about last year?
A Eczema.
Q Any other reason?
A Her physical.
Q Aside from her physical, just as needed?
A Maybe she was sick.
Q Okay. Do you remember what she was sick with?

Page 113

A Common cold.
Q Did it have anything to do with her nutrition?
MR. REZVANI: Objection.
THE WITNESS: No.
BY MS. BRANCH:
Q And I know you said earlier that you had never discussed nutrition or vitamins with doctors during annual visits.
What about during these as-needed visits? Do you recall ever speaking with your daughter's doctor about nutrition during an as-needed visit?
A No.
Q Okay. And I think we've covered this but just to be clear for the record, have you ever discussed your lawsuit with anyone other than your lawyers?
MR. REZVANI: Objection; asked and answered.
THE WITNESS: No.
MS. BRANCH: Okay.
BY MS. BRANCH:
Q Going back to the documents you've reviewed in this case.
You testified that you reviewed three court

Page 114

documents; is that right?
A Yes.
Q Okay. And is that one of -- is Exhibit No. 2 the request for production -- the responses to the request for production, is that one of them?
A Yes.
Q Okay. And the complaint in the case that we discussed earlier, is that another one?
A Yes.
Q Okay. And what was the third document that you reviewed?
A I don't recall the name of it.
Q Okay. But it was another court document?
A Yes.
Q Okay. Now, I'm handing you what will be marked as Exhibit No. 7.
(Defendant's Exhibit 7 was marked for identification by the Certified Shorthand Reporter and is attached hereto.)
BY MS. BRANCH:
Q If you just want to look over it for a minute.
A (Witness complies.)
Q Does this look familiar?
A Yes.

Page 115

Q Did you review this -- the interrogatories that are in front of you?
A Yes.
Q Do you understand what interrogatories are?
A I believe questions.
Q They're questions that you answered?
A I don't remember. Oh, yeah. Yes.
Q Okay. Could you please turn to the very last page of the document?
A (Witness complies.)
Q Is that your signature?
A Yes.
Q Could you just read the paragraph starting at line ten, starting with the factual contentions?
A To myself?
Q Sure.
A (Witness complies.)
Q In that first sentence you say that the contentions -- the factual contentions so what -- the answers you've provided are based on your own knowledge; right?
A Yes.
Q When do you recall reviewing these? And just to be clear for the record, these are supplemental responses and so there were initial

Page 116

responses provided and supplemental responses. These were the second responses that were provided.
So do you recall when you first saw the supplemental responses?
MR. REZVANI: Objection.
THE WITNESS: Maybe two or three weeks or so.
BY MS. BRANCH:
Q Do you recall receiving -- or did you receive the first set of responses to the interrogatories?
A The first set?
Q Well, let's try it this way: Do you remember receiving more than one set of interrogatories?
A I don't recall.
Q Do you remember responding to two different sets of interrogatories?
A I don't recall.
Q Do you recall amending your interrogatory responses?
MR. REZVANI: Objection.
THE WITNESS: "Amending," what do you mean?
BY MS. BRANCH:
Q So changing them?

Page 117

MR. REZVANI: Objection.
THE WITNESS: I don't recall.
MS. BRANCH: Okay.
BY MS. BRANCH:
Q Do you recall supplementing your interrogatory responses?
MR. REZVANI: Objection.
THE WITNESS: I don't recall.
BY MS. BRANCH:
Q So, did you receive -- so earlier you testified that you received the request for documents --
A Yes.
Q -- by email.
Did you also receive the interrogatories by email?
A Yes.
Q And did you type out the answers to the interrogatories or did somebody else?
A I did not type them.
Q Okay. Did you review them before signing the document?
A I did.
Q Okay. Ms. Woods, are you familiar with someone named Michael Dennis?

Page 118

A No.
Q Are you familiar with anyone named Kevin Caves?
A No.
Q If you could please turn to page six of the interrogatory responses?
A (Witness complies).
Q And I'd like to direct your attention to line 17 of page six with the sentence starting with "Specifically."
A Uh-huh.
Q And can you just read that sentence starting with "specifically" aloud for the record?
A "Specifically, plaintiff refers defendant to the expert report of J. Michael Dennis submitted on July 16th, 2019."
Q Okay. So, as you stated you don't know Michael Dennis.
You've never heard that name; right?
A No.
Q Okay. Even though you signed a verification that said that these responses are based off of your knowledge; right?
MR. REZVANI: I think you are incredibly mischaracterizing the way that this works so I

Page 119

object.
MS. BRANCH: You can answer.
THE WITNESS: Yes.
MS. BRANCH: Okay.
BY MS. BRANCH:
Q Now, if you could read that next sentence, the short one starting with "Plaintiff also refers"?
A "Plaintiff also refers to defendant Bayflint," dash, "00003688."
Q And just to be clear for the record, plaintiff, that's referring to you; right?
A Yes.
MR. REZVANI: Objection.
BY MS. BRANCH:
Q And what is Bayflint 00003688?
MR. REZVANI: If you know.
THE WITNESS: I'm not sure.
MS. BRANCH: Okay.
BY MS. BRANCH:
Q Have you ever heard of that before?
A Have I heard of it? No.
Q Now, when you refer to the expert report of Michael J. Dennis, have you read that report?
MR. REZVANI: Objection.
THE WITNESS: No.

Page 120

BY MS. BRANCH:
Q Did you know that that report existed?
MR. REZVANI: Objection.
THE WITNESS: No.
BY MS. BRANCH:
Q But you refer defendants to it here --
MR. REZVANI: Objection.
BY MS. BRANCH:
Q -- in your response; right?
MR. REZVANI: Objection.
THE WITNESS: Yes.
BY MS. BRANCH:
Q Now, going back to Bayflint 00003688, why did you include that document in your interrogatory response if you've never heard of it?
MR. REZVANI: Objection to form.
Again, you are mischaracterizing the way that this works.
But over my objection she can answer.
THE WITNESS: I'm not sure.
BY MS. BRANCH:
Q Have you ever looked at the document?
MR. REZVANI: Asked and answered.
THE WITNESS: Yes.
//

Page 121

BY MS. BRANCH:
Q You've looked at Bayflint 00003688?
MR. REZVANI: That's not what you said.
THE WITNESS: No.
MS. BRANCH: Okay.
BY MS. BRANCH:
Q So you don't know what it says?
MR. REZVANI: Asked and answered again.
THE WITNESS: No.
BY MS. BRANCH:
Q And your lawyers included it in these responses?
MR. REZVANI: Objection.
THE WITNESS: I'm not sure.
MS. BRANCH: Okay.
BY MS. BRANCH:
Q How does this document support your allegations against Bayer?
MR. REZVANI: Objection. Are you really asking her about a document that you already established 50 times that she hasn't seen and you are asking her how it establishes a claim against Bayer?
MS. BRANCH: These are her verified responses based on her knowledge.
MR. REZVANI: That is not the way this

Page 122

works and you know that.

So I'm going to object again. It's asked and answered. A host of other objections, but go ahead. If this is how you want to use your time, it's your deposition.

So over my deposition you can answer. Do you want the question read back?

THE WITNESS: Yes.

(The record was read as follows:

"QUESTION: How does this document support your allegations against Bayer?")

THE WITNESS: And what document are you referring to?

BY MS. BRANCH:

Q Referring to Bayflint 0003688?

A I'm not sure.

Q Okay. Now, could you turn to interrogatory nine on page 11?

A (Witness complies.)

Q And interrogatory nine asks for multivitamins that you or your family have purchased, including but not limited to, Flintstones Gummies.

Is that what it asks for?

A What number?

Q Interrogatory No. 9?

Page 123

A Oh, I thought you --

Q Oh, sorry, on page 11.

A Okay. Yes.

Q And you disclosed a few different multivitamins; right?

A Right.

Q And which multivitamin did you disclose in response to interrogatory nine?

MR. REZVANI: The ones that are listed, is that what you are asking her?

MS. BRANCH: Yeah, on the next page.

BY MS. BRANCH:

Q I think it's just the one, two, three bullets.

A Okay. Yeah, the Flintstones Gummies Complete Children's Multivitamin Supplements. Flintstones Sour Gummies Complete Chewable Multivitamin Supplements.

THE COURT REPORTER: Could you please read slower.

THE WITNESS: Sorry.

THE COURT REPORTER: Thank you.

THE WITNESS: I'm sorry. Do you want me to start over?

THE COURT REPORTER: Sure.

Page 124

THE WITNESS: Flintstones Gummies Complete Children's Multivitamin Supplement and Flintstones Sour Gummies Complete Children's Multivitamin Supplement and Flintstones Complete Chewables Multivitamins tablets.

BY MS. BRANCH:

Q So you list three types of multivitamins that you've purchased; right?

A Yes.

Q Okay. So other than those three Flintstones products, have you ever purchased any other vitamin products?

MR. REZVANI: Objection to form.

THE WITNESS: For myself or --

BY MS. BRANCH:

Q For anybody. For yourself? For your child?

MR. REZVANI: Objection.

THE WITNESS: Yes.

MS. BRANCH: Okay.

BY MS. BRANCH:

Q And which ones are those?

A The Vitafusion Prenatals.

Q And when did you purchase Vitafusion Prenatals?

Page 125

MR. REZVANI: Objection.

THE WITNESS: I don't recall the date. Years ago.

MS. BRANCH: Okay.

BY MS. BRANCH:

Q One year ago? Two years ago?

A A couple years.

Q Okay. Okay. So Vitafusion Prenatal, in addition to the three you list.

Any others?

A What else? What's those called? Equate.

Q Okay. And I think you mentioned earlier that you provided a picture of Equate to your lawyers; right?

MR. REZVANI: Objection.

THE WITNESS: Yes.

BY MS. BRANCH:

Q Are you aware as to whether that picture was ever turned over to Bayer?

MR. REZVANI: Objection.

THE WITNESS: I'm not.

MS. BRANCH: Okay.

BY MS. BRANCH:

Q Okay. Any others?

MR. REZVANI: Objection.

Page 126

THE WITNESS: No.
BY MS. BRANCH:
Q So just Vitafusion and Equate?
MR. REZVANI: Objection.
THE WITNESS: Oh, I don't know the name of them. It was like princess or something.
BY MS. BRANCH:
Q Princess.
And was this for you or for your daughter?
A My daughter.
Q Okay. And was it a children's multivitamin?
A Yes.
Q And when did you purchase the Princess Children's Multivitamin?
A I'm not sure.
Q Was it within the last year?
A No.
Q Last two years?
A I'm not sure.
Q It would have been in the last four years; right?
A Yes, it's around there.
Q So back to the Vitafusion Prenatal product, why did you purchase that?

Page 127

A For myself. No particular reason just because it's prenatal and I know they get a lot of vitamins in there.
Q Okay. So you purchased it because you knew it had a lot of vitamins?
MR. REZVANI: Objection.
THE WITNESS: (Witness nods head.)
BY MS. BRANCH:
Q Any other reason?
A Nope.
Q Do you know which vitamins it had?
A No.
Q Do you know how many?
A No.
Q And again you are not -- you don't know what vitamins are according to your prior testimony; right?
MR. REZVANI: Objection; asked and answered.
THE WITNESS: No.
MS. BRANCH: Okay.
BY MS. BRANCH:
Q But you purchased it because you thought it had vitamins?
MR. REZVANI: Objection.

Page 128

THE WITNESS: Yes.
MS. BRANCH: Okay.
BY MS. BRANCH:
Q So when you purchased the Vitafusion Prenatal product, did you look at the supplement facts when did you so?
A No.
Q Did you look at the back of the label at all?
A No.
Q Okay. You also purchased Equate.
Why did you purchase Equate?
A I purchased Equate because after buying the complete, I just didn't trust anything that said, "complete," so I just purchased Equate.
Q You said you purchased Equate two or three years ago; right?
A No.
Q When did you purchase Equate?
A After the gummies.
Q Did you purchase Equate -- sorry, go ahead.
A After the chewables.
Q After the chewables?
A Yes.
Q When did you purchase Equate?

Page 129

A Maybe -- maybe end of March, April of this year.
Q Okay.
A Yes.
Q End of March, April this year?
A Yes.
Q And how many vitamins are in the Equate product?
A I'm not --
MR. REZVANI: Objection.
THE WITNESS: How many vitamins?
MS. BRANCH: Uh-huh.
THE WITNESS: Oh, I'm not sure.
BY MS. BRANCH:
Q And what about minerals? How many minerals?
MR. REZVANI: Objection.
THE WITNESS: I'm not sure.
BY MS. BRANCH:
Q What's in the Equate?
MR. REZVANI: Objection.
THE WITNESS: I don't know.
MS. BRANCH: Okay.
BY MS. BRANCH:
Q So you also purchased the Princess product.

Page 130

And sorry, when you purchased Equate, did you look at the supplement facts?
A No.
Q Okay. So same questions for the Princess product.
When did you purchase -- I think you said a few years ago?
A Yes.
Q Okay. And why did you purchase the Princess product?
A No particular reason.
Q No reason at all?
A No.
Q Okay. But to provide to your daughter; right?
MR. REZVANI: Objection.
THE WITNESS: Yes.
MS. BRANCH: Okay.
BY MS. BRANCH:
Q And did you look at the supplement facts when you purchased the Princess product?
A No.
Q And do you know how many vitamins are in the Princess product?
MR. REZVANI: Objection.

Page 131

THE WITNESS: No.
BY MS. BRANCH:
Q Do you know which vitamins are in the Princess product?
MR. REZVANI: Objection.
THE WITNESS: No.
BY MS. BRANCH:
Q Do you know how many minerals are in the Princess product?
MR. REZVANI: Objection.
THE WITNESS: No.
BY MS. BRANCH:
Q Can you tell us anything that's in the Princess product?
MR. REZVANI: Objection.
THE WITNESS: No.
MS. BRANCH: Okay.
BY MS. BRANCH:
Q Now, based on your responses that we were just looking at on page 12 -- are you still on page 12?
A Yes.
Q Okay. And this is, sorry, for the record, Exhibit No. 7. Page 12 of Exhibit No. 7.
You indicate that you purchased Flintstones

Page 132

Gummies a few times over the years; right?
A Yes.
Q And when did you first purchase Flintstones Gummies?
A 20 -- 2015 or '16.
Q And why did you purchase Flintstones Gummies in 2015 or '16?
A Because I wanted my daughter to have some vitamins.
Q Okay. Any other reason?
A No.
Q Did you read the supplement facts when you purchased them in 2015 or '16?
A No.
Q Was your daughter with you when you purchased them?
A Yes.
Q And did she help you pick out the product?
A No.
Q So how did you choose the Flintstones product over all the other ones on the shelf?
A Because it said, "complete."
Q And did any of the other products say, "complete"?
A Not that I saw.

Page 133

Q Okay. So it's your testimony that you saw "complete" and that's why you grabbed the Flintstones?
MR. REZVANI: Objection.
THE WITNESS: That is true.
BY MS. BRANCH:
Q And is there any other reason why you decided to purchase Flintstones over any other product?
A No.
Q Have you -- had you heard of Flintstones before that?
A Yes.
MR. REZVANI: The vitamins or just the --
MS. BRANCH: Let's start with the vitamins.
BY MS. BRANCH:
Q Had you heard the Flintstones vitamins before you purchased them in 2015?
A Yes.
Q And how had you heard of them?
A Commercials.
Q Okay. Have you ever taken them yourself?
A Yes.
Q Okay. So when did you take them yourself? When you were a kid?

Page 134

A Yes.
Q And did you ever watch the Flintstones cartoon?
A Yes.
Q Does your daughter ever watch the Flintstones cartoon?
A No.
Q Okay. How often would you give your daughter the Flintstones Gummies? Every day?
A Oh, yes. Yes, every day.
Q Okay. And did your daughter like the way it tastes?
A The gummies?
Q Uh-huh.
A Yes.
Q Okay. How many did she take a day?
A It's two.
Q And did you ever have any trouble getting her to take them or she liked them so she would take them?
MR. REZVANI: Objection.
THE WITNESS: No trouble.
MS. BRANCH: Okay.
BY MS. BRANCH:
Q So you purchased them three or four times

Page 135

in 2016.
Does that sound right?
A Yes.
Q And then three or four times in 2017?
A Yes.
Q And three or four times in 2018?
A Yes.
Q And then again in 2019, in January?
A Yes.
Q Okay. So you brought them roughly 13 times in four years?
A Yes.
Q And did you finish -- did your daughter finish every bottle?
A Yes.
Q And of those 13 times that you purchased, did you ever turn the bottle around and look at the supplement facts?
A No.
Q You also purchased the sour gummies product in 2016; is that right?
A Yes.
Q Why did you decide to switch to the sour version or to purchase a version that was sour?
A Now those she did want.

Page 136

Q She wanted the sour ones?
A Yes.
Q Okay. And she liked the taste of those?
A She was in between and, no, not -- she didn't ask for them again.
Q Did she like the non-sour version better than the sour version?
A I would say so.
Q And you bought the regular version after 2016?
MR. REZVANI: Objection.
THE WITNESS: The regular you keep saying.
BY MS. BRANCH:
Q So going back you testified that you bought the sour version in 2016; right?
A Yes.
Q And then subsequent to that you purchased the regular gummy version?
A Yes.
Q And was that because your daughter preferred the regular version?
A No. She -- no.
Q Okay. You just decided to buy the regular version again?
MR. REZVANI: Objection.

Page 137

THE WITNESS: Yes.
MS. BRANCH: Okay.
BY MS. BRANCH:
Q So you said the reason why you purchased some of these vitamins is you wanted to give your daughter vitamins; right?
A Yes.
Q Okay. And how did you know that you should give your daughter vitamins if you have never talked to anybody about it?
MR. REZVANI: Objection.
THE WITNESS: I'm not sure.
BY MS. BRANCH:
Q Did you know what type of the vitamins to give her?
A No.
Q And you've said you gave her two per day; right?
A Yes.
Q Okay. And how did you know to give her two vitamins per day?
A Because that was -- is what the directions said.
Q Okay. So you read the directions?
A Yes.

Q But you never read the supplement facts?
MR. REZVANI: Objection.
THE WITNESS: No.
MS. BRANCH: Okay.
BY MS. BRANCH:
Q Do you know where the directions that say, you know, give two gummies are on the bottle?
A I believe they're at the top.
Q At the top of the back of the label or the front of the label?
A The back.
Q Okay. And are they right above the supplement facts?
A Could be.
Q Are they part of the supplement facts?
A I'm not sure.
Q Okay. But you did read the directions that say give two a day?
A I read it.
Q Okay. We'll come back to that once we have the labels.
So you also state in your responses that you purchased the Flintstones chewable in 2019; is that right?
A Yes.



Q And why did you switch to the chewable?
A Because I want her to try the chewable ones.
Q Just -- is that the only reason?
A That's the only reason.
Q Any other reason why you switched?
A No.
Q Okay. Does your child like the chewable more than the gummy?
A No.
Q Does she like the gummy more than the chewable?
A Yes.
Q Okay. Now, when you purchased the Vitafusion Prenatal, was that a gummy or a chewable?
A A gummy.
Q Okay. And that was for you; right?
A Yes.
Q And when you purchased the Princess, was that a gummy or a chewable?
A Gummy.
Q Okay. And what about the Equate that you purchased recently, was that a gummy or a chewable?
A Gummy.
Q Okay. And is that because your daughter



prefers gummies?
MR. REZVANI: Objection.
THE WITNESS: Yes.
MS. BRANCH: Okay.
BY MS. BRANCH:
Q And she a likes the way they taste?
MR. REZVANI: Objection.
THE WITNESS: She likes them.
MS. BRANCH: Okay.
BY MS. BRANCH:
Q And why does she prefer the gummies over the chewables?
A I'm not sure.
Q You just know that she does?
A Yes.
Q Okay. Okay.
MS. BRANCH: I'm at a decent stopping point, but I don't have to stop if you guys are fine.
MR. REZVANI: That's okay.
MR. COHN: You should just keep on going.
MS. BRANCH: Okay.
MR. HEIKALI: Is it a new topic?
MS. BRANCH: Yeah, it's new topic.
MR. HEIKALI: Sonnetta, are you okay?
THE WITNESS: I'm good.



MR. HEIKALI: Okay.
MS. BRANCH: Okay.
BY MS. BRANCH:
Q So do you -- I assume that you prepare meals for your daughter on occasion?
A Yes.
Q How often?
A Two to three times a week.
Q And other than the two or three times a week that you prepare meals for your daughter, who prepares meals for her if you are not doing it?
A Sometimes herself. It's not really preparing, but sometimes she a does it herself.
Q Okay. Well, let's step back.
Does she eat lunch at school?
A Yes.
Q And is that school -- is that lunch that she eats at school prepared by the school?
A Yes.
Q Okay. And then does she also sometimes bring her lunch to school?
A Every so often.
Q Okay. About how often?
A Once every couple of months.
Q And when she brings the lunch to school, do

Page 142

you help her prepare it or does she prepare it herself?
A It depends on what it is.
Q Okay. So what's something where you would help her prepare it?
A It depends on the sandwich.
Q Okay. What types of sandwiches would you help her prepare?
A A meat sandwich.
Q And what kind of sandwich can she prepare on her own?
A Peanut butter and jelly.
Q Okay. Any other sandwiches that she likes?
A Tuna.
Q And do you prepare that or does she?
A I do.
Q Okay. Any other sandwich?
A No.
Q Okay. So aside from sandwiches are there any other types of meals that she would prepare and bring with her to school?
A No.
Q Okay. And what type of lunch -- or I guess backing up.
Does she bring anything else with the

Page 143

sandwich to school with her?
A Yes.
Q What does she bring?
A Chips, any type of fruit, water, juice and maybe some kind of snack, like cookies or something.
Q Okay.
A Crackers.
Q And when you do prepare meals, I think you said two or three times a week?
A Uh-huh.
Q Do you do that for the health benefits of the food, like when you are choosing what to feed your daughter?
A Sometimes.
Q And what foods do you typically feed her that you think have health benefits?
A Salads.
Q Okay.
A Vegetables.
Q What kind of vegetables?
A Greens. Spinach. Cabbage.
Q Okay. What about any sort of meat?
MR. REZVANI: What's the question?
BY MS. BRANCH:
Q Do you feed her any sort of meat --

Page 144

MR. REZVANI: Oh, okay.
BY MS. BRANCH:
Q -- for the health benefits?
MR. REZVANI: Okay.
THE WITNESS: I'm not sure. On the meat, no, I'm not sure.
MS. BRANCH: Okay.
BY MS. BRANCH:
Q Well let's talk through just atypical meal.
What does your daughter typically eat for breakfast?
A She eats breakfast at school.
Q And do you know what she eats at school for breakfast?
A Various things. I'm not -- I'm not there.
Q Okay. But has she ever told you this is what I have for breakfast?
A Every now and then. Maybe some cereal.
Q Okay.
A Muffins. Pancakes.
Q Okay. Do you know what kind of cereal?
A No.
Q Okay. And what about lunch? We've talked about when she brings her lunch, but what's sort of a typical lunch she would have that the school

Page 145

prepares?
A Chicken. Pizza. They have pizza. Burritos. Some type of burritos and other stuff. I don't know what it is. So much stuff.
Q Okay. So chicken, pizza and burritos and maybe some other things?
A Yeah.
Q Okay.
A Salads.
Q And what is a typical meals for dinner that your daughter eats?
A Spaghetti, turkey chops, turkey meat loaf and steak. Chicken tacos, grilled chicken salad, mashed potatoes, macaroni and cheese and sometimes rice.
Q And do you choose these items to feed your daughter partly based on the health benefits it can provide to her?
A Sometimes.
Q And the nutrition that it will provide to her?
A I don't know what nutrition it will -- it will provide to her. I don't know.
Q Okay. Do you choose these items based on what vitamins they might provide to her?

A No.
Q Okay. So why -- what are some of the reasons why you choose certain foods over others?
MR. REZVANI: Objection.
THE WITNESS: Over what others?
BY MS. BRANCH:
Q So, for instance, do you choose foods that she likes --
A Yes.
Q -- and that she'll eat?
A Yes.
Q Because you want her to eat the food that you are providing her?
A Yes.
Q So is her preference one of the reasons why you choose certain foods?
A Sometimes.
Q Okay. So you said health benefit is one reason. Her preference is another reason.
Any other reason why you choose certain food over another?
MR. REZVANI: Objection.
THE WITNESS: No.
MS. BRANCH: Okay.
//



BY MS. BRANCH:
Q Do you try to avoid certain food such as sugar?
A Sometimes.
Q What about processed foods? Do you try to avoid feeding your daughter processed foods?
A No.
Q Is your daughter a picky eater?
A No.
Q Does she prefer grains over vegetables and fruit?
A No.
Q She likes vegetables?
A Yes.
Q Okay. Is there any type of food she just doesn't like?
A I can't say that there is.
Q Okay. Fair enough.
Does she drink any, like, sodas.
A Not often.
Q Okay. But sometimes?
A Every so often.
Q And what types of -- you mentioned juice and water.
Any other types of drinks that she likes?



A No, no.
Q Okay. Any concerns with your daughter's health?
MR. REZVANI: Objection.
THE WITNESS: No.
MS. BRANCH: Okay.
BY MS. BRANCH:
Q Any nutritional issues that have been identified by doctors?
A No.
Q Okay. Any other health concerns that she has --
MR. REZVANI: Objection.
BY MS. BRANCH:
Q -- other than her feet I guess?
MR. REZVANI: Objection.
MS. BRANCH: No?
THE WITNESS: No.
MS. BRANCH: Okay. I think I'm at a good stopping point mainly because I need to take a bio break. I haven't been.
THE VIDEOGRAPHER: Off the record. The time is 10:25 a.m.
(Brief interruption in proceedings.)
THE VIDEOGRAPHER: Back on the record at



10:36 a.m.
MS. BRANCH: First, just on the record, I wanted to note that we are reserving the right to reopen the deposition based on certain discovery that was not provided within her discovery responses that was asked for, for instance, other vitamins that she purchased, so I just wanted to make that record before we started.
MR. REZVANI: Sure. We can talk about that prior to you making your motion.
MS. BRANCH: Okay.
BY MS. BRANCH:
Q Now, Ms. Woods, going back to Exhibit No. 7, I think you have in front of you.
A Uh-huh.
Q Can you turn to page 12?
A (Witness complies.)
Q And just so the record is clear, you did not disclose Vitafusion Prenatal in this response; right?
MR. REZVANI: Objection.
THE WITNESS: In this response?
BY MS. BRANCH:
Q Or in any responses?
MR. REZVANI: Objection.

Page 150

THE WITNESS: No.
BY MS. BRANCH:
Q And you did not disclose Equate Children's Multivitamin?
MR. REZVANI: Objection.
THE WITNESS: No.
BY MS. BRANCH:
Q And you did not disclose the Princess Children's Multivitamin?
MR. REZVANI: Objection.
THE WITNESS: No.
MS. BRANCH: Okay.
BY MS. BRANCH:
Q So there are three multivitamins that were not disclosed in response to your sworn interrogatories?
MR. REZVANI: Objection.
THE WITNESS: Right.
BY MS. BRANCH:
Q Now, going back to these other vitamins that you've purchased, aside from Flintstones, I want to know through each of those and try to understand, you know, when you purchased those.
So, you mentioned I think the earliest one that you bought was the Vitafusion Prenatal; is that

Page 151

right?
A Yes.
Q So when you went to the store to purchase the Vitafusion Prenatal, did you -- why did you decide to purchase that particular product?
MR. REZVANI: Objection; asked and answered.
THE WITNESS: Because they were prenatal pills.
BY MS. BRANCH:
Q And what about the Vitafusion brand, why did you choose that brand?
MR. REZVANI: Objection.
THE WITNESS: No particular -- no particular reason on the brand.
BY MS. BRANCH:
Q Did you look at the bottle when you purchased, the front label?
MR. REZVANI: Objection.
THE WITNESS: Yes.
BY MS. BRANCH:
Q And did you look at some of the words that were on the front of the label?
A Yes.
Q And did you consider those words when you

Page 152

purchased the Vitafusion brand?
A Yes.
Q Okay. And did you consider the size of the bottle when you purchased the Vitafusion brand?
A No.
Q And which Vitafusion Prenatal vitamins did you purchase, do you recall?
A What do you mean which, like gummy?
Q Like which -- which brand because sometimes there are multiple within the same brand?
A Oh, I'm not sure.
Q Okay. And which words that were on the label did you read when you purchased the Vitafusion brand that day?
A Prenatal.
Q Anything else?
A No.
Q Okay. And you also mentioned -- I think the next one you purchased was the Princess Multivitamin?
MR. REZVANI: Objection.
THE WITNESS: Yes.
MS. BRANCH: Okay.
BY MS. BRANCH:
Q And did you have the -- did you know when

Page 153

you went to the store that you were going to purchase multivitamins when you purchased the Princess brand that day?
A Are you asking did I know I was going to purchase the Princess.
Q Did you know were you going to purchase children's multivitamins?
A Yes.
Q Okay. So you went to the store knowing that you were looking for children's multivitamins that day?
MR. REZVANI: Objection.
BY MS. BRANCH:
Q I'm merely asking whether you were in the store and you just happened to see them and you grabbed them or whether you went to the store knowing that you were going to buy children's multivitamins?
A Yes, I knew that I was going to buy vitamins.
Q Okay.
A Multivitamins.
Q And was your daughter with you the day you purchased the Princess Multivitamins?
A Yes.
Q And did you read the front of the label

Page 154

before you purchased the Princess Multivitamins?
A Yes.
Q And did you read the words on the label?
MR. REZVANI: Objection to form.
THE WITNESS: The Princess.
BY MS. BRANCH:
Q And did you read any other words that you remember on the front of the label?
A Not that I recall.
Q But you looked at the front of the label?
A Yes.
Q Okay. And you remember reading the front of the label?
A I don't recall that.
Q Do you remember the characters that were on the product?
A The princess.
Q And did your daughter -- does your daughter like princesses?
A Princesses, I'll say yeah.
Q And did she say, Mom, I want the princess ones? Like how did -- was that one the reasons why that's what you chose?
MR. REZVANI: Objection.
THE WITNESS: No. She didn't say it.

Page 155

BY MS. BRANCH:
Q Did any of the words that you read on the front of the label, other than "Princess," matter when you purchased the product?
MR. REZVANI: Objection.
THE WITNESS: You said did any of the words matter?
MS. BRANCH: Yeah.
BY MS. BRANCH:
Q Other than -- I mean you said that you purchased because it said, "Princess."
A Yeah.
Q Were there any other words that mattered to you when you decided to purchase the Princess product?
MR. REZVANI: Objection.
THE WITNESS: No.
BY MS. BRANCH:
Q So it was just the Princess?
MR. REZVANI: Objection.
BY MS. BRANCH:
Q I'm just trying to understand why --
A Somewhat.
Q -- you would chose the Princess product. You said you saw the princesses, but you

Page 156

said you don't know whether your daughter would have chosen them. I'm trying to understand why you chose that product.
Was it just that you saw the princesses on the front?
MR. REZVANI: Objection.
THE WITNESS: There was no particular reason.
MS. BRANCH: Okay.
BY MS. BRANCH:
Q But you can't remember any other words that caught your eye on the label that mattered?
MR. REZVANI: Objection.
THE WITNESS: No.
MS. BRANCH: Okay.
BY MS. BRANCH:
Q Now, you also said that you recently purchased Equate; right?
A Yes.
Q Okay. And that was within -- I think you said March or April?
A Yes.
Q Okay. And why did you choose Equate?
A Because by me purchasing the Flintstones with the complete, it did not -- I didn't trust that

Page 157

any of the other vitamins, if it said, "complete," that it was true, so I chose Equate.
Q Okay. So you chose Equate because it didn't say, "complete"?
A Right.
MR. REZVANI: Objection.
BY MS. BRANCH:
Q Did you compare the ingredients -- the Flintstones ingredients versus the Equate ingredients?
A No.
Q Do you know which vitamins are in the Equate brand?
A No.
Q Okay. Any other reason why you chose Equate?
MR. REZVANI: Objection.
THE WITNESS: No.
MS. BRANCH: Okay.
BY MS. BRANCH:
Q And are you still giving your daughter Equate?
A Yes.
Q Okay. So I just have one last question going back to the initial phone call after you saw

Page 158

the ad.
When you received the phone call at that point were you thinking of retaining a lawyer at that point?
A Actually, I wasn't thinking about that. I just wanted to know information.
Q Okay. So you weren't thinking, oh, I'm going to hire a lawyer on this call?
MR. REZVANI: Objection.
THE WITNESS: Not at that -- no.
MS. BRANCH: Okay.
BY MS. BRANCH:
Q So going back to what you discussed on that call, what did you discuss with the lawyer who called you?
MR. REZVANI: Objection; privilege.
Don't answer.
MR. COHN: You might want to do research on this because you'll see based upon her responses there is not privilege. We can take it up at the end of this deposition, we can take it up on another day, but you should do some research on that privilege assertion.
MS. BRANCH: Yep.
MR. REZVANI: Thanks for the guidance.

Page 159

MR. COHN: You're welcome.
BY MS. BRANCH:
Q Other than the prenatal supplement that we discussed earlier, have you personally ever taken any other multivitamins?
A No.
Q Okay. So I -- I know earlier you testified that you aren't familiar with vitamins.
Have you ever heard of -- and I think you also testified that you didn't do any research.
But have you ever heard of the National Institutes of Health?
MR. REZVANI: Objection.
THE WITNESS: No.
MS. BRANCH: Okay. Well, it's a government agency. It's responsible for medical research. They oversee what information consumers receive about multivitamins.
MR. REZVANI: Objection.
MS. BRANCH: Now I'm handing the court reporter what will be marked as Exhibit No. 8.
(Defendant's Exhibit 8 was marked for identification by the Certified Shorthand Reporter and is attached hereto.)
MR. REZVANI: Thanks.

Page 160

BY MS. BRANCH:
Q And if you could just turn to the second page of that?
A (Witness complies.)
Q And can you read out loud the highlighted definition of "multivitamin"?
A "A product that is meant to supplement the diet. Multivitamins contain a variety of vitamins. The number and amounts of these nutrients can vary substantially by product."
Q So at least according to the National Institutes of Health, multivitamins are meant to supplement the diet.
Do you agree with that definition?
MR. REZVANI: Objection.
THE WITNESS: I don't agree or disagree.
BY MS. BRANCH:
Q Do you expect that a multivitamin will give you everything that you need from a nutritional perspective?
MR. REZVANI: Objection to form.
THE WITNESS: I'm not sure.
BY MS. BRANCH:
Q Do you think you also get nutrition from food that you eat?

Page 161

A Depending on what food you eat, maybe.
Q And that you get vitamins in the food that you eat?
A I'm not sure.
Q But at least according to the National Institutes of Health it's meant to supplement, not replace the diet; right?
MR. REZVANI: Objection.
THE WITNESS: I'm not sure.
MS. BRANCH: Okay.
BY MS. BRANCH:
Q Why do you give your daughter vegetables? Is it for her health?
A Yes, the vegetables.
Q Uh-huh.
A Yes.
Q And to provide nutritious food to her?
A Yes.
Q So that she's getting certain nutrients through her food?
A I don't know about the nutrients.
Q About what so that she's getting vitamins through her food?
MR. REZVANI: Objection to form.
THE WITNESS: I don't know about the

Page 162

vitamins.
MS. BRANCH: Okay.
BY MS. BRANCH:
Q Do you expect that taking a multivitamin pill will give you everything that you need to live?
MR. REZVANI: Objection to form.
THE WITNESS: I'm not sure. Everything -- I'm not sure.
BY MS. BRANCH:
Q So if you were to take just a multivitamin and not eat any food, do you think you would survive?
MR. REZVANI: Objection.
THE WITNESS: No.
MS. BRANCH: Okay.
BY MS. BRANCH:
Q So you have to be getting at least something from your food?
MR. REZVANI: Objection.
THE WITNESS: Yeah.
BY MS. BRANCH:
Q And when you gave your daughter multivitamins, you didn't -- you didn't expect that to replace the food she was eating; right?
A No.
Q You still fed her?

Page 163

A Yes.
Q Okay. And so based on the definition, these supplements, they are meant to supplement food; right?
MR. REZVANI: Objection; form and argumentative and asked and answered but go ahead.
THE WITNESS: I'm still not sure.
BY MS. BRANCH:
Q Well, that's what it says; right?
MR. REZVANI: Objection.
THE WITNESS: Yes.
MS. BRANCH: Okay.
BY MS. BRANCH:
Q And did you expect the multivitamins to give your daughter one hundred percent of all the stuff she needs?
MR. REZVANI: Objection; form.
THE WITNESS: Yes.
BY MS. BRANCH:
Q A hundred percent of all of the vitamins?
MR. REZVANI: Objection.
THE WITNESS: It said, "complete."
BY MS. BRANCH:
Q So you expected each of the vitamins within for there to be a hundred percent of them?

Page 164

MR. REZVANI: Objection.
THE WITNESS: Yes.
BY MS. BRANCH:
Q A hundred percent of each individual vitamin?
MR. REZVANI: Objection.
THE WITNESS: Yes.
MS. BRANCH: Okay.
BY MS. BRANCH:
Q But you don't need to get a hundred percent of vitamins through a multivitamin, at least according to this definition; right?
MR. REZVANI: Objection.
THE WITNESS: I'm not sure.
MS. BRANCH: Okay.
BY MS. BRANCH:
Q Are you familiar with the various types of vitamins?
A No.
Q Do you know what vitamin A is?
A No.
Q Have you ever heard of it?
A Maybe not.
Q What about vitamin C? Have you ever heard of vitamin C?

Page 165

A I have.
Q Okay. How have you heard of it?
A A commercial.
Q Did -- are you aware that vitamin C is in oranges and orange juice?
A I am.
Q Okay. So you do know that you get vitamins through food?
MR. REZVANI: Objection.
MS. BRANCH: I'm just trying to understand the inconsistencies.
MR. REZVANI: To be honest with you, if you want to do it this way, it's argumentative. You do it all the time. Note my objection to argumentative. And if you are going to continue doing it in this fashion when you are arguing with the question, so it's your testimony this, so it's your testimony that, I'm just going to give you a heads-up that if you continue it, I am going to make an application for a protective order pursuant to the rules.
I don't think these are proper questions given the other questions you are asking so...
MR. COHN: Go ahead and do it.
MR. REZVANI: Okay.
MR. COHN: Don't make silly threats like

Page 166

that.

BY MS. BRANCH:

Q Now, going back to vitamin C, you testified that you knew that it's in oranges and orange juice; right?

A You didn't say orange juice. You said oranges.

Q I think I said both, but oranges?

A Okay.

Q And orange juice?

A Well, yes.

Q And an orange is a food; right?

MR. REZVANI: Objection.

THE WITNESS: Yeah.

MS. BRANCH: Okay.

BY MS. BRANCH:

Q So you at least know that vitamin C can be found in food?

MR. REZVANI: Objection to form.

THE WITNESS: You asked me about oranges.

BY MS. BRANCH:

Q An orange is a food; right?

MR. REZVANI: Objection.

THE WITNESS: Yes.

//

Page 167

BY MS. BRANCH:

Q And so you know that vitamin C can be found in food; right?

MR. REZVANI: Objection.

THE WITNESS: No.

BY MS. BRANCH:

Q So is it that an orange is a food or is not a food? Do you see what -- the disconnect? You are testifying that you don't know whether vitamins can be found in food.

You are saying that you know vitamin C can be found in oranges. I'm just trying to understand the inconsistencies.

MR. REZVANI: Objection; argumentative. It's an inconsistency in your mind.

Ask a question, please.

BY MS. BRANCH:

Q Can you explain that inconsistency to me?

MR. REZVANI: Objection to form.

This is the part where it's argumentative, but just note my objection.

THE WITNESS: When you say, "orange," you talking about oranges. So you say food that can be anything.

//

Page 168

BY MS. BRANCH:

Q But I'm saying an orange is a type of food; right?

MR. REZVANI: Objection.

THE WITNESS: Yes.

MS. BRANCH: Okay.

BY MS. BRANCH:

Q So you know that vitamin C can be found in at least one type of food and that's oranges?

MR. REZVANI: Objection.

THE WITNESS: Yes.

MS. BRANCH: Okay.

BY MS. BRANCH:

Q What about vitamin D? Are you familiar with vitamin D?

A Yes.

Q Okay. And how are you familiar with vitamin D?

A I believe it's in milk.

Q Okay. And how do you know that it's in milk?

A Commercials.

Q Okay. And vitamin D is a type of food; right? Or, sorry, milk is a type of food; right?

A Milk is a food?

Page 169

Q It's something you consume?

A Yes.

Q Okay. What about vitamin E? Have you ever heard of vitamin E?

A I have.

Q Okay. And where have you heard of vitamin E?

A I believe -- a commercial, I believe.

Q Okay. And what do you know about vitamin E?

A I don't know much.

Q Okay. Just that it's a type of vitamin?

A Yes.

Q Okay. And what type of commercial do you recall seeing it in?

A Maybe a hair commercial.

Q Okay. Any food commercials?

A No.

Q Okay. Are you familiar with vitamin K?

A No.

Q Are you familiar with any of the B vitamins?

MR. REZVANI: Objection.

THE WITNESS: I just heard of -- I'm not familiar like know what it is, no.

Page 170

MS. BRANCH: Okay.
BY MS. BRANCH:
Q Are you aware that there are multiple type of B vitamins?
MR. REZVANI: Objection to form.
THE WITNESS: Yeah.
MS. BRANCH: Okay.
BY MS. BRANCH:
Q Do you know how many?
A No.
Q Do you know anything else about B vitamins?
A No.
Q Okay. Do you know anything about vitamin B1?
A No.
Q Or vitamin B2?
A No.
Q Or vitamin B3?
A No.
Q Or 4? What about vitamin B12? Have you ever heard of that?
A I have.
Q And what do you -- what do you know about vitamin B12?
A I don't.

Page 171

Q Have you ever heard of vitamin B1?
A No.
Q Have you ever heard of vitamin B2?
A No.
Q Okay. Have you ever heard of vitamin B3?
A No.
Q Okay. Okay. Have you ever looked at -- I know you testified that you didn't with respect to Flintstones.
But have you ever looked at any other labels before buying a product?
A As to?
Q So when you go to a store you buy a product, do you look at the label -- the back of the label?
A Sometimes.
Q What types of product do you look at the back of the label?
A Cereal. Granola bars.
Q Okay. And what do you look for on the back of the label when you look at cereal and granola bars?
A The sugar.
Q The sugar.
Anything else?

Page 172

A And the sodium.
Q Why those two things?
A Because I need to watch it.
Q Okay. And is that for yourself?
A Yes.
Q Any other ingredients that you look for?
A No.
Q Any other types of products that you tend to look at the back of the label?
A Maybe a sauce or something.
Q When you are looking at the back of the label for cereal, do you notice that it also lists vitamins?
A I -- yes.
Q Okay. So you've seen vitamins on the back of a cereal label?
A Yeah.
Q And you've seen vitamins on the back of a granola bar label?
A I'm not sure.
Q Okay. Any other foods that you tend to look at the label?
A A bunch of foods.
Q All right. So you agree that there are vitamins within these foods that we're discussing;

Page 173

right?
MR. REZVANI: Objection.
THE WITNESS: Yes.
MS. BRANCH: Okay.
BY MS. BRANCH:
Q Have you ever looked at the supplemental fact section for a multivitamin?
A No.
Q So you've never looked at the back of a label for a multivitamin that you've bought?
MR. REZVANI: Objection.
THE WITNESS: Yes.
BY MS. BRANCH:
Q You looked at the back of the label for a multivitamin that you bought?
A Yes.
Q Okay. And have you ever seen the supplement facts when you turned and look at the back of the label?
MR. REZVANI: Objection.
THE WITNESS: I don't know what the -- no, no.
MS. BRANCH: Okay.
BY MS. BRANCH:
Q So what did -- when you turned and looked

Page 174

at the back of the label, what do you see when you're purchasing a multivitamin?
A I look for the directions. Not when I'm purchasing.
Q Okay. So you don't look at supplemental -- you don't look at the back of the label when you are purchasing multivitamins?
A No.
Q And have you ever looked at back of the label when purchasing multivitamins?
MR. REZVANI: Objection.
THE WITNESS: No.
BY MS. BRANCH:
Q So you look at the back of the label after you've already bought it?
A To read the directions.
Q Okay. And you did look at the back of the label and read the directions for the Flintstones Gummies; right?
A Yes.
Q So you've seen the back of the label for the Flintstones Gummies?
MR. REZVANI: Objection.
THE WITNESS: For the directions.
//

Page 175

BY MS. BRANCH:
Q So you only read the directions, you didn't read anything else?
MR. REZVANI: Objection.
THE WITNESS: Right.
MS. BRANCH: All right.
BY MS. BRANCH:
Q And are you aware that the supplement facts list all the vitamins that the product contains?
MR. REZVANI: Objection.
THE WITNESS: No.
BY MS. BRANCH:
Q But you are aware that the cereal box lists the vitamins that it contains; right?
MR. REZVANI: Objection.
THE WITNESS: Yes.
MS. BRANCH: Okay.
BY MS. BRANCH:
Q And you said you purchased multivitamins for your child because you wanted her to get vitamins; right?
MR. REZVANI: Objection.
THE WITNESS: Right.
BY MS. BRANCH:
Q But you're not aware that the supplement

Page 176

facts list those vitamins?
MR. REZVANI: Objection.
THE WITNESS: No, I'm not aware of what vitamins are on the back.
MS. BRANCH: Okay.
BY MS. BRANCH:
Q But you're aware that the supplement facts do list the vitamins that are in the product?
MR. REZVANI: Objection.
THE WITNESS: Yes.
MS. BRANCH: Okay.
BY MS. BRANCH:
Q And what about minerals, are you aware that the supplemental facts list all the minerals in the product?
A I'm not sure.
Q And what about the other ingredients? Are you aware that the supplement facts list other ingredients that are in the product aside from vitamins and minerals?
MR. REZVANI: Objection.
THE WITNESS: No.
MS. BRANCH: Okay.
BY MS. BRANCH:
Q When you bought the Flintstones Gummies,

Page 177

what did -- did you have any specific expectation of what was in the product?
MR. REZVANI: Objection to form.
THE WITNESS: I just know that it said, "complete," so my expectation was that it was going to have all the multivitamins that it was supposed to have.
MS. BRANCH: Okay.
BY MS. BRANCH:
Q And what are all the multivitamins it's supposed to have?
A I'm not sure.
Q Okay. So what does all the vitamins it should have mean to you?
A When it says, "complete," I'm assuming that that's what -- I don't -- it's going to have everything that it needs to have. All the multivitamins that it's supposed to have.
Q But when you say, "it's supposed to have," what does that mean?
MR. REZVANI: Objection; asked and answered.
THE WITNESS: I'm saying that it should have like -- if it's complete -- I don't know the vitamins. So if it's saying, "complete," that's --

that's what I was looking for.
BY MS. BRANCH:
Q Do you have any idea which specific vitamins it should have?
A No.
Q What about minerals? Do you have any expectation of what minerals it should have?
MR. REZVANI: Objection to form.
THE WITNESS: No.
BY MS. BRANCH:
Q Did you have any expectation of whether it should have vitamin A?
MR. REZVANI: Objection.
THE WITNESS: No.
BY MS. BRANCH:
Q Did you have any expectation of whether it should have vitamin C?
MR. REZVANI: Objection.
THE WITNESS: Maybe.
MS. BRANCH: Okay.
BY MS. BRANCH:
Q Is that because you had heard of vitamin C before?
MR. REZVANI: Objection.
THE WITNESS: Yes.



BY MS. BRANCH:
Q Did you have any expectation of whether it should include vitamin D?
A I'm not sure.
Q Do you have any idea of whether it should have had vitamin A?
MR. REZVANI: Objection.
THE WITNESS: Not -- no.
BY MS. BRANCH:
Q Did you have any idea of whether it should have had vitamin C?
MR. REZVANI: Objection.
THE WITNESS: Maybe.
BY MS. BRANCH:
Q Did you -- did you have any idea of whether it should have had vitamin D?
MR. REZVANI: Objection.
THE WITNESS: Not sure.
BY MS. BRANCH:
Q Did you have any idea of whether it should have had vitamin E?
MR. REZVANI: Objection.
THE WITNESS: I'm not sure.
MS. BRANCH: Okay.
//



BY MS. BRANCH:
Q Did you have any idea of whether it should have vitamin K?
MR. REZVANI: Objection.
THE WITNESS: I'm not sure.
BY MS. BRANCH:
Q Did you have any expectation -- or did you have any idea of whether it should have any of the B vitamins?
MR. REZVANI: Objection.
THE WITNESS: No, I'm not sure.
BY MS. BRANCH:
Q Any idea of whether it should have vitamin B1?
MR. REZVANI: Objection.
THE WITNESS: No.
BY MS. BRANCH:
Q What about vitamin B2?
MR. REZVANI: Objection.
THE WITNESS: No.
BY MS. BRANCH:
Q Any idea of whether it should have vitamin B3?
MR. REZVANI: Objection.
THE WITNESS: No.



MS. BRANCH: Okay.
BY MS. BRANCH:
Q So you had no idea of which particular vitamins it should have.
MR. REZVANI: Objection.
BY MS. BRANCH:
Q Right?
A Right.
Q And you had -- did you have any idea of how many vitamins it should have?
MR. REZVANI: Objection.
THE WITNESS: No.
BY MS. BRANCH:
Q So you had no idea of how many vitamins it should have?
MR. REZVANI: Objection.
THE WITNESS: I had no idea.
MS. BRANCH: Okay.
BY MS. BRANCH:
Q Did you expect that the supplement facts would show you what was in the product?
MR. REZVANI: Objection.
THE WITNESS: I don't know.
BY MS. BRANCH:
Q Did you expect that if you turned the

Page 182

bottle around you could see the ingredients --
MR. REZVANI: Objection.
BY MS. BRANCH:
Q -- just like when you turn the cereal box around?
MR. REZVANI: Objection.
THE WITNESS: I'm sure.
BY MS. BRANCH:
Q So you did expect the ingredients to be listed?
MR. REZVANI: Objection.
THE WITNESS: Yeah.
MS. BRANCH: Okay.
BY MS. BRANCH:
Q And is it your position that products should contain vitamins that kids already get enough of through food?
MR. REZVANI: Objection.
THE WITNESS: Again.
BY MS. BRANCH:
Q So we talked about earlier how you get vitamins through food; right?
A Right.
Q Okay. And my question is: Is it your position that products -- multivitamin products

Page 183

should contain vitamins that kids already get enough of through their food?
MR. REZVANI: Objection.
THE WITNESS: I'm not sure.
MS. BRANCH: Okay.
BY MS. BRANCH:
Q So, if your daughter was getting a hundred percent of the vitamin A she needs in a day through her food, then would you expect the supplement that you are giving her to also contain vitamins A?
MR. REZVANI: Objection.
THE WITNESS: I'm not sure.
MS. BRANCH: Okay.
BY MS. BRANCH:
Q Did you expect the Flintstones Gummies to have minerals when you bought it?
MR. REZVANI: Objection to form.
THE WITNESS: I'm not sure about minerals.
MS. BRANCH: Okay.
BY MS. BRANCH:
Q Did you expect it to have any minerals?
A I don't know.
Q So you had no expectation at all about minerals?
MR. REZVANI: Objection.

Page 184

THE WITNESS: No.
BY MS. BRANCH:
Q Are you familiar with any minerals?
MR. REZVANI: Objection.
THE WITNESS: No.
BY MS. BRANCH:
Q Have you ever heard of iron?
A Oh, okay. Yes.
Q Have you ever heard of zinc?
A Yes.
Q Any other minerals you can think of that you are familiar with?
A No.
Q And when you purchased Flintstones, did you expect it to contain all minerals that exist?
MR. REZVANI: Objection.
THE WITNESS: I'm not -- I'll still not sure.
MS. BRANCH: Okay.
BY MS. BRANCH:
Q So you didn't have any expectation of whether it contained all minerals?
MR. REZVANI: Objection.
THE WITNESS: Well, it's supposed to be multivitamins, so I'm not sure on the minerals.

Page 185

MS. BRANCH: Okay.
BY MS. BRANCH:
Q But you do know that there are minerals in multivitamin products?
MR. REZVANI: Objection.
THE WITNESS: I don't.
MS. BRANCH: Okay.
BY MS. BRANCH:
Q So why are you defining the complete to mean all vitamins but not minerals?
MR. REZVANI: Objection.
THE WITNESS: Because it's multivitamins, not -- it don't say mineral. It say multivitamin.
BY MS. BRANCH:
Q So that's based off of the word "multivitamin" on the product?
A Right.
Q Okay. You didn't expect it to have all vitamins and minerals that exist; right?
MR. REZVANI: Objection.
THE WITNESS: Again, I'll not -- I don't know about the minerals.
BY MS. BRANCH:
Q You don't know what you expected?
MR. REZVANI: Objection.

Page 186

THE WITNESS: I didn't expect -- you said I didn't expect it to have all the multivitamins? No, I did.
BY MS. BRANCH:
Q You expected it to have all multivitamin -- sorry, all vitamins and minerals that exist?
MR. REZVANI: Objection.
THE WITNESS: I don't know about the minerals.
MS. BRANCH: Okay.
THE WITNESS: So the multivitamins, I expected it to have what it was supposed to have.
MS. BRANCH: Okay.
BY MS. BRANCH:
Q And when you say, "supposed to have," does that mean all vitamins that exist?
MR. REZVANI: Objection.
THE WITNESS: No.
MS. BRANCH: Okay.
BY MS. BRANCH:
Q Are you familiar with the term "essential vitamins"?
A No, no, I don't think so.
Q Are you familiar with what the FDA says about essential vitamins?

Page 187

A No.
Q Or how many there are?
A No.
Q Okay. I'm handing the court reporter what will be marked as -- it was previously marked as Exhibit No. 2 in a prior deposition, but it will now be marked as Exhibit No. 9 to this deposition.
For the record it's the Flintstones Gummies Complete bottle.
(Defendant's Exhibit 9 was marked for identification by the Certified Shorthand Reporter and is attached hereto.)
MS. BRANCH: And then I'm going to go ahead and mark of the Flintstones Sour Gummies as well. Actually, I'm going to wait on that one. I might not need it.
MR. REZVANI: Do you have an extra copy of the vitamins.
THE WITNESS: I don't, sorry.
MR. HEIKALI: Morgan, for the record can you read the trademark date on the bottle just so we know it's not something that's like from 2010 or to the extent something's changed.
MS. BRANCH: Well, it's the same label that's in the complaint.

Page 188

MR. HEIKALI: Okay.
MS. BRANCH: Okay.
BY MS. BRANCH:
Q And if you could just grab that bottle.
A (Witness complies.)
Q Does this look familiar to you?
A Yes.
Q And is that the gummy -- the Flintstones Gummies product that you purchased?
A Yes.
Q And the one that is outlined in the complaint that you filed against Bayer?
A Yes.
Q Okay. Now, can you please just turn it around and look at the supplement facts?
A (Witness complies.)
Q And just generally what does the supplement facts say just looking at the label? What type of information does it provide?
MR. REZVANI: Objection to form.
THE WITNESS: Are you asking me what it says right here (indicating)?
MS. BRANCH: Well, let's break it down.
BY MS. BRANCH:
Q What does it say at the top? What is the

Page 189

first thing it says?
A The directions?
Q Uh-huh.
A Yes.
Q And are these directions you referenced earlier that you read?
A Yes.
Q And are these directions right above the supplement facts?
A Yes.
Q Okay. And does the supplement facts also list the ingredients in the product?
A The supplement facts?
Q Sorry, if you just turn the label and you see ingredients?
A Oh.
Q Are the ingredients listed on the label?
A Yes.
Q Okay. And going back to the supplement facts panel, does it contain which vitamin -- does it outline which vitamins are in the product?
A Yes.
Q Okay. And does it outline other things such as zinc?
A Yes.

Page 190

Q And are you familiar with zinc?
A I heard of it.
Q Okay. Now I want to look at the quantities. It says the percent daily value for adults and the percent daily value for children.
Do you see that?
A Yes.
Q Okay. And then it lists the percentages under that; right?
A Oh, wait a minute.
Are we on the same part?
Q So if you look at the percent daily values for children?
A Yes.
Q Next to each vitamin it has a percent; right?
A Uh-huh.
Q And what is the percentage for children for vitamin A?
A Okay. Forty percent.
Q Okay. And I guess just going back.
Do you understand what the percent daily value is?
A No.
Q Okay. It's the percent one needs in a day.

Page 191

MR. REZVANI: Objection.
BY MS. BRANCH:
Q Does that sound familiar?
MR. REZVANI: Objection.
THE WITNESS: To the percent one needs?
BY MS. BRANCH:
Q What's called the percent daily value.
Do you see that?
A Yes.
Q Okay. So the daily value of a certain vitamin that one needs.
Do you see that?
A Okay.
Q Okay. So here it says, as you said, 40 percent for vitamin A; right?
A Right.
Q And that's less than a hundred percent?
A Yes.
Q Okay. And for vitamin C, what does it say?
A Thirty-eight percent.
Q And that's also less than a hundred percent; right?
A Yes.
Q Okay. And then vitamin D, what's the percentage?

Page 192

A Seventy-five percent.
Q Okay. And that's also less than a hundred percent?
A Yes.
Q Okay. And it also says B6, what's the percentage for B6?
A Seventy-one percent.
Q Okay. And that's also less than a hundred percent?
A Yes.
Q Okay. So earlier you testified that you expected there to be a hundred percent of all vitamins in the product.
MR. REZVANI: Objection.
BY MS. BRANCH:
Q Do you remember that?
MR. REZVANI: Objection.
THE WITNESS: Yes.
BY MS. BRANCH:
Q But if you turn the supplement facts over, you can see the percentages; right?
A Right.
Q Okay. But you are not suing over whether the product has less than a hundred percent of the daily value; right?

Page 193

MR. REZVANI: Objection.
THE WITNESS: No.
MS. BRANCH: Okay. Okay. I'm at a good stopping point just for a five-minute break.
MR. REZVANI: Sure.
MS. BRANCH: Actually, do you guys want to go ahead and have lunch.
MR. REZVANI: It's up to you guys.
MS. BRANCH: Oh, it's not even here yet.
MR. COHN: Oh, yeah, it's not here. So a take a five-minute break for the non-existent food.
MS. BRANCH: Sorry, got everyone excited.
THE VIDEOGRAPHER: This will mark the end of media unit number two. Going off the record at 11:17 a.m.
(Lunch recess taken.)
THE VIDEOGRAPHER: We're back on the record and this marks the beginning of media unit number three and the time is 12:00 p.m.
Go ahead.
BY MS. BRANCH:
Q Ms. Woods, earlier you agreed that you can get vitamins through orange -- through eating oranges; right?
MR. REZVANI: Objection.

Page 194

THE WITNESS: Yes.
BY MS. BRANCH:
Q And you agreed that you can get vitamins through eating cereal; right?
MR. REZVANI: Objection.
THE WITNESS: I don't recall that.
BY MS. BRANCH:
Q Well, you said that you saw vitamins listed on the back of the cereal box when you looked at it; right?
A Yes.
Q And so you agreed that you can get vitamins through cereal?
MR. REZVANI: Objection to form.
THE WITNESS: Yes.
BY MS. BRANCH:
Q So you agree that you can get vitamins through food; right?
MR. REZVANI: Objection.
THE WITNESS: Yes.
BY MS. BRANCH:
Q And you can get vitamins from other sources others than taking a multivitamin; right?
MR. REZVANI: Objection.
THE WITNESS: Yes.

Page 195

BY MS. BRANCH:
Q And that a multivitamin supplement should not replace the food that you eat; right?
MR. REZVANI: Objection.
THE WITNESS: I didn't say that.
BY MR. REZVANI:
Q No, but do you agree that a multivitamin cannot replace the food that you eat?
MR. REZVANI: Objection.
THE WITNESS: Yes.
MS. BRANCH: Okay.
BY MS. BRANCH:
Q Now, I want to go back to the way you've defined the word "complete," which the record reflects is all the vitamins that were -- that it should have or supposed to have.
Do you recall that?
MR. REZVANI: Objection.
THE WITNESS: Yes.
BY MS. BRANCH:
Q And that you expected it to contain a hundred percent of all the vitamins it should have; right?
MR. REZVANI: Objection.
THE WITNESS: Yes.

Page 196

MS. BRANCH: Okay.
BY MS. BRANCH:
Q But you don't know which vitamins it's supposed to have?
MR. REZVANI: Objection.
THE WITNESS: No.
BY MS. BRANCH:
Q And you don't know the amount of vitamins it's supposed to have?
MR. REZVANI: Objection.
THE WITNESS: No.
MS. BRANCH: Okay.
BY MS. BRANCH:
Q So going back to the label, which I think we were discussing right before lunch, you would agreed that if you had simply turned the bottle around, you would have seen which vitamins the product contained; right?
MR. REZVANI: Objection.
THE WITNESS: Right.
BY MS. BRANCH:
Q And you would have seen that the product did not contain a hundred percent of the vitamins; right?
MR. REZVANI: Objection.

Page 197

THE WITNESS: Right.
BY MS. BRANCH:
Q And would you have seen the minerals that it contained?
MR. REZVANI: Objection.
THE WITNESS: I can't answer that with a yes or a no.
BY MS. BRANCH:
Q Well, you would have seen all of the ingredients in the product?
A Yes.
Q Okay. Now, just looking back at the label, when you bought it, had you looked, you would have seen that it does contain vitamin A; right?
MR. REZVANI: Objection.
THE WITNESS: Right.
BY MS. BRANCH:
Q And if you had looked you would see that it does contain vitamin C; right?
MR. REZVANI: Objection.
THE WITNESS: Right.
BY MS. BRANCH:
Q And if you had looked you would have seen that it contains vitamin D?
MR. REZVANI: Objection.

Page 198

THE WITNESS: Right.
BY MS. BRANCH:
Q And if you looked you would have seen that it contains vitamin E?
MR. REZVANI: Objection.
THE WITNESS: Right.
BY MS. BRANCH:
Q And you would have seen that it contains vitamin B6?
MR. REZVANI: Objection.
THE WITNESS: Right.
BY MS. BRANCH:
Q You would have seen that it contains folic acid?
MR. REZVANI: Objection.
THE WITNESS: Right.
BY MS. BRANCH:
Q You would have seen that it contains vitamin B12?
MR. REZVANI: Objection.
THE WITNESS: Right.
BY MS. BRANCH:
Q And biotin?
MR. REZVANI: Objection.
THE WITNESS: Right.

Page 199

BY MS. BRANCH:
Q And pantothenic acid?
MR. REZVANI: Objection.
THE WITNESS: Right.
BY MS. BRANCH:
Q And iodine?
MR. REZVANI: Objection.
THE WITNESS: Right.
BY MS. BRANCH:
Q And zinc?
MR. REZVANI: Objection.
THE WITNESS: Right.
BY MS. BRANCH:
Q And if you had simply turned the bottle around, you had also would have seen that it does not contain vitamin B1; is that true?
MR. REZVANI: Objection.
THE WITNESS: Right.
BY MS. BRANCH:
Q And if you had simply turned the bottle around, you would have seen that it does not contain vitamin B2; right?
MR. REZVANI: Objection.
THE WITNESS: Right.
//

Page 200

BY MS. BRANCH:
Q You would have seen that it does not contain vitamin B3 had you turned the bottle around?
MR. REZVANI: Objection.
THE WITNESS: Right.
BY MS. BRANCH:
Q And you would have seen that it does not contain vitamin BK, had you looked at the label; right?
MR. REZVANI: Objection.
THE WITNESS: Right.
BY MS. BRANCH:
Q But you didn't see any of this because you didn't look at the supplement facts; right?
MR. REZVANI: Objection.
THE WITNESS: Right.
BY MS. BRANCH:
Q And you saw the cereal box had sugar and sodium; right?
A Right.
Q And you looked because you cared that the -- whether there was sugar and sodium in the product that you were buying; right?
MR. REZVANI: Objection.
THE WITNESS: Right.

Page 201

BY MS. BRANCH:
Q And you looked because it mattered to you because you knew that you had an issue with sugar and sodium; right?
MR. REZVANI: Objection.
THE WITNESS: Right.
BY MS. BRANCH:
Q But you didn't look at the label for any of the children's multivitamins you purchased; is that true?
MR. REZVANI: Objection.
THE WITNESS: True.
BY MS. BRANCH:
Q You didn't look at the label for the Flintstones Gummies?
MR. REZVANI: Objection.
THE WITNESS: True.
BY MS. BRANCH:
Q And you never looked at the label for children's multivitamins before you buy them; is that true?
MR. REZVANI: Objection.
THE WITNESS: True.
BY MS. BRANCH:
Q And you never looked to see what vitamins

Page 202

are in there?
MR. REZVANI: Objection.
THE WITNESS: True.
BY MS. BRANCH:
Q And you never looked to see what percentage of vitamins are in there?
MR. REZVANI: Objection.
THE WITNESS: True.
BY MS. BRANCH:
Q Because it didn't matter to you what vitamins were in the product; right?
MR. REZVANI: Objection.
THE WITNESS: No.
BY MS. BRANCH:
Q It mattered to you that there was sugar and sodium in cereal; right?
MR. REZVANI: Objection.
THE WITNESS: Right.
BY MS. BRANCH:
Q And that's why you looked?
MR. REZVANI: Objection.
THE WITNESS: Right.
BY MS. BRANCH:
Q But you didn't look because it didn't matter to you in children's multivitamins?

Page 203

MR. REZVANI: Objection; this is argumentative. This is asked and answered. But note my objection. You can keep going.
THE WITNESS: No.
BY MS. BRANCH:
Q No, it didn't matter to you?
MR. REZVANI: Objection.
THE WITNESS: That's not what I said.
MS. BRANCH: Okay.
BY MS. BRANCH:
Q So my question was: It didn't matter to you what the label said for children's multivitamins; isn't that true?
MR. REZVANI: Objection.
THE WITNESS: That's not true.
MS. BRANCH: Okay.
BY MS. BRANCH:
Q So why else wouldn't you look?
MR. REZVANI: Objection.
THE WITNESS: I didn't look because it said, "complete."
BY MS. BRANCH:
Q You also didn't look at the Princess label, did you?
A No.

Page 204

Q And you also didn't look at the back of the label of the Equate, did you?
MR. REZVANI: Objection.
THE WITNESS: No.
BY MS. BRANCH:
Q And you also didn't look at the back of the label of the prenatal vitamins, did you?
MR. REZVANI: Objection; asked and answered. We have gone through this. And now you are overdoing it again.
So again, note my objection. But you can continue if you like.
MR. COHN: You are welcome to call the judge, otherwise your speaking objections are inappropriate.
MR. REZVANI: They're not my speaking objection. It's prejudiced. Go ahead.
MR. COHN: Absolutely. Let Morgan ask the witness questions. She's gone back and forth on some things to try and create a clean record which I would suppose you would want as well.
MR. REZVANI: I'm making objections. I'm not making speaking objections.
MR. COHN: Oh, you are.
MR. REZVANI: I'm not getting in the way of

Page 205

the deposition.
MR. COHN: Let her ask the questions.
MR. REZVANI: She can ask all the questions she wants and just let me object which is what I'm supposed to do.
MR. COHN: Okay.
BY MS. BRANCH:
Q You didn't look at the supplement facts when you bought Equate because it didn't matter to you what was in the product; right?
MR. REZVANI: Objection; argumentative. Asked and answered.
THE WITNESS: No, that's not true.
MS. BRANCH: Okay.
BY MS. BRANCH:
Q So why didn't you look at the label for Equate?
MR. REZVANI: Objection.
THE WITNESS: Because it didn't say, "complete."
MS. BRANCH: Okay.
BY MS. BRANCH:
Q So what about Princess? Why didn't you look at the back of the label?
MR. REZVANI: Objection.

Page 206

THE WITNESS: It didn't say, "complete."
MS. BRANCH: Okay.
BY MS. BRANCH:
Q And what about the prenatal vitamins? Why didn't you look at the back of the prenatal vitamins?
MR. REZVANI: Objection.
THE WITNESS: No particular reason on that one.
MS. BRANCH: Okay.
BY MS. BRANCH:
Q But you -- it's your practice not to look at the back of children multivitamins labels before you buy them; right?
MR. REZVANI: Objection.
THE WITNESS: I haven't.
MS. BRANCH: Okay.
BY MS. BRANCH:
Q I just want to the clarify one thing for the record.
You testified earlier that you took Flintstones as a kid; right?
A Right.
Q And what type of Flintstones product did you take?
A The tablets.

Page 207

Q Okay. The chewable tablets?
A Chewables, yes.
Q Okay. And how long did you take them as a kid?
A Not very long.
Q Okay.
A We probably had them every once in a while.
Q And it was something that you enjoyed taking as a kid?
A Yeah, I liked them.
Q And you -- when you went to buy Flintstones products you recognize that because you took it as a kid; right?
MR. REZVANI: Objection.
BY MS. BRANCH:
Q You recognized the product on the shelf, the Flintstones product on the shelf because you took it as a kid; right?
MR. REZVANI: Objection.
THE WITNESS: I don't think because I took them as a kid, but I recognized it.
BY MS. BRANCH:
Q You were familiar with it?
A I'm familiar with it.
Q And that's partly because you took them

Page 208

when you were a kid?
A No.
MR. REZVANI: Objection.
MS. BRANCH: Okay.
BY MS. BRANCH:
Q But you were familiar with the product because you took them as a kid; right?
MR. REZVANI: Objection.
THE WITNESS: Not so much.
BY MS. BRANCH:
Q Well, you remember taking them when you were a kid?
A Yes.
Q Okay. So when you saw them you knew that you had taken them as a kid; right?
A Right.
MR. REZVANI: Objection.
MS. BRANCH: Okay.
BY MS. BRANCH:
Q Now, earlier you also testified that your daughter prefers gummies over the chewable; right?
A Right.
Q Okay. And is it the case that you prefer to purchase vitamins that your child will enjoy?
MR. REZVANI: Objection.

Page 209

THE WITNESS: Yes.
BY MS. BRANCH:
Q And you would prefer to purchase a vitamin that -- you would prefer to purchase a vitamin that doesn't taste or smell bad; right?
MR. REZVANI: Objection.
THE WITNESS: Correct.
MS. BRANCH: Okay.
BY MS. BRANCH:
Q Now, I know you mentioned a few types of multivitamins that you purchased that we didn't know about before today, including the Princess Multivitamin, the Equate Multivitamin.
Have you seen -- understanding you haven't -- at least I don't think -- purchased other children's multivitamins.
Have you seen other children's multivitamin gummies in the store?
MR. REZVANI: Objection.
THE WITNESS: Yes.
BY MS. BRANCH:
Q What, just off the top of your head, other brands of children's multivitamins have you seen?
A I don't know the brand, but I could just tell you what -- like a Sponge Bob or something.

Page 210

Q Okay. Any other characters that you've seen?
A I have, but I can't think of the name. It's some little kid or something on there. I think it's a boy. I'm not --
Q Okay.
A I can't remember the name.
Q Okay. So you've mentioned Disney characters. Obviously the Flintstones characters and maybe a boy that you don't remember the name and Sponge Bob.
Any other characters that you can think of.
A No.
Q Is that something that you notice when you are looking at multivitamins?
A Yeah, I noticed it.
Q Okay. Now, I'm handing the court reporter -- I'm sorry, I only have one. They're -- you know.
MR. REZVANI: Okay. We'll just take pictures.
MS. BRANCH: They're heavy.
MR. REZVANI: That's okay.
MS. BRANCH: So this is previously marked as Exhibit No. 8 in a prior deposition but will be mark as Exhibit No. 10.

Page 211

(Defendant's Exhibit 10 was marked for identification by the Certified Shorthand Reporter and is attached hereto.)
BY MS. BRANCH:
Q Now, Ms. Woods, just for the record, this is a bottle of L'il Critters Gummy Vites Complete Multivitamin.
Do you recognize this brand?
A Yeah.
Q Okay. So it's something you've seen in the store?
A Yeah.
Q Okay. Have you ever purchased it before?
A No.
Q And to your knowledge is this another gummy multivitamin for kids?
A Yes.
Q Okay. And does it have "complete" on the bottle as well?
A It does.
Q Okay. Now, if you could please turn it around?
A (Witness complies).
Q Do you see anywhere the -- listed vitamin B1?

Page 212

A No.
Q Okay. Do you see anywhere listed vitamin B2?
A No.
Q What about B3?
A No.
Q And what about vitamin K?
A No.
Q Okay. And did you compare the Flintstones product to this product when you bought it?
A No.
Q Would you agree that this product also says "complete"?
A Yes.
Q Okay. And that it's also missing vitamins B1, B2, B3 and K?
MR. REZVANI: Objection.
THE WITNESS: Yes.
MS. BRANCH: Okay.
BY MS. BRANCH:
Q But you didn't know that because you didn't turn it around and look at it at the store?
A I don't know that --
MR. REZVANI: Objection that she even looked at that.

Page 213

THE WITNESS: Yeah.
MS. BRANCH: Okay.
BY MS. BRANCH:
Q But I'm just asking. You never saw that, picked it up, turned it around and looked at it?
A No.
Q Okay. I'm now handing you what was previously marked as Exhibit No. 9 at a prior deposition, but what will now be marked as Exhibit No. 11.
(Defendant's Exhibit 11 was marked for identification by the Certified Shorthand Reporter and is attached hereto.)
MR. REZVANI: Morgan, are you done with those two?
MS. BRANCH: Yes. Well, maybe just keep that one, but the gummy -- the L'il Critters is fine.
BY MS. BRANCH:
Q Now, Ms. Woods, is this the Disney -- the Princess Multivitamin Gummy that you mentioned before?
A I don't think so.
Q Okay. Why don't you think so?
A Because I believe it just had one girl on there.

Page 214

Q Okay. But was it the same Disney brand with Disney princesses?
MR. REZVANI: Objection.
THE WITNESS: I'm not sure.
MS. BRANCH: Okay.
BY MS. BRANCH:
Q Well, the Princess product that you said you bought, were the princesses on the front Disney princesses or a different type of princess?
A I'm not sure.
Q Okay. Could this have been the product that you purchased?
MR. REZVANI: Objection.
THE WITNESS: I don't know.
BY MS. BRANCH:
Q Is it possible?
A I'm not --
MR. REZVANI: Objection.
THE WITNESS: I'm not sure.
MS. BRANCH: Okay.
BY MS. BRANCH:
Q And have you heard of the Disney multivitamins before?
A Heard of them?
Q Have you seen them in the store?

Page 215

A I can't really say if I've seen this one. I don't know. I don't know.
Q Okay. But you've seen multivitamins with princess characters?
A Yes.
Q Okay. And is this also a gummy multivitamin for kids?
A Yes.
Q Okay. And does it have "complete" on the front?
A Yes.
Q Just like the L'il Critters that we looked at before?
A Yes.
Q Okay. And if you turn it around, can you just -- and I won't have you go through it, but can you see -- can you just look and see whether there's vitamins B1, B2, B3 or vitamin K?
A No.
Q Okay. And when you bought Flintstones, did you pick this bottle up and look at it and compare the label?
A No.
Q Okay. Now, if this were the same product that you purchased, do you recall noticing the word

Page 216

"complete" on the product before you brought it?
MR. REZVANI: Which one are we talking about?
MS. BRANCH: The Princess product.
THE WITNESS: No.
MS. BRANCH: Okay.
BY MS. BRANCH:
Q So you didn't notice the word "complete" when you purchased that before?
MR. REZVANI: Objection.
THE WITNESS: No.
MS. BRANCH: Okay.
BY MS. BRANCH:
Q And you didn't turn the label around then to look at the supplement facts?
MR. REZVANI: Objection.
THE WITNESS: No.
MS. BRANCH: Okay.
BY MS. BRANCH:
Q Did you ever notice other products on the shelf that had the word "complete" when you purchased multivitamins?
MR. REZVANI: Objection.
THE WITNESS: No.
//

Page 217

BY MS. BRANCH:
Q You never noticed any other product that had the word "complete"?
A No.
Q Okay. But we've seen that there are other products that have the word "complete"?
MR. REZVANI: Objection.
THE WITNESS: Right.
BY MS. BRANCH:
Q So you are here today as the class representative; right?
A Right.
Q And how would you define the class in this case?
MR. REZVANI: Objection.
THE WITNESS: The class is everyone who purchased the multivitamins.
BY MS. BRANCH:
Q Do you know how big that class is?
A I don't.
Q Do you know the time period that the class covers?
A I don't.
Q Do you personally know any of the individuals who fall within the class that you

Page 218

represent?
A I don't.
Q Do you know of any common characteristics you share with the other members, aside from purchasing the product?
MR. REZVANI: Objection.
THE WITNESS: No.
BY MS. BRANCH:
Q Have you spoken with any class members?
A No.
Q Have you asked any of the class members about why they purchased the Flintstones?
MR. REZVANI: Objection.
THE WITNESS: No.
BY MS. BRANCH:
Q Have you spoken with anybody about why they chose to buy children's multivitamins?
MR. REZVANI: Objection.
THE WITNESS: No.
BY MS. BRANCH:
Q Or the reason for their purchase?
MR. REZVANI: Objection.
THE WITNESS: No.
BY MS. BRANCH:
Q Have you spoken with anybody who's

Page 219

purchased the Flintstones Gummies?
A No.
MR. REZVANI: Objection.
BY MS. BRANCH:
Q Have you spoken with anybody about the word "complete" on children's multivitamins?
MR. REZVANI: Objection.
THE WITNESS: No.
BY MS. BRANCH:
Q Have you spoken with anybody about the word "complete" on Flintstones that might be in the class?
MR. REZVANI: Objection.
THE WITNESS: No.
BY MS. BRANCH:
Q Have you ever asked anybody how they interpret the word "complete" on the Flintstones label?
MR. REZVANI: Objection; this is all asked and answered. She said she hasn't spoken to any of the class members. But note my objection.
THE WITNESS: No.
BY MS. BRANCH:
Q Have you ever asked anybody whether they shared your interpretation of their word "complete" of the vitamins the product should have?

Page 220

MR. REZVANI: Objection.
THE WITNESS: No.
BY MS. BRANCH:
Q Do you know why any other class members made the decision to purchase Flintstones?
MR. REZVANI: Objection.
THE WITNESS: No.
BY MS. BRANCH:
Q Do you know what the other class members' reasoning for purchasing Flintstones Gummies was?
MR. REZVANI: Objection.
THE WITNESS: No.
BY MS. BRANCH:
Q Do you know what bottles or labels any of the class members saw?
MR. REZVANI: Objection.
THE WITNESS: No.
BY MS. BRANCH:
Q Do you know whether any of the class members read packaging and labeling before making their purchases?
MR. REZVANI: Objection.
THE WITNESS: No.
BY MS. BRANCH:
Q Do you agree that there are different

Page 221

reasons why someone would purchase multivitamins?
MR. REZVANI: Objection.
THE WITNESS: Yes.
MS. BRANCH: Okay.
BY MS. BRANCH:
Q Do you think one of those reasons is brand loyalty?
MR. REZVANI: Objection.
THE WITNESS: I'm not sure.
BY MS. BRANCH:
Q Could be, though?
MR. REZVANI: Objection.
THE WITNESS: I'm not sure.
MS. BRANCH: Okay.
BY MS. BRANCH:
Q What about price? Do you think that's one consideration that consumers take when they are purchasing multivitamins?
A Yes.
Q What about the characters? Whether their kids like the characters, do you think that's one thing that people consider when they are purchasing vitamins?
A Could be.
Q Okay. Do you think it's the taste, whether

Page 222

their kids like the product?
A Could be.
Q And is another reason that maybe it's recommended by a friend and that's why someone would purchase a certain multivitamin?
A Maybe.
Q It could be that it was recommended by a physician, that might be another reason to choose a certain type of multivitamin; right?
A Right.
Q It could also be the form, like it was with your daughter, gummy versus the chewable; right?
A Right.
Q And that's another reason why someone might choose one vitamin over another; is that true?
A It could be true.
Q It could be other statements on the bottle; right?
MR. REZVANI: Objection.
THE WITNESS: It could be.
BY MS. BRANCH:
Q So, at least for the Flintstones Gummies, it says, "Number one pediatrician recommended brand."
That could be a reason why someone would choose Flintstones; right?

Page 223

MR. REZVANI: Objection.
THE WITNESS: Could be.
BY MS. BRANCH:
Q And it could be other claims like healthy for bones; right?
MR. REZVANI: Objection.
THE WITNESS: Right.
BY MS. BRANCH:
Q It could be that someone's child has a specific need for a type of vitamin; right?
MR. REZVANI: Objection.
THE WITNESS: Right.
BY MS. BRANCH:
Q Why did you switch to the Flintstones Gummies before?
MR. REZVANI: Objection.
THE WITNESS: Because I want her to taste it, the chewable.
MS. BRANCH: Okay.
BY MS. BRANCH:
Q And why is that?
A No particular reason.
Q Was it because you took the chewable as a kid?
A No.

Page 224

Q Okay. You just wanted her to try something different?
MR. REZVANI: Objection.
THE WITNESS: Yes.
BY MS. BRANCH:
Q Any other reason?
MR. REZVANI: Objection.
THE WITNESS: No.
MS. BRANCH: Okay.
BY MS. BRANCH:
Q Do you know whether other consumers get enough B1 through diet alone?
A No.
Q Do you know whether consumers get enough B2 from diet alone?
A No.
Q Do you know whether consumers get enough B3 through their diet alone?
A No.
Q Do you know that grains are enriched with vitamins B1, B2 and B3?
MR. REZVANI: Objection.
THE WITNESS: No.
BY MS. BRANCH:
Q Do you know that the government requires

Page 225

that grains be enriched with vitamins B1, B2 and B3?
MR. REZVANI: Objection.
THE WITNESS: No.
BY MS. BRANCH:
Q Did you know that children -- the vast majority of children get sufficient B1, B2 and B3 from diet alone?
MR. REZVANI: Objection.
THE WITNESS: No.
BY MS. BRANCH:
Q Did you know that consumers -- the vast majority of consumers get enough vitamin K through their diet?
MR. REZVANI: Objection.
THE WITNESS: No.
BY MS. BRANCH:
Q Knowing that children get enough B1, B2 and B3 from grains and from their diet, do you think they should supplement their diet with additional B1, B2 and B3?
MR. REZVANI: Objection.
THE WITNESS: I don't that.
BY MS. BRANCH:
Q Do you know how much other class members paid for the Flintstones Gummies?

Page 226

A No.
Q And you don't know how much you paid for the Flintstones Gummies?
A I don't remember.
Q Okay. And even if you knew how much you paid at retail, do you know how much the wholesale price is for the product?
A No.
Q You don't know how much Wal-Mart paid Bayer to buy the products that it sells?
A No.
Q Okay. Do you have any agreement with your attorneys that you'll get paid after this lawsuit?
MR. REZVANI: Objection. Don't answer. Privileged.
BY MS. BRANCH:
Q Do you have an agreement that they'll pay your expenses, such as sitting here today for a deposition?
MR. REZVANI: Objection. Don't answer. Privileged.
BY MS. BRANCH:
Q Do you have an agreement that they'll pay for your ride to and from the deposition and expenses like that?

Page 227

MR. REZVANI: Objection; privileged. Don't answer.
BY MS. BRANCH:
Q Who paid for you to be here today?
MR. REZVANI: Objection; privileged. Don't answer.
BY MS. BRANCH:
Q Do you have an arrangement for a division of any damage award that you might get through this case?
MR. REZVANI: Objection; privileged. Don't answer.
BY MS. BRANCH:
Q When you decided not to purchase Flintstones anymore, did you seek a refund from Bayer?
A No.
Q Did you seek a refund from Wal-Mart?
A No.
Q Did you know that Bayer provides a hundred percent refund for any reason?
MR. REZVANI: Objection.
THE WITNESS: No.
BY MS. BRANCH:
Q But you continued to buy Flintstones 13

Page 228

times over the years?
MR. REZVANI: Objection.
THE WITNESS: Yes.
MS. BRANCH: Okay.
BY MS. BRANCH:
Q Did you contact anyone at Bayer to complain about the complete?
A No.
Q Did you contact Wal-Mart to complain?
A No.
Q Are your lawyers the only ones who know about your dissatisfaction with the product?
MR. REZVANI: Objection.
THE WITNESS: Yes.
BY MS. BRANCH:
Q When you are unsatisfied with a product, do you typically contact an attorney?
MR. REZVANI: Objection.
THE WITNESS: No.
BY MS. BRANCH:
Q Have you ever contacted an attorney before about a product?
A No.
Q Have you ever clicked on any other ads on Facebook about products and lawsuits?

Page 229

A No.
Q Now, in your complaint in paragraph 11 you state that you would not have purchased the product or would have paid significantly less for the product if you would have known that the vitamins B1, B2, B3 and K were in the product.
Do you recall saying that in your complaint?
A Something like that.
Q And you say you would have paid significantly less?
A I believe so.
Q How much less would you have paid?
MR. REZVANI: Objection.
THE WITNESS: Not sure the amount.
BY MS. BRANCH:
Q Because you don't know how much you paid for it?
A I don't know --
MR. REZVANI: Objection.
THE WITNESS: -- the exact amount, no.
MS. BRANCH: Okay.
BY MS. BRANCH:
Q Do you -- how much monetary damages are you claiming in this lawsuit?

Page 230

MR. REZVANI: Objection.
THE WITNESS: I don't know.
BY MS. BRANCH:
Q Do you know the price of other competitive products?
MR. REZVANI: Objection.
THE WITNESS: No.
BY MS. BRANCH:
Q Let's start here: Do you know how much the Disney Princess brand costs?
A No.
Q Do you know how much the L'il Critters cost?
A No.
Q Do you know if it's more or less than Flintstones?
A No.
Q Okay.
MS. BRANCH: Can we take just a quick break?
MR. REZVANI: Absolutely.
THE VIDEOGRAPHER: Off the record. The time is 12:27 p.m.
(Brief interruption in proceedings.)
THE VIDEOGRAPHER: We're back on the record

Page 231

at 12:37 p.m.
Go ahead.
MS. BRANCH: We have no more questions for today. However, we are leaving the deposition open. We can meet and confer afterwards. We will be seeking further testimony both based on some of the privilege objections, as well as some of the discovery violations, but for today we are done with our questions.
MR. REZVANI: Okay. Obviously reserve the right to --
MS. BRANCH: And we can meet and confer and decide whether motion to practice is needed, but for now we are not asking any more questions.
MR. REZVANI: Okay. Thank you.
THE VIDEOGRAPHER: We're going to go off the record at 12:38 p.m. and this will conclude today's testimony by Sonnetta Woods. The total number of media units used was three and they are retained by Veritext Legal Solutions.
(Deposition ended at 12:38 p.m.)

Page 232

STATE OF CALIFORNIA )
) ss.
COUNTY OF LOS ANGELES )

I, Lynda L. Fenn, Certified Shorthand Reporter No. 12566 for the State of California, do hereby certify:

That prior to being examined, the witness named in the foregoing deposition was duly sworn to testify the truth, the whole truth, and nothing but the truth;

That said deposition was taken down by me in shorthand at the time and place therein named and thereafter reduced by me to typewritten form and that the same is a true, correct, and complete transcript of said proceedings.

Before completion of the deposition, review of the transcript [ ] was [ X ] was not requested. If requested, any changes made by the deponent (and provided to the reporter) during the period allowed are appended hereto.

I further certify that I am not interested in the outcome of the action.

Witness my hand this 26th day of November, 2019.

Lynda L. Fenn

Lynda L. Fenn, CSR, RPR

# Exhibit M


Supplement
Size: 1 gummy (2-3 years old); 2 gummies
per Container: 70; 35
Per Serving
1 Gummy (2-3 Yrs)
% Daily Value*
5
Carbohydrate 1 g **
Sugars 1 g **
1000 IU 40%
15 mg 38%
300 IU 75%
9 IU 90%
0.5 mg 71%
100 mcg 50%
1.5 mcg 50%
38 mcg 25%
Pantothenic Acid 2.5 mg 50%
15 mcg 21%
1.3 mg 18%
Daily Value based on a 2,000 calorie diet.
not established.
Wal-Mart Stores, Inc., Bentonville, AR 72716
manufactured or distributed by Bayer HealthCare LLC
Flintstones™ Complete Gummies

# Exhibit N


equate™
Children's
Multivitamin
Gummies
Multivitamin
Supplement
Vitamin D
fruit flavors
natural flavors
preservatives

# Exhibit O

# Flintstones




Have you purchased a Flintstones Complete Multivitamin Gummies supplement?

[illegible]

[illegible]

[illegible]

First name *

Last name *

[illegible] *

State of Residence *

- Select state -

Phone number

Email *

[illegible] *

Select one

[illegible]

I understand and agree that by submitting this form, I consent to being contacted by Faruqi & Faruqi regarding this investigation. I also understand and agree that submitting this form does not create an attorney-client relationship, instead, my information will be forwarded to an attorney for the purpose of a confidential review and potential representation. *

I want to be contacted by Faruqi & Faruqi LLP for other potential class action investigations

I'm not a robot

reCAPTCHA
Privacy - Terms

SEND

# Exhibit P

**From:** Benjamin Heikali
**To:** Branch, Morgan
**Cc:** Timothy J. Peter; Joshua Nassir; Cohn, Jonathan; Lally, Amy P.; Fougere, Josh; Herron, TJ
**Subject:** RE: Flintstones - Discovery
**Date:** Friday, October 25, 2019 12:07:51 PM
**Attachments:** image001.png

---

Morgan,

You should have received the supplemental Interrogatory responses last night. In regard to the production, it is our current understanding that Plaintiff's production is now complete. Plaintiff reserves the right to further supplement her discovery responses and production pursuant to Fed. R. Civ. P. 26(e)(1)(A).

Regards,
Ben

**From:** Branch, Morgan <mbranch@sidley.com>
**Sent:** Wednesday, October 23, 2019 4:17 PM
**To:** Benjamin Heikali <bheikali@faruqilaw.com>
**Cc:** Timothy J. Peter <tpeter@faruqilaw.com>; Joshua Nassir <jnassir@faruqilaw.com>; Cohn, Jonathan <jfcohn@sidley.com>; Lally, Amy P. <alally@sidley.com>; Fougere, Josh <jfougere@sidley.com>; Herron, TJ <therron@sidley.com>
**Subject:** RE: Flintstones - Discovery

Ben:

Ms. Woods has taken yet another inconsistent position that, again, raises questions about her compliance with the discovery rules. On Monday, you said that the picture of the Flintstones bottle was "the only document responsive to Defendants' RFPs." But today you are sending what appear to be bank statements and indicating there is more to come. Which is it?

This is after you said in July that Ms. Woods could produce documents and information immediately after her substitution. Three months later, now you're saying Ms. Woods will be producing "rolling productions."

These inconsistencies are precisely why we need the court to intervene. If we don't receive Ms. Woods's supplemental interrogatory responses and the rest of her responsive documents by end of day tomorrow, we are filing on Friday.

Thanks.

Morgan

**MORGAN BRANCH**
Associate

**SIDLEY AUSTIN LLP**
One South Dearborn
Chicago, IL 60603
+1 312 853 0824
mbranch@sidley.com
www.sidley.com
**SIDLEY**

**From:** Benjamin Heikali <bheikali@faruqilaw.com>
**Sent:** Wednesday, October 23, 2019 5:06 PM
**To:** Branch, Morgan <mbranch@sidley.com>
**Cc:** Timothy J. Peter <tpeter@faruqilaw.com>; Joshua Nassir <jnassir@faruqilaw.com>; Cohn, Jonathan <jfcohn@sidley.com>; Lally, Amy P <alally@sidley.com>; Fougere, Josh <jfougere@sidley.com>; Herron, TJ <therron@sidley.com>
**Subject:** RE: Flintstones - Discovery

Morgan,

Ms. Woods' production is rolling and you should have received more documents served today.

Can you please tell us how her document production is "wholly deficient"? It is unrealistic to compare the volume of production between Bayer, one of the world's largest pharmaceutical companies, to Ms. Woods, a consumer who simply purchased the product for her daughter.

Regarding your contention interrogatories, while we disagree with your position that they are appropriate, we are willing to supplement the responses with the primary facts or documents known to Ms. Woods on which she currently relies, without limiting it to

documents/facts we may uncover by the end of discovery, including from Ms. Woods' deposition, expert reports, and expert depositions. We reserve our right to supplement as we uncover more documents/facts.

I believe this takes care of your dispute and there is no need for unnecessary *ex parte* motions.

Thanks,
Ben

**From:** Branch, Morgan <mbranch@sidley.com>
**Sent:** Tuesday, October 22, 2019 12:55 PM
**To:** Benjamin Heikali <bheikali@faruqilaw.com>
**Cc:** Timothy J. Peter <tpeter@faruqilaw.com>; Joshua Nassir <jnassir@faruqilaw.com>; Cohn, Jonathan <jfcohn@sidley.com>; Lally, Amy P <alally@sidley.com>; Fougere, Josh <jfougere@sidley.com>; Herron, TJ <therron@sidley.com>
**Subject:** RE: Flintstones - Discovery

Ben:

Ms. Woods's production of a *single* document with a picture of a product not even at issue in this case is wholly deficient. It is unbelievable that Ms. Woods had any basis for the allegations in her almost 30-page Complaint based on what she has produced in discovery.

As we stated last week, we also disagree with your position on the contention interrogatories, or that the *Lucero* case is persuasive (much less authoritative) on this issue. The contention interrogatories are appropriate, are few in number and tied directly to the core allegations in Ms. Woods's Complaint, and Bayer is entitled to know what Ms. Woods relied on when she sued Bayer and what she relies on today. It cannot just be a picture of a bottle of a different product.

This lawsuit has been going on for almost two years, you've had substantial discovery from Bayer for over a year and a half, you've taken a 30(b)(6) deposition, and the parties have already exchanged expert reports. That Ms. Woods cannot provide a single fact or document to support her core contentions raises serious questions as to whether Ms. Woods had any grounds to sue Bayer in the first place. Also, your statement that there is "no way we can possibly provide you every single fact and document" is not well-taken; we already met and conferred and asked whether Ms. Woods could provide any of the primary facts or documents known to her on which she currently relies. She failed to do so.

Given the Court's expedited discovery schedule and the requirements of local rules, the soonest Bayer would be heard on a motion pursuant to Local Rules 37-2 and 37-3 is November 21, past the Court's deadline for Bayer to depose Ms. Woods. Accordingly, we will be seeking the court's guidance ex parte. We consider the discussions last week and meet and confer correspondence over the weekend and this week to be sufficient to fulfill our meet and confer obligations in light of the impasse.

You will receive notice and our motion sometime this week.

Regards,

Morgan

**MORGAN BRANCH**
Associate

**SIDLEY AUSTIN LLP**
One South Dearborn
Chicago, IL 60603
+1 312 853 0824
mbranch@sidley.com
www.sidley.com
**SIDLEY**

**From:** Benjamin Heikali <bheikali@faruqilaw.com>
**Sent:** Monday, October 21, 2019 11:45 AM
**To:** Branch, Morgan <mbranch@sidley.com>
**Cc:** Timothy J. Peter <tpeter@faruqilaw.com>; Joshua Nassir <jnassir@faruqilaw.com>; Cohn, Jonathan <jfcohn@sidley.com>; Lally, Amy P. <alally@sidley.com>; Fougere, Josh <jfougere@sidley.com>; Herron, TJ <therron@sidley.com>
**Subject:** RE: Flintstones - Discovery

Morgan,

You should have received a production served from our paralegal just a few moments ago. That is the only document responsive to Defendants' RFPs.

Regarding privilege, without waiving any privilege and reserving all rights, Ms. Woods has informed us that she has not had any communication, and is not in possession, custody, or control of any document relating to a communication, with any doctor, pharmacist, or any other Healthcare Provider regarding multivitamins as requested in RFP #5 and ROG #12.

In regards to ROGs #4-8, we noted on our prior call that contention interrogatories that ask for "all" or "every" fact supporting a contention are impermissibly overbroad. *See, e.g., Lucero v. Valdez*, 240 F.R.D. 591, 594 (D. N.M. 2007) (interrogatories requiring responding party to state "each and every fact" supporting the party's contentions are impermissibly overbroad). There's no way we can possibly provide you every single fact and document in support of a contention, especially since discovery has yet to come to a close. If Defendants want to work with us on narrowing the scope of those requests, we're happy to consider that.

Thanks,
Ben

**From:** Branch, Morgan <mbranch@sidley.com>
**Sent:** Sunday, October 20, 2019 9:07 AM
**To:** Benjamin Heikali <bheikali@faruqilaw.com>
**Cc:** Timothy J. Peter <tpeter@faruqilaw.com>; Joshua Nassir <jnassir@faruqilaw.com>; Cohn, Jonathan <jfcohn@sidley.com>; Lally, Amy P. <alally@sidley.com>; Fougere, Josh <jfougere@sidley.com>; Herron, TJ <therron@sidley.com>
**Subject:** Flintstones - Discovery

Ben:

We have not seen any documents in response to RFPs 1-2, 4, 7, and 8. You said those would be produced either Friday or yesterday. Can we expect them today?

We also have not seen supplemental responses to interrogatories 4 - 8. Can we expect those today as well?

Also, as we stated on Friday, Bayer disagrees that any patient-physician privilege applies to discussions between Ms. Woods and healthcare providers (e.g., doctors, nurses, dieticians, etc) regarding multivitamins. What Mr. Woods knew and understood about multivitamins is directly relevant to her claims against Bayer. Below are just a few citations supporting our position.

- Federal Rules of Evidence (no patient-physician privilege recognized); *see also Feldman v. Allstate Ins. Co.*, 322, F.3d 660, 666 (9th Cir. 2003) ("[m]ost evidentiary rules are procedural in nature, and the Federal Rules of Evidence 'ordinarily govern in diversity cases.'")
- Cal. Evid. Code § 996 (Patient-litigant exception to privilege claim)
- Federal Courts addressing § 996 regularly find patient-litigants waive their claim to privilege over medical records and communications with physicians when the information is directly relevant to claims at issue. *See, e.g., Plumlee v. Pfizer, Inc.*, No. 13-CV-00414-LHK, 2014 WL 690511, at *3 (N.D. Cal. Feb. 21, 2014) ("Because Plaintiff's medical history is directly relevant both to her theory of delayed discovery and to issues of class certification, the Court finds Plaintiff has waived her privilege in the requested medical records, and such medical records are relevant."); *Winons v. Emeritus Corp.*, No. 13-CV-03962-SC (JCS), 2014 WL 3421115, at *2 (N.D. Cal. July 14, 2014) (Holding that requested medical records were "directly relevant to falsity and materiality" of claim under the CLRA, and that therefore that Plaintiff waived privilege); *Taylor v. Lowe's Home Centers, LLC*, No. 2:13-CV-2003-KJM-CMK, 2014 WL 12576237, at *2 (E.D. Cal. Dec. 12, 2014) ("Defendant persuasively argues that plaintiff has put her medical and earnings history at issue by bringing the instant" lawsuit.)
- The privilege is not intended to protect what we are asking for here: discussions about multivitamins. We are not seeking information about an irrelevant medical diagnosis or treatment, or any other medical communications sometimes protected. *See, e.g., Binder v. Superior Court*, 196 Cal.App.3d 893, 898 (1987) (explaining that the purpose of the doctor-patient privilege in California is two-fold: "(1) to preclude humiliation of the patient that might follow disclosure of his ailments" and "(2) to encourage the patient's full disclosure to the physician of all information necessary for effective diagnosis and treatment of the patient.")

Please let us know by tomorrow if you intend to stand by your privilege objection.

If Ms. Woods does not comply with her discovery obligations by Monday, we will send along the joint stipulation and move forward with a motion to compel on Tuesday, seeking costs and all appropriate relief.

Thanks,

Morgan

**MORGAN BRANCH**
Associate

**SIDLEY AUSTIN LLP**
One South Dearborn
Chicago, IL 60603
+1 312 853 0824
mbranch@sidley.com
www.sidley.com
**SIDLEY**

****************************************************************************************************
This e-mail is sent by a law firm and may contain information that is privileged or confidential.
If you are not the intended recipient, please delete the e-mail and any attachments and notify us immediately.

****************************************************************************************************